# EXHIBIT C

12-19-03

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BARRY LEVINE

VS                                CV 3:03CV148(SRU)

WEBSTER INSURANCE


Deposition of MICHAEL LEVINE taken in accordance
with the Connecticut Practice Book at the Law Offices of
Carmody & Torrance LLP, 195 Church Street, New Haven,
Connecticut, before Deborah Gentile, LSR, a Licensed
Shorthand Reporter and Notary Public, in and for the
State of Connecticut on December 19, 2003, at 10:09 a.m.



DEBORAH GENTILE, LSR
LSR NO. 419



DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE              100 PEARL STREET,14th FLOOR
MADISON, CT 06443            HARTFORD, CT 06103-4506
203 245-9583                      800 839-6867



Hartford          Del Vecchio Reporting          Stamford
                      (203) 245-9583


A P P E A R A N C E S:

2

Page 1

12-19-03

ON BEHALF OF THE PLAINTIFF:

THOMAS MOUKAWSHER, ESQUIRE
MOUKAWSHER & WALSH, L.L.C.
328 MITCHELL STREET, BOX 966
GROTON, CONNECTICUT  06340
860-445-1809

ION O. SMITH, ESQUIRE
MOUKAWSHER & WALSH, L.L.C.
328 MITCHELL STREET, BOX 966
GROTON, CONNECTICUT  06340
860-445-1809

ON BEHALF OF THE DEFENDANT:

CHARLES F. CORCORAN, III, ESQUIRE
CARMODY & TORRANCE LLP
POST OFFICE BOX 1110
50 LEAVENWORTH STREET
WATERBURY, CONNECTICUT  06721
203-575-2622

KRISTI D. AALBERG, ESQUIRE
CARMODY & TORRANCE LLP
POST OFFICE BOX 1110
50 LEAVENWORTH STREET
WATERBURY, CONNECTICUT  06721
203-575-2622

ALSO PRESENT:   GERALD LEVINE
                BARRY LEVINE

Hartford        Del Vecchio Reporting        Stamford
                    (203) 245-9583

3

1            S T I P U L A T I O N S

2            IT IS HEREBY STIPULATED AND AGREED by and

3    between counsel representing the parties that each party

4    reserves the right to make specific objections at the
                    Page 2

12-19-03

20    A    When my father died?

21    Q    Yes.

22    A    Died in '64.

23    Q    Okay.

24    A    My mother owned the company a hundred percent

25 until she gifted the stocks -- the stock of the company to

Hartford          Del Vecchio Reporting          Stamford
                    (203) 245-9583

30

1 the three of us. We operated the company with both the

2 life insurance and the casualty company. Then eventually

3 --

4    Q    When did she give the stock to you?

5    A    In the '60s.

6    Q    The three of you equal?

7    A    No. It could have been the '70s. I don't know.

8 I don't know.

9    Q    Fine. Equally?

10    A    What's that?

11    Q    A third and a third and a third?

12    A    Yes. It stayed that way until we brought in as

13 partners, as shareholders, Mr. Carter, my son Barry

14 Levine.

15    Q    Okay. When was that, approximately?

16    A    Late '70s early '80s, something like that.

17    Q    All right. How much approximately was given to

18 them?

19    A    Eventually, when we gave the stock, we

20 recapitalized the corporation because we were a C

21 corporation. It was very unusual, and we were a cash

22 basis C corporation which is also very unusual; and we did

Page 27

12-19-03

23   that and we had to do that because the Government forces
24   upon us to sell my father's estate.  That was a condition
25   of the settlement.  So we recapitalized the corporation

Hartford              Del Vecchio Reporting           Stamford
                         (203) 245-9583

31

1   giving the three of the shareholders, Gerry, Herbert and
2   myself, preferred stock and then issued new stock,
3   bringing in the new shareholders.  We brought the new
4   shareholders in and there were five equal common
5   shareholders but not preferred shareholders.
6        Q    Who were the five?
7        A    Besides the three of us, Dan Carter and Barry
8   Levine.
9        Q    All right.  Now I'm not a corporate lawyer and
10  when you say we were a C corporation that was unusual, I
11  don't have the foggiest idea of what you're saying
12  although I should.  Can you tell me what that means?
13       A    C corporation is a corporation acting as a
14  separate entity.
15       Q    From what?
16       A    From a separate entity.  A separate tax entity.
17  A C corporation is a corporation acting in a separate
18  entity.  An S corporation is a corporation taxed as a
19  partnership and not taxed as a separate entity.
20       Q    You also said in your answer you operated on a
21  cash basis and that was unusual, and I don't have the
22  remotest idea of what you mean or why it was unusual.  I'd
23  like you to tell me, please.
24       A    Basically a C corporation usually accrues; a
25  cash base corporation cannot accrue.  It ends December 31,

Page 28

12-19-03

6    A    One was to borrow money to pay advanced

7 premiums.

8    Q    I don't understand that.

9    A    Well, I'm not going to explain it.  That's what

10 it is.

11    Q    I'm asking you.  You had to -- can you read that

12 piece back?

13    A    We needed the cash to pay advanced premiums.  We

14 pay advanced premiums, that's an instant tax deduction.

15    Q    Okay.  I think I understand.  Thank you.

16    A    To get the cash, we went to the bank and

17 borrowed the money.

18    Q    I understand.  Then whatever cash was left was

19 distributed?

20    A    Correct.

21    Q    Was that's distributed as, salary and also into

22 the profit sharing plan or 401k?  Was that another way?

23    A    Let's not talk about the 401k.  We had no 401k.

24    Q    There was a profit sharing plan.  Was the cash

25 distributed as salary and profit sharing?

Hartford          Del Vecchio Reporting          Stamford
                      (203) 245-9583


36
1    A    We took the whole thing into account.  We had a

2 package.

3    Q    All right.  So some of it would go to profit

4 sharing and some would go to salary?

5    A    You have to work backwards.

6    Q    What do you mean?

7    A    You don't know what goes on profit sharing plan

8 until you know your compensation.

Page 32

12-19-03

9      Q      That's right.  You decide compensation but you

10  had to save something for profit sharing?

11     A      We'd have to go back and forth until we got to

12  the figure.

13     Q      Math problem?

14     A      Exactly.

15     Q      You were the person who took charge of doing

16  that math with Mr. Cushner's help?

17     A      Even though I was a third shareholder I was the

18  boss of the company.

19     Q      Why was that?

20     A      Maybe because I have more knowledge than anybody

21  else.

22     Q      You were the authority figure?

23     A      Well, there's other reasons.  I brought in most

24  of the money.

25     Q      You were the rainmaker?

Hartford           Del Vecchio Reporting           Stamford
                        (203) 245-9583

37

1      A      I don't know what a rainmaker is.

2      Q      You were the person who brought in the business

3  and the profits?

4      A      I brought in a lot of money.

5      Q      Okay.  So you were president and you were also a

6  director, correct?

7      A      President of only the life company, not of the

8  casualty company.

9      Q      Who was the president of the casualty company?

10     A      My brother Herbert.

11     Q      Are you familiar with Retirement Planning

Page 33

12-19-03

12  Associates, Inc.?

13     A    Yes, I set it up.

14     Q    What was it?

15     A    The function of Retirement Planning Associates,

16  Inc., was one function and one function only:  To

17  administer retirement plans for a fee.  That's all the

18  function it had, strictly that function and nothing else.

19     Q    Who owned it?

20     A    Dan Carter owned a third.  I own a third, and my

21  brother Herbert own a third.

22     Q    Mr. Ger --

23     A    Dan Carter didn't own it originally.

24     Q    Who did?

25     A    I owned it and my brother owned it.

Hartford          Del Vecchio Reporting          Stamford
                     (203) 245-9583

38

1     Q    Gerald Levine didn't own any of it?

2     A    No.

3     Q    Why was that?

4     A    I don't know.  I owned it and my brother owned

5  it.

6     Q    Were you an owner of Levine Financial Services

7  or Levine Life Associates, whatever its name was, between

8  1980 and 1992, during that whole period of time?

9     A    I was a third owner.

10     Q    And also Retirement Planning Associates?

11     A    A third owner.  I was also third owner of the

12  casualty company.

13     Q    At some point did you personally sell out?

14     A    Yes.

Page 34

12-19-03

15    Q    When was that, sir?

16    A    '94.

17    Q    Why was that?

18    A    Why was that?

19    Q    Yeah.

20    A    What kind of question is that:  Why was that?

21    Q    It's a perfectly good question.  I'd like you to

22 answer, if you can.

23    A    Because I wanted to.

24    Q    Why did you want to?

25    A    Well, my brother was dying and I really didn't

Hartford          Del Vecchio Reporting          Stamford
                    (203) 245-9583

39

1 want to be partners with the other guys.  My brother and I

2 are very close.  I was not close to my other partners.

3    Q    And you were 62 at the time about?

4    A    '94, I was 64.

5    Q    Okay.  Did you sign any agreement when you left?

6    A    Yes.

7    Q    Was -- what was it called?

8    A    What was the agreement called?

9    Q    Yes.

10    A    Must have been a Sales Agreement.

11    Q    Was it actually called an employment agreement,

12 if you remember?

13    A    Part of the buyout was I received compensation

14 so they could take a deduction for it.  As far as I was

15 concerned, it's part of the buyout.

16         MR. CORCORAN, III:  Can that answer be read

17         back, please.

Page 35

```
                            12-19-03
    18            (Whereupon the last question was read
    19            by the court reporter.)
    20  BY MR. CORCORAN, III:
    21      Q    But calling it an employment agreement helped
    22  the tax situation?
    23            MR. MOUKAWSHER:  Objection to form.
    24            MR. CORCORAN, III:  The answer was
    25        strictly.
```

Hartford            Del Vecchio Reporting            Stamford
                        (203) 245-9583

```
                                                        40
    1             MR. MOUKAWSHER:  Objection to form;
    2         interposed.
    3             MR. CORCORAN, III:  Fine.  That's noted.
    4             THE WITNESS:  What does that mean?
    5             MR. MOUKAWSHER:  Just putting it on the
    6         record.
    7             MR. CORCORAN, III:  So could the last
    8         couple questions and answers be read back,
    9         please.
    10            (Whereupon prior testimony was read
    11            by the court reporter.)
    12            MR. CORCORAN, III:  When I said strictly, I
    13        was repeating your answer, was I not?  That's
    14        what you said?
    15            THE WITNESS:  I don't know what you mean by
    16        "strictly."
    17            MR. CORCORAN, III:  I don't mean anything
    18        other than to repeat what you said in response
    19        to the question.
    20            THE WITNESS:  What was the question?
```

Page 36

12-19-03

21          MR. CORCORAN, III:  Let's have the question
22      read back.
23          (Whereupon the last question was read
24          by the court reporter.)
25          MR. CORCORAN, III:  Correct?

Hartford          Del Vecchio Reporting          Stamford
                       (203) 245-9583


                                                    41
1          MR. MOUKAWSHER:  Object to the form.
2          MR. CORCORAN, III:  Yeah.  You already
3      have.  Correct?
4          MR. MOUKAWSHER:  If you are asking it
5      again, I have to object to the form again.
6          THE WITNESS:  I repeat, part of the
7      agreement was deferred comp, part was not
8      deferred comp.  You may call it an employment
9      agreement.  I call it deferred comp.  I don't
10      call it an employment agreement.  It was not an
11      employment agreement.  Where you got that word
12      from, I don't know.  It was a deferred comp.
13  BY MR. CORCORAN, III:
14      Q    What's a deferred comp?
15      A    A deferred comp is where you get compensation
16  regardless of the note, requirement of employment.
17      Q    You don't actually have to work, you simply get
18  paid?
19      A    Deferred comp is exactly what it stands for,
20  deferred comp.
21          MR. CORCORAN, III:  Can the question be
22      read back again.
23          (Whereupon the last question was read

Page 37

12-19-03

24                         by the court reporter.)

25                         THE WITNESS:  Exactly.  Correct.

          Hartford              Del Vecchio Reporting              Stamford
                                   (203) 245-9583

                                                                        42

1  BY MR. CORCORAN, III:

2        Q    Even though it's called an employment agreement?

3        A    It's not called an employment agreement.  It was

4  never called an employment agreement.  Where did you get

5  that word "employment agreement"?

6        Q    Even if you weren't actually working -- even if

7  you were not performing any services in the future, would

8  there be a tax advantage to calling it an employment

9  agreement?

10       A    An employment agreement is where you're a W2

11 employee.  A deferred comp is where you are not a W2

12 employee.  Two different things.

13       Q    You were the president of this corporation for a

14 long time?

15       A    Long time.

16       Q    And you didn't have to answer any question you

17 didn't want to.  This is different.  I'd like you to

18 listen to my question and please answer the question if

19 you can, if you understand it.

20       A    If I understand the question.

21            MR. CORCORAN, III:  Let's have the question

22       read back.

23            (Whereupon the last question was read

24            by the court reporter.)

25            MR. MOUKAWSHER:  Mr. Levine, answer that in

          Hartford              Del Vecchio Reporting              Stamford
                                   (203) 245-9583
                                     Page 38

12-19-03

43

```
 1              any responsive way that you feel is necessary.
 2              If you need to elaborate, you could elaborate.
 3                   MR. CORCORAN, III:  Sure, you could always
 4              elaborate.  Feel free.
 5                   MR. MOUKAWSHER:  If your answer has already
 6              adequately stated it, you could say that too.
 7                   THE WITNESS:  It didn't give me any tax
 8              advantages.  It gave the corporation a tax
 9              advantage.
10   BY MR. MOUKAWSHER:
11        Q    What kind?
12        A    They took a tax deduction for it.
13        Q    But you didn't perform any new services?
14        A    I didn't perform any services --
15        Q    All right.  It was -- whatever it was called, it
16   was in effect a retirement agreement, correct, what you
17   entered into with the corporation, and a deferred --
18        A    It's very important what it's called.  If it's
19   called an employment contract, I would receive a W2 and
20   pay FICA and pay Medicare tax.  If it's a deferred comp,
21   I'm not subject to FICA or Medicare tax.  Don't say it's
22   not important.  It's extremely important.
23                   MR. CORCORAN, III:  Can you read the
24              question back.
25                   (Whereupon the last question was read
```

|          | Del Vecchio Reporting |          |
|----------|-----------------------|----------|
| Hartford | (203) 245-9583        | Stamford |

44

```
 1              by the court reporter.)
                Page 39
```

12-19-03

2   BY MR. CORCORAN, III:

3       Q    I didn't use the word important in my question.

4       A    Important?

5       Q    I didn't use the word important in my question.

6       A    I never said you did.  I said it's important to

7   know the difference.

8               MR. CORCORAN, III:   Can the question be

9               read back one more time.

10              (Whereupon the last question was read

11              by the court reporter.)

12              MR. CORCORAN, III:   Then you interrupted me

13              again.

14  BY MR. CORCORAN, III:

15      Q    I'll withdraw the question.  You retired as of

16  January 1, 1992; is that correct?

17      A    I don't remember the date.

18      Q    Was it in the early '90s?

19      A    I thought it was in '94, but I could be wrong.

20  I don't know.

21      Q    But you did retire?

22      A    From the corporation I did.

23      Q    Yes.

24      A    I did not retire.

25      Q    You did -- I understand.  And you did sign an

Hartford           Del Vecchio Reporting          Stamford
                     (203) 245-9583

                                                        45

1   agreement, correct?

2       A    Correct.

3       Q    And what was the purpose of that agreement as

4   you understand it today?

Page 40

12-19-03

5    A    Buy me out.

6    Q    You didn't do any work for the -- for LLIA after

7    you entered into that agreement of buying you out, did

8    you?

9    A    No.

10    Q    Did LLIA enter into such agreements with any

11    other departing employees other than yourself, if you

12    know?

13    A    My brother.

14    Q    Is that Herbert?

15    A    Herbert.

16    Q    Also Barry?

17    A    And also Barry, but not the same kind of

18    agreement.

19    Q    When was the Barry agreement?

20    A    I don't know.

21    Q    When was the Herbert agreement?

22    A    It should have been the same time mine was.

23    Q    You said the agreement with Barry wasn't the

24    same as the agreement with you.  How did it differ?

25    A    Barry's agreement was an employment contract,

Hartford              Del Vecchio Reporting         Stamford
                          (203) 245-9583

46

1    not deferred compensation.

2    Q    Was it also a buyout?

3    A    No.  Barry's -- Barry was a W2 employer of the

4    company under the employment contract.  That's why I say

5    it's important to know the difference between the two.

6    Q    Right.  Who negotiated your agreement?

7    A    I did.

Page 41

12-19-03

54

1     A    I can't give you an example.

2     Q    The last two questions that I tried to ask you

3  cut me off.

4     A    Repeat it.

5     Q    Can you give me any examples of what you saw in

6  the early 1990s which gave you concern about Barry's

7  emotional well being?

8     A    I cannot give you an example.

9     Q    Why?

10    A    I could just see it.

11    Q    But you can't remember anything specific?

12    A    No.

13             MR. CORCORAN, III:  Okay.  Let's take five

14          minutes at this point and we'll make a copy of

15          that.

16             MR. MOUKAWSHER:  This one?

17             MR. CORCORAN, III:  Sure.

18             (Whereupon a recess took place from

19             11:12 to 11:22 p.m.)

20  BY MR. CORCORAN, III:

21    Q    Of these various entities, which entity paid

22  your paycheck during the '90s?

23             MR. MOUKAWSHER:  Objection to form.

24             THE WITNESS:  We had two entities that

25          filed one corporate return.  The casualty

Hartford          Del Vecchio Reporting          Stamford
                     (203) 245-9583

55

1             operation, Lewis Agency, Inc., and Levine

2             Financial Services, Inc., filed a joint tax

Page 49

12-19-03

3      return.  The assets were co-mingled, the profit

4      was co-mingled, the income was co-mingled and we

5      worked in one part.

6  BY MR. CORCORAN, III:

7      Q    Did you hold any licenses to sell?

8      A    Of course.

9      Q    And you still hold them?

10     A    Yes, I do.

11     Q    You were the president of the company?

12     A    I was president of the Levine Financial

13  Services.  Herbert was president of Lewis Agency, Inc.

14     Q    As president -- as a practical matter, as

15  president what did you basically do?

16     A    The only thing I did as president was at the end

17  of the year we made decisions as to -- I made a decision

18  as to who would receive what.

19     Q    By way of compensation and bonuses and stuff?

20     A    Yes.  Bonuses is compensation.

21     Q    Yeah, it is.  So you were the chief executive

22  officer of the company?

23     A    Basically, yes.

24     Q    You ran it basically?

25     A    Yes, basically -- no, I didn't run it.  I don't

Hartford           Del Vecchio Reporting         Stamford
                      (203) 245-9583

56

1  know how it ran.  I just made those decisions at the end

2  of the year.

3      Q    You made the important decisions?

4           MR. MOUKAWSHER:  Objection to form.

5           THE WITNESS:  Well, I think they're

Page 50

12-19-03

18  handwriting?

19      A    Not that I -- not that I think so.

20      Q    Okay.  Did you ever hear Mr. Carter tell Barry

21  that all of the owners were waiving their contributions

22  and he should to?

23      A    No.

24      Q    Did Barry ever tell you that that happened?

25      A    No.

Hartford            Del Vecchio Reporting        Stamford
                        (203) 245-9583

                                                        103

1      Q    .Did anyone?

2      A    No.

3      Q    Did you ever hear Dan Carter tell Barry that Dan

4  and Gerry were waiving their contributions and he should

5  also?

6      A    No.

7      Q    Did your son ever tell you what happened?

8      A    No.

9      Q    Did Barry ever talk to you about the

10  circumstances surrounding his waiver?

11              MR. MOUKAWSHER:  Objection to form.

12              THE WITNESS:  No.

13  BY MR. CORCORAN, III:

14      Q    You left LLIA around 1993 or 1994?

15      A    Yes.

16      Q    Are you aware as to whether they started a 401k

17  plan after you left?

18      A    They started, I believe, before I left.

19      Q    Okay.  Did you ever tell Barry that the plan was

20  started?

Page 93

12-19-03

21    A    No.

22    Q    Why not?

23    A    Why should I?

24    Q    He's your son.

25    A    So what?  Do I got to tell him everything?

Hartford            Del Vecchio Reporting          Stamford
                         (203) 245-9583

104

1    Q    No.

2    A    I assumed that everybody knew it.

3    Q    Did you participate in the 401k plan?

4    A    Yes.

5    Q    After you left?

6    A    You can't participate after you leave.

7    Q    So after you left you didn't.

8    A    You can't.

9    Q    After you signed your deferred compensation

10   agreement or whatever --

11   A    I was no longer an employee.

12   Q    Thanks.  So you weren't entitled to participate?

13   A    I was not.

14   Q    When did Barry start at Levine Financial?

15   A    I don't remember.

16   Q    Did he move over to the Levine Agency at some

17   point?

18   A    Yes.

19   Q    Why?

20   A    I think, as I recall today, he was unhappy and

21   wanted a different position.

22   Q    So you respected that?

23   A    Yes.

Page 94

12-19-03

24    Q    And you moved him?

25    A    I moved -- he moved.

105

1    Q    You told him he could move and so he did?

2    A    I didn't say he could move.  He just moved.  I

3    didn't run the company like you think a corporation is

4    run.  It's a family business.

5    Q    And therefore what?

6    A    We ran by the seat of our pants.

7    Q    And that -- how did that effect Barry's transfer

8    from Levine LLIA to Levine Financial?  He simply decided

9    to move and did it?

10    A    Well, no.  Everybody greed he could do it.  The

11    agreement had to come from Gerry because -- because he and

12    Herby were operating the casualty company so it had to

13    come from Herby.

14    Q    What did he do at Levine Financial?

15    A    Levine Financial?

16    Q    Yes.

17    A    He worked with me in my life insurance business.

18    Q    Selling and services?

19    A    Uh-huh.  Yes.

20    Q    Did he work for you?

21    A    He worked for the agency.

22    Q    And did he report to you directly for any

23    particular task or tasks?  Did you tell him what to do?

24    A    We communicated.

25    Q    Did you have him service your accounts in any

12-19-03

5    A    I don't know what you mean by "management roll."

6    Q    Did he make any personnel decisions?

7    A    No.  The decisions usually were made by me.

8    Q    Salary decisions you also made?

9    A    I made them all.

10    Q    Let's see.  Was Dan Carter also employed by
11 Levine Financial?

12    A    Yes.

13    Q    He worked for Retirement Planning Associates,
14 correct, but was paid out of Levine Financial?

15    A    Yes.

16    Q    Was he Barry's manager?

17    A    He should not have been.

18    Q    He really didn't have any authority over Barry,
19 did he?  He was on an equal level, correct?

20    A    He was on equal level, but I don't know --
21 there's no such thing as authority in our operation.

22    Q    He couldn't tell Barry what to do?

23    A    He couldn't tell anybody what to do.

24    Q    Who couldn't?

25    A    None of us could tell anybody what to do except

Hartford        Del Vecchio Reporting        Stamford
                    (203) 245-9583

109

1 the girls who type this out or do that.

2    Q    You were the president theoretically?

3    A    Name only.  You're stuck with that word
4 president.

5    Q    Well, I got it from you.

6    A    Well, but name only.

7    Q    Dan Carter was not Barry's boss?

Page 98

12-19-03

8      A    He wasn't suppose to be Barry's boss.

9      Q    Did Barry talk direction from anybody?

10     A    If anybody, he took it from me.

11     Q    All right.  What was Dan Carter's role in LLIA?

12     A    Dan Carter was the -- was running Retirement
13  Planning Associates.  He was planning administrator for
14  all the plans that the -- that we administered for fee
15  basis.  He was also the major trustee of our profit
16  sharing plan.  He did it almost anything he wanted to do,
17  without me knowing about it.

18     Q    Do you know whether Barry Levine takes
19  medication for his mental condition?

20     A    I don't.  I don't know.

21     Q    Do you know whether he ever has?

22     A    I don't recall.

23     Q    Do you know if he's ever been on medication for
24  mental illness?

25     A    I don't know.

110

1      Q    Are you aware if any -- okay.  You don't know
2  anything about his medication?

3      A    No.

4      Q    You don't know if he's ever taken any?

5      A    Well, he has a mental problem.  I assume he does
6  take something.  I never asked him what.

7      Q    You're not aware of it?

8      A    I don't know.

9      Q    It's purely an assumption?

10     A    It's an assumption that he has a mental

CORRECT PAGE

NAME OF CASE:  BARRY LEVINE VS WEBSTER INSURANCE

NAME OF WITNESS:  MICHAEL LEVINE

PAGE LINE          NOW READS               SHOULD READ

PAGE 30
LINES 23 + 24

THE GOVERNMENT          THE GOVERNMENT
FORCES UPON US          FORCED US TO DO THIS
TO SELL MY FATHER'S     TO SETTLE MY
ESTATE                  FATHER'S ESTATE

122

J U R A T

I have read the foregoing 121 pages
and hereby acknowledge the same to be a
true and correct record of the testimony.

_____
MICHAEL LEVINE

Subscribed and sworn to _____.

Before me this __9th__ day of __September__, 2004.


_____
Notary Public  Philip C. Scheide Jr

My Commission Expires:

PHILIP C. SCHEIDE JR.
*NOTARY PUBLIC*
MY COMMISSION EXPIRES MAR. 31, 2005

123

## C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this ___14th___ day of ___January___, 2004.

_____
Deborah Gentile
Notary Public

My commission expires: October 31, 2006

Hartford         Del Vecchio Reporting         Stamford
                     (203) 245-9583