# EXHIBIT D

BLevine122303

\*\*\* CONFIDENTIAL \*\*\*                              1

1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
2

3     - - - - - - - - - - - - - -X
                                          :
4     BARRY LEVINE,                       :
                  Plaintiff,              :
5                                         :
      VS                                  :CIVIL ACTION NO:
6                                         : 3:03CV148(SRU)
      WEBSTER INSURANCE,                  :
7                  Defendant.             :
                                          :
8     - - - - - - - - - - - - - -X

9

10

11

12

13        Deposition of BARRY LEVINE, taken pursuant to the
      Federal Rules of Civil Procedure, before Kimberly M.
14    White, CSR, LSR, (Lic#SHR433) Licensed Shorthand
      Reporter and Notary Public within and for the State
15    of Connecticut, held at the law offices of Carmody &
      Torrance LLP, 195 Church Street, New Haven,
16    Connecticut, on Tuesday, December 23, 2003 at 10:14
      a.m.

17

18

19

20

21

22             DEL VECCHIO REPORTING SERVICES
               LICENSED SHORTHAND REPORTERS
23                  117 RANDI DRIVE
                    MADISON, CT 06443
24      203-245-9583FAX 203-245-2760    800-839-6867

25    HARTFORD                                   STAMFORD


              DEL VECCHIO REPORTING SERVICES, LLC

                      203 245-9583

               \*\*\* CONFIDENTIAL \*\*\*                    2

BLevine122303

1    A P P E A R A N C E S:

2    ON BEHALF OF THE PLAINTIFF:
     THOMAS G. MOUKAWSHER, ESQ.
3    MOUKAWSHER & WALSH, L.L.C.
     328 Mitchell Street
4    Groton, Connecticut  06340

5    IAN O. SMITH, ESQ.
     MOUKAWSHER & WALSH, L.L.C.
6    21 Oak Street, Suite 100
     Hartford, Connecticut  06106

7

8

9    ON BEHALF OF THE DEFENDANT:
     CHARLES F. CORCORAN, III, ESQ.
10   CARMODY & TORRANCE LLP
     195 Church Street, 18th Floor
11   New Haven, Connecticut  06509-1950

12   KRISTI D. AALBERG, ESQ.
     CARMODY & TORRANCE LLP
13   50 LEAVENWORTH STREET
     WATERBURY, CONNECTICUT  06721-1110

14
     ALSO PRESENT:
15
     Gerald U. Levine, CPCU
16   Executive Vice President
     Webster Insurance

17

18

19

20

21

22

23

24

25


DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                          3


1          MR. CORCORAN:  Good morning.  Usual

2      stips?
                         Page 2

BLevine122303

 6         MR. CORCORAN:  He started to answer.  He

 7    said --

 8         MR. MOUKAWSHER:  Well, I need time to

 9    interpose my objection.

10         MR. CORCORAN:  Right.

11    BY MR. CORCORAN:

12    Q    Give me your answer.

13    A    Okay.  Let me be clear here.

14         MR. MOUKAWSHER:  Make sure you understand

15    the question.

16    A    That would probably be best.  If you could

17    just make sure that I heard the question --

18    BY MR. CORCORAN:

19    Q    Sure.  Absolutely.

20         (The last question was read back.)

21    A    I asked the two women that were working the

22    receptionist desk if they could please tell me what

23    happened to the calls that came for me.  I wanted

24    them to let me know what was being said about me and

25    why I wasn't receiving me calls.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    53

 1    BY MR. CORCORAN:

 2    Q    But they never did that?

 3    A    They -- oh, no.  Never happened.  Within

 4    minutes of that, the -- all hell broke loose at the

 5    office; and that was the beginning of the very end.

 6    Q    All right.  And when you say "that was the

 7    beginning of the very end," what happened after that?

Page 49

BLevine122303

 8      A      After that -- up to that point, I was on a

 9  leave of absence with the intention that I was going

10  to come back into the company at the end of the

11  summer; and after that occurrence, that was no longer

12  an option to me.  I was -- I no longer had the option

13  to be part of the office.

14      Q      Okay.  And what was -- what was the

15  chronological date of that, if you recall?  When were

16  you basically put in that position?

17      A      The conversation with the receptionist

18  occurred --

19      Q      -- which foreclosed your future at the

20  agency.

21      A      That was --

22             MR. MOUKAWSHER:  Objection to form.

23  BY MR. CORCORAN:

24      Q      When was that?

25             MR. MOUKAWSHER:  Objection to form.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    54

 1  BY MR. CORCORAN:

 2      Q      I'm asking you to put a date on it.

 3             MR. MOUKAWSHER:  You're also loading into

 4             an assumption.

 5             MR. CORCORAN:  It's based on occurrences.

 6             MR. MOUKAWSHER:  No, it isn't.

 7             MR. CORCORAN:  Okay.  Fine.  We'll argue

 8             about it --

 9  BY MR. CORCORAN:

BLevine122303

3    A    I spend my days tending to the house,

4    tending to the yard, going on the computer.  I see a

5    chiropractor once a week.  Oh, that's another

6    physician.  I see a chiropractor.

7    Q    Uh-huh.

8    A    I'm involved in my children's lives, often

9    visit them at school; help my parents, if they pick

10    up groceries from the store, carry things that are

11    heavy for them.  I was working on remodeling a

12    bathroom in my house, scrapping wallpaper off, that

13    type of thing.  So I manager to have a full day's

14    worth of things to do that are not -- you know, being

15    gainfully employed isn't one of them.

16    Q    Can you tell me -- can you give me a brief

17    summary of your educational background, sir.

18    A    Oh, absolutely.  For high school, I attended

19    a college prepor- -- college preparatory school named

20    Northfield Mount Hermon School in Mount Hermon,

21    Massachusetts; and I attended that school from 1969

22    to 1973, where I graduated.

23        Next, I went to college.  I attended the

24    University of Vermont from September of 1973 and

25    finished my first semester only of my sophomore year,

1    which ended on December of '74.

2    Q    And then where did you go for further

3    education?

4    A    I entered the business in April 1 of 1975.

BLevine122303

15    A    It's the same company that just endured a

16   name change.

17    Q    Okay.  And who were the other agency owners

18   who worked at Levine Financial or LLIA?

19    A    Michael Levine.

20    Q    Uh-huh.

21    A    Daniel Carter.

22    Q    Okay.  And were the other owners Herbert,

23   Jerry and Andrew?

24         MR. MOUKAWSHER:  Objection to form.

25   BY MR. CORCORAN:

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                        73

1    Q    Were the other agency owners Herbert, Jerry

2   and Andrew?

3         MR. MOUKAWSHER:  Objection to form.

4    A    Not at all times.

5   BY MR. CORCORAN:

6    Q    Okay.  Can you explain.

7    A    In 1982, there were five owners of the

8   business -- Michael Levine, Herbert Levine, Gerald

9   Levine, Daniel Carter and Barry Levine in 1982.

10    Q    Okay.

11    A    In 1989, Andrew Levine was added as a

12   partner at that time or fellow stockholder.

13    Q    All right.  How old are you, sir?

14    A    Forty-eight.

15    Q    So you were born in 1956, '55?

16    A    Fifty-five.

BLevine122303
DEL VECCHIO REPORTING SERVICES, LLC
203 245-9583
*** CONFIDENTIAL ***                              79

1      A    Yes.

2      Q    Do you know why the transition occurred?

3    Withdrawn.

4           Do you know whether or not the move related

5    to your difficulty in performing your job duties?

6      A    Can you rephrase that?

7      Q    Do you know if the move from one agency to

8    another was related in any way to your difficulties

9    in performing your job duties?

10           MR. MOUKAWSHER:  Objection to form.

11   BY MR. CORCORAN:

12      Q    Or not.

13           MR. MOUKAWSHER:  If you don't understand

14           the question, don't answer it.

15      A    I don't really understand it exactly.

16   BY MR. CORCORAN:

17      Q    Do you know why you were moved?

18      A    Yes.

19      Q    Why?

20      A    I had asked to be moved.

21      Q    Okay.  And you were moved from Levine Life

22   to Louis Levine, correct?

23      A    Well, at the time, it was Levine Financial

24   Services.

25      Q    Fine.  Which was a successor.

DEL VECCHIO REPORTING SERVICES, LLC
203 245-9583
Page 74

BLevine122303
*** CONFIDENTIAL ***                    80

1      A      Actually, so my paycheck became Louis Levine

2   Agency --

3      Q      Okay.

4      A      -- instead of Levine Financial Services.

5      Q      So you moved from Levine Financial to Louis

6   Levine Agency, correct?

7      A      Yes.

8      Q      Levine Financial -- at Levine Financial, you

9   worked for your father, correct?

10     A      With my father.

11     Q      With your father.

12            But when you moved to the Louis Levine

13  Agency, you were working with Jerry Levine, correct?

14            MR. MOUKAWSHER:  Objection to form.

15     A      I never really worked with Jerry Levine, no.

16  BY MR. CORCORAN:

17     Q      Okay.  Who did you work with at the Louis

18  Levine Agency?

19     A      Independent.

20     Q      Okay.  Who else worked there?

21     A      Well, when you say "there," we were all

22  under one roof, so every --

23     Q      For the Louis Levine Agency, not your

24  father, correct?

25     A      No.  I didn't work with Jerry because he was

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    81

BLevine122303

4          MR. MOUKAWSHER:  No. You're --

5          MR. CORCORAN:  This is a sensitive area.

6      Obviously, you know that; and you're all over

7      the record, and you're making it much harder

8      for me to get answers to my questions.

9          Read the question again.

10    (An off-the-record discussion was had.)

11     (The last question was read back.)

12         MR. MOUKAWSHER:  Objection to the form of

13     the question.

14         And I instruct the witness:  If you don't

15     understand the question, don't answer it; if

16     you need to answer it without giving a yes or

17     no answer, you're permitted to do so under

18     the rules.

19         MR. CORCORAN:  Withdrawn.

20  BY MR. CORCORAN:

21     Q    Did you ever darken the doors of the Levine

22  Agency after January 1, 1993?

23         MR. MOUKAWSHER:  Objection to form.

24     A    I don't understand what "darken the doors"

25  means.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    99

1   BY MR. CORCORAN:

2      Q    Did you ever go back into the Levine Agency

3   after January 1, 1993 physically?

4      A    There might have been an occasion or two

5   where I picked up a paycheck.

Page 92

BLevine122303

6   Q    But not to perform services?

7   A    No.

8   Q    So as a practical matter, Exhibit 2 is not

9   an employment agreement in the conventional sense

10  that we use the term "employment agreement," is it?

11        MR. MOUKAWSHER:  Objection to form.

12  A    I'm not sure what a conventional sense is.

13  BY MR. CORCORAN:

14  Q    An employment agreement is an written

15  agreement whereby an individual agrees to perform

16  services, correct?

17        MR. MOUKAWSHER:  Objection, form.

18  A    I can't say that's correct.

19  BY MR. CORCORAN:

20  Q    Why not?

21  A    My agreement refers to being available to

22  perform.  I was never asked --

23  Q    You're sort of anticipating two or three

24  questions.

25  A    No.


DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    100


1   Q    Let's have the question read back, and I'd

2   ask you to focus on that.

3         MR. MOUKAWSHER:  He gave a fully

4         responsive answer.

5         MR. CORCORAN:  I'd like the question.

6         Please read it back.

7         (The last question was read back.)
                    Page 93

BLevine122303

8    BY MR. CORCORAN:

9        Q    You don't agree that an employment agreement

10   is an agreement whereby an individual agrees to

11   perform services; is that your testimony?

12              MR. MOUKAWSHER:  Objection to form.

13   BY MR. CORCORAN:

14       Q    In the ordinary course.

15       A    I'm not a lawyer.  You're asking about

16   agreements.  I just can discuss what I understand my

17   employment agreement --

18       Q    Did you ever perform any service --

19              MR. MOUKAWSHER:  Let him finish.  Let him

20              finish his answer.

21   BY MR. CORCORAN:

22       Q    Is there something else you wanted to say,

23   Mr. Levine?

24       A    I was in the middle of a sentence.  I was --

25   I was -- my employment agreement was to -- I was to

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    101

1    be available.  That was the only, only wording I had

2    to go by, was to be available.

3    BY MR. CORCORAN:

4        Q    And available for what?

5        A    Available to perform duties at the Levine

6    Agency.

7        Q    But you were never asked to do that?

8        A    No, I never was.

9        Q    Okay.  Pursuant to the terms of this

BLevine122303

10    agreement, did you agree to sell your stock in the

11    company?

12        A    Yes, I did.

13        Q    And did you sell it to your father as a

14    result of this agreement?

15        A    No.

16        Q    Whom did you sell it to?

17        A    LLIA, Inc.

18        Q    Was this -- withdrawn.

19            Did you, in fact, sign this agreement on or

20    about the date that is recited on page 1 of the

21    agreement, January 1, 1993, if you recall?

22        A    No, I did not, actually.

23        Q    When did you sign it?

24        A    This agreement wasn't signed until the

25    middle of February, beginning of March, 1995.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                          102

1        Q    Okay.  Did you ever discuss this -- the

2    language of this agreement with your father?

3        A    Yes.

4        Q    And tell me what those discussions involved.

5        A    My father acted on my behalf because I was

6    unable to discuss these with my former partners, and

7    this is the employment agreement that I was presented

8    with.

9            MR. CORCORAN:  Can I have that read back.

10           (The last answer was read back.)

11    BY MR. CORCORAN:

Page 95

BLevine122303

12    Q    When you say "my father acted on my behalf,"

13    do you mean that your father present- -- what do you

14    mean when you say "my father acted on my behalf" in

15    connection with this?  I'd like you to explain that.

16    A    My father and his legal representatives

17    drafted and presented me with what we're looking at,

18    the stated employment agreement.

19    Q    Who presented it to you, your father or his

20    lawyers or both, if you remember?

21    A    Not really.  There were many occasions.  At

22    times they were with Attorney Joan Bozec, and others

23    were just with my father.

24    Q    Well, I'm talking about this document,

25    Exhibit 2, which you signed.  You're saying you saw

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    103

1    it many times?

2    A    More than one occasion.

3    Q    Okay.  And under what circumstances did you

4    see it?

5    A    I saw it in preparation of accepting it.

6    Q    Okay.  So you saw an early draft?

7    A    Yes.

8    Q    And then you saw the final version?

9    A    Yes.

10    Q    Was there a difference between the two, if

11    you recall?

12    A    I don't recall.

13    Q    Did you negotiate this document with your

Page 96

BLevine122303

14    father or did you simply sign what you were given, if

15    you recall?

16         A    My father acted on my behalf, so I didn't

17    negotiate with him.  He negotiated with the others.

18         Q    Did you give your father instructions or did

19    you -- were you comfortable knowing that he had your

20    best interest at heart?

21         A    Yes, I was comfortable that he had my best

22    interest at heart.

23         Q    So your father negotiated on your behalf,

24    and, ultimately, he gave you a copy of what is

25    Exhibit 2; and he said, Sign this, and you did?

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    104

1         A    Somewhat similar to that, yes.

2         Q    Okay.  When you say "somewhat similar," was

3    it somewhat different from what I just said?

4         A    It wasn't the exact way, you know, that he

5    presented it to me to sign.  You know, it was -- it

6    was my father, so. . .

7         Q    So he said, This is what we would like you

8    to sign; this is what you should sign?

9         A    This is, you know, what he was able to

10    achieve.

11         Q    Okay.  And how did he represent this to you

12    when he described it to you?  What did he --

13    withdrawn.

14              What did he say this would mean for you?

15         A    That this would provide me with seven years

Page 97

BLevine122303

16    of income and health benefits and all benefits that

17    would have been eligible had I still been able to

18    enter the Levine Agency.

19        Q    Okay.  This was, in any event, the period of

20    time when you were fully disabled; was it not?

21            MR. MOUKAWSHER:  Objection to form.

22        A    Fully disabled has all different meanings,

23    you know.

24    BY MR. CORCORAN:

25        Q    For purposes of conducting your occupation.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    105

1             MR. MOUKAWSHER:  Objection to form.

2        A    I recall, at the time, I was able to put

3    into the business; but it wasn't necessarily what you

4    just mentioned.

5             MR. MOUKAWSHER:  Again, if you don't

6             understand the question or you can't answer

7             it because of the way it's phrased, don't

8             answer it.  If you do understand it, then

9             answer it in whatever way you have to.

10    BY MR. CORCORAN:

11        Q    When your father presented this agreement to

12    you, Mr. Levine, did he explain to you why it was

13    called an employment agreement or not, if you recall?

14        A    I remember some of the reasons why it was

15    called an employment agreement.

16        Q    Was one of the reasons that it -- did he

17    explain to you that one of the reasons it was called

Page 98

BLevine122303

18  an employment agreement was because there were

19  certain tax advantages to calling it that which would

20  rebound to the benefit of the agency?

21      A    That was part of what was mentioned, yes.

22      Q    What else was mentioned?

23      A    In addition to the benefits to the agency,

24  it would have benefits to me, because I really wasn't

25  concerned about the benefits to the agency at that

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    106

1  point.

2      Q    Okay.  So he said you would get -- are you

3  referring to page 2, paragraph 5?

4      A    Yes.  That's part of it.

5      Q    Okay.  Is there another section of the

6  agreement to which your father referred when he

7  discussed benefits which you could turn to and show

8  me, any other provision in Exhibit 2?

9      A    Well, compensation was a benefit.

10     Q    Sure, it was.

11     A    You know --

12     Q    Sure, it was.

13     A    -- that's -- stock purchase was a benefit,

14  although they didn't do that by the terms of the

15  agreement.

16     Q    They deviated?

17     A    They didn't purchase my stock until 1999.

18     Q    Okay.  Going back to the Levine Agency, this

19  was a small family business, correct?

Page 99

BLevine122303

20      A    It started off as a small family business.
21  It grew to be 50 employees strong.  So I would not
22  say "small."
23      Q    Who was your boss while you worked there?
24          MR. MOUKAWSHER:  Objection to form.
25      A    Which company?  At which time are we

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    107

1  referring to?
2  BY MR. CORCORAN:
3      Q    Who were your bosses when you worked there?
4      A    I wouldn't say I had a boss.
5      Q    Did you take direction from your father?
6      A    We worked together.
7      Q    Okay.  Did you take direction from Dan
8  Carter?
9      A    At times.
10     Q    And who did Dan Carter take his direction
11  from?
12          MR. MOUKAWSHER:  Objection to form.
13  BY MR. CORCORAN:
14     Q    If any.
15     A    I don't know who he took his direction from.
16     Q    Okay.  If you had to say that one individual
17  ran the business more than anyone else, who would
18  that person have been?
19          MR. MOUKAWSHER:  Objection to form.
20     A    There, again, I don't understand exactly
21  what you're saying because what's running the
                    Page 100

BLevine122303

22    business?  Bringing in the money or being clerical?

23    BY MR. CORCORAN:

24       Q    Made the big decisions.

25            MR. MOUKAWSHER:  Objection to form.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    108

1       A    I don't know what a big decision is, but

2    there are all different kinds of decisions.

3    BY MR. CORCORAN:

4       Q    Who was the most important single employee

5    of the business, in your opinion, during the period

6    you worked there?  Was it your father?

7       A    Yes.

8       Q    And were his opinions respected?

9       A    Yes.

10      Q    Okay.  And did he make the important

11   business decisions?

12            MR. MOUKAWSHER:  Objection to form.

13      A    I don't know what important business

14   decisions were.  You would have to go topic by topic.

15   BY MR. CORCORAN:

16      Q    Was your father largely in charge of the

17   corporation, the business of the corporation?

18            MR. MOUKAWSHER:  Objection to form.

19      A    There was no one largely in charge.

20   Everyone had a role.

21   BY MR. CORCORAN:

22      Q    He was the president; was he not?

23      A    Of some of the corporations.

Page 101

BLevine122303

24    Q    What was his role as you perceived it?

25    A    To continue to be a top salesman.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                              109

1     Q    Okay.  He sold more than anybody else?

2     A    By far.

3     Q    Okay.  Who determined what your salary was?

4     A    My father.

5     Q    Who determined your father's salary?

6     A    My father.

7     Q    Who determined Daniel Carter's salary?

8     A    My father.

9     Q    Who determined Jerry Levine's salary?

10    A    My father.

11    Q    Who determined Andrew Levine's salary?

12    A    After he became a partner in 1989, I guess

13   that would be my father.

14    Q    Okay.  And was there a Herbert Levine, also?

15    A    Yes.

16    Q    Who fixed Mr. Herbert Levine's compensation?

17    A    My father.

18    Q    Who determined whether you would receive a

19   bonus in any given year?

20    A    My father.

21    Q    And the amount of the bonus?

22    A    My father.

23    Q    Did he do this for everyone in the company?

24    A    Yes.

25    Q    Was his authority in this regard seriously

Page 102

BLevine122303

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    110

1    challenged during your employment at the agency?

2            MR. MOUKAWSHER:  Objection to form.

3        A    I'm not sure what you mean by "seriously

4    challenged."

5    BY MR. CORCORAN:

6        Q    Were his decisions ever overruled or

7    reversed by anyone else?

8        A    I can't speak about all decisions out there.

9    I just --

10        Q    Do you know any instances of a decision made

11    by your father with respect to compensation or

12    bonuses which was ever reversed by any other employee

13    of the agency?

14        A    No.

15        Q    Do you know how your father calculated

16    bonuses?

17        A    No.

18        Q    Did your father initially encourage you to

19    join the family business?

20        A    Initially, before I had entered it, you are

21    referring to --

22        Q    Yeah.

23        A    -- or while I was growing up?

24        Q    Yeah.

25        A    We, actually, never discussed it.

DEL VECCHIO REPORTING SERVICES, LLC

Page 103

BLevine122303

6    made for this year conform exactly to what you wrote

7    down, would you then be troubled --

8            MR. MOUKAWSHER:  Objection.

9    BY MR. CORCORAN:

10    Q    -- about this document as it relates to your

11    sworn testimony today?

12            MR. MOUKAWSHER:  Objection to form.

13    A    I don't see why I should be troubled.

14    BY MR. CORCORAN:

15    Q    Well, isn't it exactly the opposite of what

16    you're saying under oath?

17            MR. MOUKAWSHER:  Objection to form.

18            Charlie, I'm going to ask you to not keep

19            asking the same question over and over again

20            because if you ask it again, I'm going to

21            instruct the witness not to answer it; and I

22            would be within my rights to do it since

23            you've asked the same --

24            MR. CORCORAN:  Could the witness'

25            response to my last question be read back.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    179

1            (The last answer was read back.)

2    BY MR. CORCORAN:

3    Q    When you were employed at the Levine Agency,

4    did you have any responsibilities which were

5    administrative in nature, such as opening the mail?

6            MR. MOUKAWSHER:  Objection to form.

7    A    When are you referring to?

Page 167

BLevine122303

8    BY MR. CORCORAN:

9        Q    Ever.

10       A    Well, I was only employed by the Levine

11   Agency from 1991 and forward.

12       Q    Levine Life Associates.

13       A    Okay.

14       Q    Same question.

15       A    Was I ever --

16       Q    Did you -- did you have any administrative

17   duties such as opening the mail and answering phones?

18       A    Yes.

19       Q    Maintaining the payroll?

20       A    I didn't maintain the payroll.  I was -- did

21   clerical tasks at times.

22       Q    You mean writing down?

23       A    I -- I -- I made entries into the payroll

24   ledger, wrote the checks out to the employees.

25       Q    Balancing the records?

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    180

1        A    There was a period of time I may have

2    reconciled the checkbook.

3        Q    Did you do this between 1980 and 1986 when

4    they hired a bookkeeper called Tony Martone?

5        A    I'm not sure of the exact date Tony Martone

6    was hired.

7        Q    But approximately then, that's when he took

8    over from what you did?

9        A    I don't know exactly when he started, so I

Page 168

BLevine122303

10    can't tell you when he took over.

11        Q    I'm not asking for the date.  I'm saying:

12    Did he succeed to that job -- withdrawn?

13            Did you perform that job until they hired

14    Tony?

15        A    No.

16        Q    Okay.  Was there somebody after you and

17    before Tony?

18        A    I only did it for a short period of time.

19        Q    I show you these documents and ask if you

20    can recognize them.

21            (An off-the-record discussion was had.)

22    BY MR. CORCORAN:

23        Q    Okay.  So I'm showing you a document

24    previously marked as Defendant's 3.  Can you identify

25    it?

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    181

1        A    (No response.)

2        Q    Can you identify this?

3        A    Yes.

4        Q    What is it?

5        A    This is the Levine Life Associates payroll

6    account ledger.

7        Q    Okay.  And do you recognize the handwriting?

8        A    Yes, I recognize my handwriting.

9        Q    Okay.  Have you ever filed -- we're going to

10    move on to the next.  That's fine.  You can give it

11    back or you can keep it.

Page 169

BLevine122303

12    A    It's not all my handwriting.

13    Q    No.  I think I'm beginning to recognize your

14    handwriting.

15    A    Okay.

16    Q    The diagonal figures in, like, the third

17    column are not yours, correct?

18    A    The guts in the center are not mine.

19    Q    Yeah.  Right.  Right.  I can tell.  You have

20    sort of a backhand, a slight backhand print, right?

21    A    I don't think so.

22    Q    You don't?  Okay.  Fine.  Whatever.

23         Have you ever filed for unemployment

24    compensation?

25    A    Yes, I have.


DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    182


1    Q    Did you do that in July of 1994?

2    A    Yes, I did.

3    Q    Why?

4    A    Because Jerry had stopped my paycheck at

5    that time.  He withheld it back to use me as leverage

6    for negotiation for Michael and Herbert Levine.

7    Q    Can you explain what you thought was going

8    on.

9    A    What I thought was going on as far as what?

10    Q    I don't understand what you mean.  Can you

11    explain.  What kind of leverage?  What was going on

12    at the time?

13    A    Well, Jerry was trying to cheat my father

Page 170

BLevine122303

14    out of what he owed him for the company by holding me

15    hostage.  That's what he was doing.

16        Q    So he stopped --

17        A    He stopped paying me.  He held my paychecks

18    back for, I believe, at least a two-week period.

19        Q    Were these the paychecks under the agreement

20    that you signed, the buyout agreement?

21        A    The buyout agreement wasn't signed until

22    1995.

23        Q    It's dated 1993?

24        A    Effective 1993.

25        Q    Right.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                        183

1        A    It wasn't signed until March of 1995.

2        Q    Okay.

3        A    That's another example of --

4        Q    This is --

5             Of what?

6        A    -- of -- of having everything held in limbo,

7    and --

8        Q    Okay.  But this is a period when you were

9    not coming into the office?

10        A    As I stated earlier, I was prohibited from

11    coming into the office from July of '92.

12        Q    Okay.  So there was a point in time when Mr.

13    Levine -- you understand Mr. Jerry Levine stopped

14    sending your check out?

15        A    Actually, that was August, 1992 they stopped

Page 171

BLevine122303

16  coming.

17      Q    Okay.  So you filed for unemployment

18  compensation?

19      A    Yes.  My father directed me to go down to

20  unemployment, and I went down to unemployment.  I

21  showed them my unsigned employment agreement.  I

22  explained to them my paycheck had been held back, and

23  they said they that there shouldn't be any reason why

24  I shouldn't submit for unemployment.  So I did.

25      Q    Okay.  So you listed the Levine Agency as

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    **184**

1   you employer based on an unsigned employment

2   agreement during a period when you were performing no

3   services for the Levine Agency?

4       A    Earlier you asked if I was performing any

5   sales on behalf of the agency.  Okay.  I can't say

6   that I wasn't performing any services because I

7   continued to field calls coming to me at home from

8   clients that I had written business on, to this day.

9            So had I been doing any sales on behalf of

10  the Levine -- Louis Levine Insurance Agency and all

11  its related companies?  No

12      Q    So people would call you on the phone at

13  home; you would refer to them to the agency?

14      A    No.  I would speak with them.  I wouldn't

15  refer them to the agency.  I would answer their

16  questions.

17      Q    Okay.

Page 172

BLevine122303

18    A    So in terms of service, I wouldn't say that

19  that wasn't the case; but the agreement was unsigned,

20  but I was still receiving a W2 wage in the interim.

21    Q    And you received benefits from July, 1994

22  until January of 1995; is that not correct, for a

23  26-week period?

24    A    A 26-week period, yes.

25    Q    Okay.  Until January of 1995?

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    185

1    A    That's correct.

2    Q    But didn't the Levine Agency pick up with

3  your paychecks a couple of weeks after July?

4    A    Yes, they did.

5    Q    So you were getting paid from the Levine

6  Agency and collecting unemployment benefits at the

7  same time?

8         MR. MOUKAWSHER:  Objection.

9  BY MR. CORCORAN:

10    Q    Were you not?

11    A    Can you rephrase that?

12    Q    No.

13    A    No?

14    Q    That's the question --

15         MR. MOUKAWSHER:  If you don't understand

16         it, don't answer it.

17  BY MR. CORCORAN:

18    Q    You were getting paid -- you were collecting

19  unemployment in the last half of 1994 --

Page 173

BLevine122303

20    A    Right.

21    Q    -- and at the same time, you were getting

22    checks from the Levine Agency?

23    A    Okay.

24    Q    Isn't -- is that true?

25    A    Yes.

DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    186

1    Q    Isn't that a fraud?

2    A    Not at all.

3    Q    Why not?

4    A    Because the form at unemployment asked had I

5    returned to work at the Levine Agency, and I did not

6    return to work for that entire time period.  I

7    reviewed this with unemployment.  You may speak with

8    them.  I answered the forms honestly.  Every form

9    that came in:  Had I returned to work?  I had not.

10    And at that point, I had an unsigned agreement for

11    that entire time with the Levine Insurance Agency.

12    Q    Did you ever pay the unemployment

13    compensation back?

14            MR. MOUKAWSHER:  Objection to form.

15            MR. CORCORAN:  What's wrong with the

16        form?

17            MR. MOUKAWSHER:  It assumes that he had

18        the obligation to pay it.

19            MR. CORCORAN:  No, it doesn't.

20            MR. MOUKAWSHER:  I just said he didn't.

21            MR. CORCORAN:  It doesn't assume any

Page 174

BLevine122303

22      obligation at all.  It's a factual question.

23          MR. MOUKAWSHER:  Well, ask it.  I didn't

24      interrupt you.

25          MR. CORCORAN:  It's a silly objection.


DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                    187


1           Can the question be read back.

2               MR. MOUKAWSHER:  You're wasting time.

3           (The last question was read back.)

4       A    I was never asked to pay it back, and I

5   never did.

6   BY MR. CORCORAN:

7       Q    Did you ever advise them you were receiving

8   paychecks from the Levine Agency?

9       A    Oh, yes.  Absolutely.  I clearly told them.

10  I kept them full abreast.  They had a copy of my

11  unsigned unemployment agreement -- unsigned

12  employment agreement

13      Q    When did you learn that the Levine Agency

14  started a 401K plan?

15      A    To the best of my recollection, it was late

16  in 1996 that I received a telephone call from father

17  telling me that the Levine Insurance Agency had begun

18  a 401K plan.

19      Q    And at the time you learned that, did you

20  make inquiry of the owners of Levine Agency with

21  respect to the 401K plan?

22      A    Well, I had my father make inquiry because

23  it wasn't talking with Gerald Levine and Danny Carter

Page 175

BLevine122303

24    for that entire time period.

25        Q    Okay.


DEL VECCHIO REPORTING SERVICES, LLC

203 245-9583

*** CONFIDENTIAL ***                              188


1        A    And so, yes, on my behalf, he did.

2        Q    Okay.  Was that an oral inquiry?

3        A    To the best of my knowledge, it was strictly

4    oral.

5        Q    Okay.  Was there any reason you couldn't

6    have sent a letter saying, Have you instituted a 401K

7    plan?

8        A    Is there any reason why I wouldn't have

9    written a letter to them?

10       Q    Yes.  Yes.

11       A    I didn't have any desire to contact them

12    directly either in letter or in writing.  Everything

13    that was negotiated was done through my father.

14       Q    Okay.  And what did your father ask them, to

15    the best of your knowledge?

16       A    To the best of my knowledge, my father asked

17    them why I was not allowed to participate in the 401K

18    plan.

19       Q    And what was the answer?

20       A    Dan Carter told him, either through Jerry or

21    directly, that they weren't going to spend one more

22    penny on me than was already agreed.

23       Q    Okay.  Have you ever invested in an

24    individual retirement account between 1992 and 2000,

25    an IRA?

Page 176

# C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor am I an employee of either party to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this __30th__ day of _December_____, 2003.

_Kimberly M White_
Kimberly M. White
Notary Public

My commission expires:  8/31/2007.