# EXHIBIT E

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * * *
BARRY B. LEVINE, PLAINTIFF, *
VS. *
PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, DEFENDANT. *
* * * * * * * * * * * * * * * *

3:96-CV-00528 (AHN)

# DEPOSITION OF MICHAEL LEVINE

Taken before Jonathan P. Lodi, Stenographer and Notary Public in and for the State of Connecticut, pursuant to Notice and the Federal Rules of Civil Procedure, at the law offices of Suisman, Shapiro, Wool, Brennan & Gray, P.C., 2 Union Plaza, New London, Connecticut, on May 8, 1997, commencing at 9:40 a.m.

APPEARANCES:

PETROCELLI LAW OFFICES, P.C.
By: Charles P. Messina, Attorney at Law
146 Westminster Street - Suite 500
Providence, RI 02903
Representing the Plaintiff

DAY, BERRY & HOWARD
By: James H. Rotondo, Attorney at Law
CityPlace I
Hartford, CT 06103-3499
Representing the Defendant

BRANDON REPORTING SERVICE
(860) 549-1850
11-A Capitol Avenue
Hartford, CT 06106

Services over to the Louis Levine Agency?

A Barry took a reduction in compensation. If he took a cut in compensation it's because I told him he needed to take a cut in compensation. I was running the whole company. I was a senior partner, and there's a good reason for that too.

Q Good reason for what?

A Being a senior partner.

Q What do you mean?

A Well, Barry and myself, our division, made most of the money in the company. We were a very good team.

Q Request number fourteen seeks "all documents relating to or evidencing an agreement pursuant to which Barry Levine left and/or terminated employment with Louis Levine Agency."

You believe that's among the materials you produced?

A Yes.

Q Exhibit 21 is the document relating to accusations of harassment, is that correct?

A This, what you call Exhibit 21, discusses the opinion of certain people in the company that Barry was totally mentally ill, irrational and did all kinds of things only somebody that was unstable would do.

Q Was there an agreement that was entered into by

which his employment with Louis Levine Agency was terminated?

A The only agreement, I believe, I ever had on that was Barry's employment contract.

Q And there was an employment contract entered into?

A Yes.

Q Okay. I don't see that in and among the materials you have --

A Well, that would be not in my pile. That would be in -- Barry must have given you that.

Q You don't have that?

A No. That's Barry's. I don't have that.

Q Request number fifteen seeks "all documents relating to or evidencing an agreement pursuant to which Barry left and/or terminated employment with LLIA."

A Same company. See, LLIA was a holding company of all the companies.

Q All right. Just so we have the structure down, LLIA was a holding company?

A When you talk about LLIA, that's just a holding company that owns all the operating companies.

Q Okay. And the operating companies were Levine Financial and Louis Levine Agency?

A Correct.

Q Did Barry have any involvement in those discussions?

A I don't remember if he did or he didn't. I don't think he had much to say about it because he was not in a position to say much.

Q Did you handle the negotiations on his behalf?

A I kind of did most of the talking for him. Yes, I did.

Q Were lawyers consulted in connection with this employment agreement?

A Well, lawyers drew it up.

Q And do you know who those lawyers were?

A Well, it either was Larry Greenberg or somebody in his firm. I would have to take that as a guess. I don't know who drew it up. I would think that Larry Greenberg drew it up, but I don't know. I know he signed it.

Q Now, as part of this employment agreement did the irrevocable trust for Barry Levine surrender its shares of stock?

A As part of the deal, yes. Yes, because this agreement was supposed to take place in lieu of his buy/sell. And the reason for it obviously is the corporation wanted a tax deduction in paying it out like most buy/sells are, a covenant not to compete or something

like that. And part of the monthly income that he was going to receive for seven years was supposed to be considered for his stock, and therefore should be delegated on his tax return as a sale of stock and the corporation's not supposed to take a deduction for it, but which the corporation has not done it yet. That's one of my arguments that I'm fighting about, you know, because this expires in the year 2000 or -- well, the end of seven years. It's a seven-year contract. And Jerry has not -- I've sent him letters on this, but he has not agreed yet to -- I'm sure he will, probably the last year, agree to handle it so that the last year part of the eight eighty a month he receives, a week he receives, is for stock and part of it is for income. And I don't know if that's in here or not, but it should be. Here it is. Stock purchase. Here it is right here under section four, page two, three thirty-seven per week is for the stock. You understand?

Q Yes.

A So this is a combination -- this really is to replace the buy/sell. And reason the corporation wanted to do it this way, as part of the negotiations, was they wanted to deduct it, most of it. And that's pretty much standard procedure in the industry. Whether the IRS will accept it that way, that's their problem; not mine.

lot of business. And that's when Barry and I worked together and were both working hard and we were very successful. But there's no breakdown there of --

Q How is money paid out at Levine Financial Services and at LLIA; how is it decided how much any one person would make?

A I made the decision.

Q By yourself?

A Absolutely.

Q Without consulting anybody else?

A Well, I told them -- I told my partners what they want and nobody challenged me because I was in charge of a company making all the money. I made all the money -- my company with Barry made most of the money of the company. I made a decision who should get what.

Q What factors did you use?

A In my head. It's a family business. I thought I was being fair to everybody and I made a decision who should get what based upon what I think they should get and what production they did.

Q And was that true for the period between 1985 to 1990?

A That goes back to 1970, for crying out loud.

Q Was there any --

A All the way up until probably '92.

Q Was there any specific formula that you used?

A No. I would never use a formula because I wouldn't be committed to anything. But I took into account everybody's work performance and what they did and so forth, what they produced.

Q Between 1985 and 1990 Barry received a straight salary of ninety thousand dollars a year, is that correct?

A He got a salary, plus we gave out bonuses depending upon productions.

Q Okay. And you were the person who figured out how much the bonuses were?

A I did everything.

Q Now, you said there was no formula that was used --

A What I mean by bonus is --

Q Wait for me to finish my question.

A I've got to finish that bonus question.

Q I will give you the opportunity to do that.

You said that there was no formula that was used for purposes of calculating a bonus, is that correct?

A That is correct. Nothing in writing.

Q You made a determination of the amount of bonus that each person received based upon a whole group of factors you thought was fair under the circumstances?

A In my mind.

Q Was there any doubt about the fact that you were the largest producer in the entire company?

A Well, Barry was a large producer as well.

Q Were you the largest producer in the company?

A Yes.

Q And isn't it true that Barry helped service your clients?

A He did a lot for me. I couldn't have done what I did.

Q Did Jerry Levine have any input into the amount of the bonus that each person received between 1985 and 1990?

A Oh, he made his voice heard, but I was the boss. I overruled anything anybody said.

Q Did Dan Carter have any input into the amount of bonuses anybody received?

A He had a voice in it, but I didn't listen to any of them, especially Dan Carter or Jerry.

Q All right. Did Barry have any input in the amount of bonuses people received?

A No. Again, I'm the boss. The only one I would listen to is my brother Herbie. Sometimes we made joint decisions, and only we made the decisions. We were the senior partners. Jerry's there for a ride and Danny was there for a ride. As far as we were concerned, they had

nothing to say about anything. Too bad you can't ask Herbie. He'd back me up.

Q Now, you indicated that the total amount of monies earned by Levine Financial Services dropped from 1.6 million to 1.4 million from 1987 to 1988?

A They dropped from one million, six fifty-eight in 1987 to one million, four ninety-three plus in 1988. That's not much of a drop.

Q Okay. Can you explain --

A I wouldn't call that a drop. I don't like the word drop you used there.

Q That's a hundred and fifty thousand dollars less?

A That's peanuts.

Q It's a hundred and fifty thousand dollars less?

A That's not a drop.

Q Sir, is it a hundred and fifty thousand dollars less?

A It's a hundred and fifty thousand dollars less, but it's not a drop.

Q Can you explain why your income went up between 1987 and 1988?

A Because I decided we could take more money out of the company than we did the previous year. We left so much money in the company for reserves. The other problem

CERTIFICATE OF REPORTER

I, Jonathan P. Lodi, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to notice, there came before me on the 8th day of May, 1997, at 9:40 a.m., the following named person, to wit: Michael Levine, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS THEREOF, I have hereunto set my hand this 23rd day of May, 1997.

Jonathan P. Lodi, CSR, Notary Public

CSR No. 154

My Commission Expires: 1/18/2000