# EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                 |
BARRY B. LEVINE,                 |     Case Number
        Plaintiff,               |
                                 |     3:96 CV 00528 (AHN)
VS.                              |
                                 |
PROVIDENT LIFE AND ACCIDENT      |
INSURANCE COMPANY,               |
        Defendant.               |
                                 |
- - - - - - - - - - - - - - - - x

COPY

---------------------------------------------------------------
        CONTINUED DEPOSITION OF:   BARRY B. LEVINE
---------------------------------------------------------------

        Taken before Robin L. Balletto, Registered
Professional Reporter, a Notary Public in and for the
State of Connecticut, pursuant to Notice and the Federal
Rules of Civil Procedure, at the offices of Suisman,
Shapiro, Wool, Brennan and Gray, New London, Connecticut,
on March 28, 1997, commencing at 9:50 a.m.

                BRANDON REPORTING SERVICE
                    (203) 549-1850
                  11A Capitol Avenue
            Hartford, Connecticut  06106

1

2   APPEARANCES:

3


4        Representing the Plaintiff

5             PETROCELLI LAW OFFICES
              Richard W. Petrocelli, Esq.
6             146 Westminster Street
              Providence, Rhode Island   02903
7


8        Representing the Defendant

9
              DAY, BERRY & HOWARD
10            James Rotondo, Esq.
              CityPlace I
11            Hartford, Connecticut   06103-3499

12

13


14       Also Present:
15                      Sarah Ekern

16

17

18

19

20

21

22

23

24

25

006268

```
 1                      BARRY B. LEVINE,

 2         having been first duly sworn, was examined

 3         and testified as follows:

 4

 5       DIRECT EXAMINATION CONTINUED BY MR. ROTONDO

 6

 7       Q     Mr. Levine, I would like to follow up with some

 8  questions from the last session of your deposition, okay?

 9       A     Okay.

10       Q     Have you had a chance to read that transcript?

11       A     Yes, I did.

12       Q     You indicated in the last session of your

13  deposition that when you did, I believe securities work

14  for The Hartford Insurance Group, that you received mail

15  from a particular office.

16       A     Yes.

17       Q     What office was that?

18       A     That was the East Hartford office I mentioned

19  there.

20       Q     You indicated also that from time to time,

21  representatives of Provident would come down to the

22  offices of the Levine Financial Services and talk to you

23  about products that Provident was selling; is that

24  correct?

25       A     Yes, it is.
```

006270

1    Q    At any point after 1992, did you ever perform

2    any work for any company under the umbrella of LLIA?

3    A    No.

4    Q    Were you fired from the Louis Levine Agency?

5    A    You might say.

6    Q    Who fired you?

7    A    The board.

8    Q    And who was on the board at the time?

9    A    The same members that are stockholders that we

10   just went over.

11   Q    That would be your uncle --

12   A    Uncles, cousin and father.

13   Q    When was it that you were fired?

14   A    Late October, early November '92.

15   Q    Were you working on a regular basis at the

16   Louis Levine Agency up until late October, early November

17   1992?

18   A    Well, I have to ask you what you specifically

19   mean by "regular basis."  I was not ordinary and regular,

20   no.

21   Q    I think I understand what your problem was with

22   my question.

23        Did you work 40 hours a week at the Louis

24   Levine Agency in 1992, up to either August or November of

25   1992?

1    A    Yes.

2    Q    And how long thereafter were you fired?

3    A    I think that they had an emergency meeting over

4 that weekend, might have even been the following Saturday

5 morning.

6    Q    So by the following Monday you had been

7 terminated?

8    A    By Monday, it had already been mentioned, if my

9 memory serves me correctly.

10    Q    And that was a Monday in September of 1992?

11    A    Possibly even in early October; I can't be

12 absolutely sure.

13    Q    But it is either --

14    A    Late September, early October, yes; and I never

15 did those things, it was just talk.

16    Q    You never tampered with the phones?

17    A    No, not once.  I was only upset because I found

18 out that calls from associates of mine, I was never told

19 about, like I didn't exist anymore.

20    Q    What happened to your compensation after you

21 were fired?

22    A    My compensation remained unaffected for the

23 rest of the year, I believe.

24    Q    When did you start having discussions about the

25 agreement that you entered into with LLIA, which you could

1    call either a severance agreement or employment agreement;

2    when did you start entering into those discussions?

3         A       My father entered into those discussions on my

4    behalf.

5         Q       Your father negotiated on your behalf?

6         A       Yes.

7         Q       When, to your knowledge, did those discussions

8    begin?

9         A       Later '92; and they reached a tentative

10   agreement effective January 1 of '93, because at that time

11   my pay became $880 a week.

12                   MR. ROTONDO:   We can mark as Exhibit 30 a

13        memo dated 8/31/92, two pages in length, by

14        Mr. Evans.

15                   (Levine Exhibit 30:   Marked for

16                    Identification.)

17   BY MR. ROTONDO:

18        Q       If you could take a look at that, Mr. Levine.

19        A       Okay.

20        Q       Have you had a chance to review Exhibit 30?

21        A       Yes.

22        Q       Were you able to read the handwriting?

23        A       Yes.

24        Q       Is there anything that you believe is

25   inaccurate in Exhibit 30?

1      A      No.

2      Q      Now, in the first paragraph there is an

3    indication that Mr. Evans spoke with you on August 31,

4    1992, and you indicated that your partners have voted to

5    reduce your salary from $100,000 to $35,000 a year.

6      A      Uh-huh.

7      Q      Does reading that statement change your memory

8    at all as to when it was this incident with the telephones

9    took place?

10      A      I would have to assume yes, that that would be

11    late August '92.

12                MR. PETROCELLI:  Don't guess.

13    BY MR. ROTONDO:

14      Q      I wasn't asking you to guess.  I'm asking you

15    if looking at that refreshes your memory, that the

16    incident, in fact, took place in August as opposed to what

17    you thought was either September, early October.

18      A      It's still a guess; that's why I would assume.

19                MR. PETROCELLI:  That's why I'm saying

20      don't guess.

21      A      I'm still not absolutely sure.  I can only

22    sense from this that it was within a month from the time

23    you're talking.

24    BY MR. ROTONDO:

25      Q      Was there a woman in the Levine offices by the

1   name of Tammy Bell?

2       A    Yes.

3       Q    And how old was Tammy Bell at the time you were

4   there?

5       A    Twenty-three or -four, maybe.

6       Q    Did she ever make any accusations that you ever

7   harassed her?

8       A    As I mentioned earlier, Cathy, and there was

9   the one other woman that stood beside her, that was Tammy

10  Bell.  They were teaming up in that event, they both

11  went -- do you remember I mentioned it was Cathy and

12  another woman?

13      Q    Yes.

14      A    Tammy Bell was the other woman.

15      Q    So Cathy and Tammy went and complained to your

16  Uncle Gerald?

17      A    Yes, Tammy was my assistant, so she -- at the

18  time, I think she was just trying to get in with the girls

19  of the main area.  I had only had one assistant and that

20  was Tammy, so she was spreading her wings out, and I think

21  she found a friend in Cathy.  I never did anything to

22  Tammy.

23      Q    I'll just ask the question, I think you've

24  explained it.  Did Tammy ever make any accusations that

25  you had sexually harassed her?

006293

250

1       A     None that I know of.

2       Q     Had you ever made any comments of a sexual

3  nature to Tammy?

4       A     None that I recall.

5       Q     By the time the board had voted to reduce your

6  salary from $100,000 a year to $35,000 a year, you had

7  been fired from the Louis Levine Agency; isn't that

8  correct?

9              MR. PETROCELLI:  Objection.

10      A     Let me just mention one thing.  They mention

11  $35,000 there, and that may be true.  I'm not sure if that

12  actually took place only because I know my gross pay for

13  that year was 90,000, so I'm not sure how that could have

14  been.  I'm sure there was some reduction, but I'm not sure

15  it went to that level.  What was your question?

16  BY MR. ROTONDO:

17      Q     By the vote to reduce your salary, had you

18  already been fired?

19              MR. PETROCELLI:  Objection, form.

20      A     I'm not sure what happened then.  It was a very

21  confusing time in my life, everything was coming all at

22  once.  They were upset about the phones, and they were

23  upset about what they thought I had done on a harassment

24  basis, but the insurance agency was in my blood; I was a

25  descendant of that, and I believe they were trying to bear

006294

1    with me through these tough times.

2              I don't think there was -- at any one point in

3    time they said I was never to return.  I might have been

4    let go, or whatever.  It came by mutual decision that I

5    agreed not to return by accepting the terms of my

6    employment agreement or salary-continuation agreement, but

7    there was no one set point in time where they said,

8    "You're fired, don't return."  I had problems, I'll admit

9    to that, but I can't tell you exactly what months and what

10   day in late '92 which occurred, but I know these things

11   did occur.

12   BY MR. ROTONDO:

13        Q    As of August 31, 1992, had anyone at the Louis

14   Levine Agency made it clear to you that they did not want

15   you to be working there at that time?

16        A    When you're asking if it was made clear to me,

17   that means if it was clear to me in my mind.  No, I

18   wouldn't say it was clear to me in my mind.

19        Q    As of August 31, 1992, had anyone at the Louis

20   Levine Agency told you that they did not want you working

21   there?

22              MR. PETROCELLI:  Objection, form.

23        A    You know, a lot of the conversations that

24   occurred didn't occur with me, they occurred with my

25   father, you know, so did anyone tell me directly, no.  A

252

1    lot of times, my father was the buffer between the

2    partners and myself, because I might have overreacted or

3    gotten upset as to the nature of everything, so...

4    BY MR. ROTONDO:

5        Q    So your testimony is that no one ever told you

6    that before August 31, 1992?

7        A    No.  To the best of my knowledge, no.

8        Q    Did your father ever relate to you at any time

9    before August 31, 1992, that the other board members did

10   not want you to be working at the Louis Levine Agency

11   before August 31, 1992?

12       A    Can you just repeat that one more time?  I

13   don't understand what you're saying.

14       Q    You indicated that your father served as a

15   buffer at times between you and other family members who

16   were involved in running the Louis Levine Agency.

17       A    Right.

18       Q    Did your father ever relate to you before

19   August 31, 1992 that the other family members did not want

20   you to be working at the Louis Levine Agency?

21       A    Oh, yes.  For a while, I knew that they would

22   rather me not be there, you know, so that was part of my

23   family conflict that I had on top of all my all my other

24   conflicts is I had inner conflicts as well as external

25   conflicts, yes.

006296

1              MR. ROTONDO:   I would like to mark as

2        Exhibit 31 a document entitled, Employment Agreement,

3        which is five pages in length.

4                   (Levine Exhibit 31:   Marked for

5                    Identification.)

6    BY MR. ROTONDO:

7        Q      Mr. Levine, I'm going to show you a document

8    that's been marked as Exhibit 31, and I would ask you to

9    look at it; do you recognize it?

10       A      Yes.

11       Q      Is this the employment agreement that you've

12   referred to on a number of occasions between you and LLIA?

13       A      Yes.

14       Q      And on the last page, is that your signature?

15       A      Yes.

16       Q      And do you recognize the signatures of any of

17   the people who witnessed the document?

18       A      Yes.

19       Q      Can you tell us who they are?

20       A      Yes.  The first one is Attorney Lawrence

21   Greenberg, and the others were employees of his firm.

22       Q      Oh, okay.

23       A      But if you note, there is no date on this form,

24   by the way, date signed is omitted.

25       Q      Is there any reason for that?

254

1    A    Because it was signed way later than that date,

2 because it took so long to agree to everything; I think it

3 wasn't signed until 1994.

4    Q    Did you negotiate this agreement?

5    A    No.

6    Q    Who negotiated it?

7    A    My father.

8    Q    He negotiated it on your behalf?

9    A    Yes.

10    Q    Was there any lawyer retained to represent your

11 interests in connection with Exhibit 31?

12    A    No; wait, my father always had lawyers that he

13 referred to, so I don't know who -- I retained no one.

14    Q    You didn't retain anybody, but he may or may

15 not have retained someone?

16    A    Correct.

17    Q    Did your father have a regular lawyer that he

18 worked with?

19    A    He had many different lawyers that he worked

20 with in his estate-planning field.

21    Q    Some of those were referral contacts, things

22 like that?

23    A    Yes.

24    Q    You testified in the last session of your

25 deposition about having appetite problems; is that

006298