# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BARRY LEVINE | : | CIVIL ACTION NO. |
| | : | 3:03 CV 148 (SRU) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| WEBSTER INSURANCE | : | |
| | : | |
| Defendant | : | NOVEMBER 5, 2004 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

In this action, plaintiff Levine[1] claims relief for breach of fiduciary duty and wrongful denial of benefits due under the Louis Levine Agency, Inc. Profit Sharing Plan & Trust and the Levine Company Salary Savings Plan, which was a 401(k) Plan. He brings his suit against Webster as successor in interest to the Louis Levine Agency, Inc. in its capacity as a fiduciary of the two Levine Plans.

During Levine's employment with the Levine companies,[2] he became the victim of fraudulent conduct by the primary agent of the Profit Sharing Plan's administrator with respect to contributions he was entitled to in his Plan account, but did not receive. For an approximate nine-year period Daniel Carter led Levine to believe that he (Carter) and Levine's uncle, Gerald Levine, were waiving their Plan contributions, and therefore were

---

[1]  When the name "Levine" is used alone, it refers to the plaintiff, Barry Levine. When other members of the Levine family (such as Gerald and Michael) are referenced, their full names, first and last, are used.

[2]  LLIA, Inc. was a holding company that included the Louis Levine Agency, Inc., Retirement Planning Associates, Inc., and Levine Life Associates, Inc. (which changed its name to Levine Financial Services, Inc. at some point). Levine worked for the Levine Life Associates / Levine Financial Services from 1975 through 1990 or 1991, when he switched to the Louis Levine Agency. When necessary, these business entities will be referred to individually; the term "Levine companies" will be used to describe them collectively where appropriate.

not having contributions made to their accounts. Believing Carter, Levine waived his contributions. In February of 2002, Levine learned that Carter's representations were false, and that while Levine had consistently waived his contributions, Carter and Gerald Levine had not. Carter's misrepresentations caused Levine to lose approximately $230,000 in contributions to his Plan account, exclusive of any earnings he would have accrued thereon to date. In addition, in 1996, when the Louis Levine Agency established a 401(k) Plan, Levine was eligible to participate, but was never apprised of his eligibility. This exclusion deprived Levine of the opportunity to make roughly three years of tax deferred contributions to the 401(k) Plan and lost him the matching amounts that the Agency would have contributed to his account under the terms of the Plan. After exhausting his administrative remedies in late 2002, Levine filed suit against Webster in January 2003 for violation of Sections 404 and 502(a)(1)(B) of ERISA.

On September 17, 2004, Webster moved for summary judgment against Levine, claiming that "[t]he only *disputed issues* in [his] case are *legal questions* that can be answered based on the *undisputed facts* [. . . .]"[3] While Webster does raise a variety of legal questions with which it hopes to halt Levine's efforts to recover the benefits to which he is entitled, an examination of the evidence reveals that the record is fraught with disputed facts. As Levine discusses in this memorandum, based on the evidence in the record, as well as Webster's misstatements of law, Webster is entitled to summary

---

[3] Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 1.

judgment on none of the five arguments[4] around which it structures its motion.  As well, the record contains countless factual ambiguities that must be construed in a light most favorable to Levine, the non-moving party.[5]  Levine therefore respectfully asks that the Court deny Webster's Motion for Summary Judgment.

## II.     FACTS AND BACKGROUND

Levine started at Levine Life Associates in early 1975 after attending the University of Vermont.[6]  When he began his job, his first responsibility was studying for insurance licensing exams and obtaining the licenses that would enable him to sell insurance products.[7]  As soon as he was licensed, he began a successful career of selling insurance.[8]  In 1990 or 1991 Levine switched to the Louis Levine Agency, where he continued to do the same type of work.[9]  As a life insurance specialist and "salesman" with various industry certificates and designations, Levine was never solely responsible for "maintaining" payroll records at the Levine companies.[10]  Like many company employees, Levine did "from time to time" access and make handwritten entries in the payroll ledger.[11]  But he performed these tasks in connection with writing checks for employees and did so for only a "short period of time."[12]  It was, according to both Michael Levine and Carter, the agency accountants Anthony Martone, Joseph Cushner,

---

[4]  Webster lists the five grounds on which it believes it is entitled to summary judgment on pages 1-2 of its brief.
[5]  Soras v. University of New Haven, 154 F. Supp. 2d (D. Conn. 2001).
[6]  B. Levine Depo., Exhibit 1, at 66:23 – 67:4; 72:9-16.
[7]  Id.. at 77:18-22.
[8]  Id. at 78:9-12.
[9]  Id. at 78:11-22.
[10]  Id. at 68:22 – 69:13; 179:19-21.
[11]  Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental Requests for Admissions, Exhibit 2, Response Nos. 18 – 19A.
[12]  M. Levine Depo., Exhibit 3, at 107:24-25. B. Levine Depo., Exhibit 1, at 180:18.

and John Crown, not Levine, who were responsible for maintaining the companies' payroll and accounting records.[13]

Levine's father, Michael Levine, was president of Levine Life Associates, and he made all decisions with respect to compensation and bonuses Levine companies' employees received.[14] But Michael Levine did not have anything to do with the administration of the Profit Sharing Plan.[15] Retirement Planning Associates, Inc., was the third-party administrator of the Plan.[16] Carter, who was co-owner (and later President) of Retirement Planning Associates, was, as Michael Levine states, the "planning administrator" and "major trustee of our profit sharing plan," and as such *did almost anything he wanted to do, without me knowing about it.*"[17] In his role as Plan administrator, Carter supervised another employee, Celeste Calabria, who handled the "technical and clerical" aspects of the plan.[18] Carter was a fiduciary of the Plan and thus he had fiduciary duties under ERISA.

During almost every year from 1980 through 1988 (usually in December), at the companies' offices in Waterford, Connecticut, Carter would approach Levine and tell him that he should waive off his contributions to the Profit Sharing Plan because he (Carter) and Gerald Levine were doing so.[19] Carter would present Levine with waiver forms indicating that he agreed to waive his Plan contributions for the previous calendar

---

[13]  M. Levine Depo., Exhibit 3, at 26:12-14.  D. Carter Depo., Exhibit 4, at 35:24 – 36:5.
[14]  M. Levine Depo., Exhibit 3, at 28:3-4; 50; 55:16-20.
[15]  Id. at 109:11-17; 119:7-13.
[16]  Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 4.
[17]  Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 4.  M. Levine Depo., Exhibit 3, at 109:11-17; 119:7-13.  (emphasis added).
[18]  Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 3.
[19]  B. Levine Depo., Exhibit 1, at 116:6 – 117:8; 126:25 – 127:4.

year.[20]   Relying on what Carter told him, Levine signed waivers in 1980, 1981, 1982, 1983, 1984, 1985, 1987, and 1988.[21]

Carter resented Levine because he was receiving roughly the same compensation as Carter (even though he was younger and had been with the Levine companies for fewer years)[22] so he got back at him the only way he could: by inducing him to waive his plan contributions.[23]   Levine first discovered that Carter misled him in February 2002, when his father gave him a document called Reallocation of Earnings.[24]   The Reallocation document reflects participants' Profit Sharing Plan balances and shows that Levine's balance was far short of where it should have been because of his years of waiving, and much smaller than Carter's and Gerald's, whom he then discovered did not actually waive contributions.[25]

Webster claims that Carter never misled Levine about others waiving, but rather Levine decided to waive because throughout the 1980's he was experiencing financial hardship, and furthermore he was following his father's advice to waive contributions and take the money as taxable income to help him out of these economic troubles.[26]   However, testimony from both Levine and Carter, as well as payroll records, establish that for seven out of the eight years Carter convinced Levine to waive Plan contributions Levine *never* received additional taxable income in lieu of contributions.[27]   Interestingly,

---

[20]   Id. at 117:4-20.
[21]   Id. at 119:21 – 122:7.
[22]   M. Levine Depo., Exhibit 3, at 67:2 – 68:4.
[23]   Id. at 117:15 – 118:6.
[24]   Declaration of B. Levine, Exhibit 1, at ¶6.
[25]   Reallocation of Earnings spreadsheet, Exhibit 6.
[26]   Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 6.
[27]   B. Levine Depo., Exhibit 1, at 116:15-19.  M. Levine Depo., Exhibit 3, at 116:2 – 117:13.  D. Carter Depo., Exhibit 4, at 35:10-20; 37:9 – 38:9.  Barry does not recall whether he received cash in lieu of his 1987 Plan contribution (Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental

for several of the years for which Levine waived, and for which Webster claims that he received substantial sums of cash instead of Plan contributions, Levine's "non-salary" compensation itemized in the payroll records matches *almost exactly* that of Carter's, who was on the same salary tier as Levine and did not waive.[28]  For example, Webster claims that in 1983 Levine received a $13,552.73 bonus payment in lieu of a Plan contribution, and that this figure is reflected in the payroll records.[29]  However, what the records actually show is that Carter's and Levine's non-salary compensation sums were *nearly identical* that year ($77,999 and $77,680, respectively), and certainly didn't vary by $13,552.73.[30]  And according to Michael Levine, any additional bonus paid to an employee due to a Profit Sharing Plan waive-off would "[a]bsolutely" be listed as a separate "line item" on a ledger sheet, apart from any "ordinary" year-end bonus.[31]

Indeed, Levine had no reason to waive his Plan contributions because from 1980 through 1988 (or later), he was not experiencing any sort financial hardship but was doing very well, making over $200,000 per year.[32]  While his income was high, his living expenses were low.[33]  He had extra cash on hand to invest, and did so through CDs, stocks, and limited partnerships.[34]  Furthermore, contrary to what Webster contends, Levine's father never even knew that Levine waived off his contributions and as an experienced financial planner Michael Levine would *never* have encouraged Levine to

---

Requests for Admissions, Exhibit 2, Response No. 30F).  He might have taken such payment in 1988 in order to purchase the condominiums mentioned below (Declaration of B. Levine, Exhibit 1, at ¶1).

[28]  M. Levine Depo., Exhibit 3, at 90:24 – 91:1; 92:2-15.

[29]  Defendant's October 3, 2003 Supplemental Answer to Plaintiff's Interrogatory 14, Exhibit 8.

[30]  D. Carter Depo., Exhibit 4, at 43:1-5.  1983 Levine Life Associates payroll ledger, Exhibit 9.  (The 1983 ledger reflects that non-salary payments were received by Carter on February 18, September 15, October 31, November 28, and December 16; and by Levine on February 18, June 23, September 15, October 31, November 28, December 20, and December 28).

[31]  M. Levine Depo., Exhibit 3, at 116:22 – 117:13.

[32]  B. Levine Depo., Exhibit 1, at 113:4-8.

[33]  Id. at 112:10-16.  M. Levine Depo., Exhibit 3, at 97:18 – 98:4.

[34]  B. Levine Depo., Exhibit 1, at 114:12 – 115:1.

not contribute to a retirement plan.[35] The genesis of Levine's eventual financial troubles was not until 1988 or 1989 when he purchased 21 condominiums as rental properties.[36] Because of increases in taxes, oil prices, and condo fees around the same time he purchased the condos, Levine began to lose money on his investment (he eventually filed for bankruptcy in 1991).[37]

In approximately August of 1990 the stress he experienced from a combination of his financial pressures from the condos, a serious illness his father suffered, and his ex-wife moving out of town with his two young sons caused Levine to suffer from severe depression.[38] Around this time Levine's depression made him temporarily unable to interact with his co-workers and clients in an "upbeat" or "positive" way.[39] In summer 1992 he took a paid leave of absence from the Agency.[40] He continued to work from home during his paid leave of absence.[41] While Levine never returned physically to the Levine companies after his summer 1992 leave of absence (except perhaps to pick up a pay check), and did not perform insurance sales work *at* the companies' offices, he continued to work from home taking clients' calls and answering their questions.[42] In February or March of 1995 Levine signed an Employment Agreement, under which he would receive, for seven years, a weekly salary and company benefits in exchange for being available to perform services for the Levine companies.[43] He continued to work under this Agreement as a W2 employee of the Levine companies through the end of

---

[35] M. Levine Depo., Exhibit 3, at 79:9 – 80:5; 88:11-15; 113:14 – 114:6.
[36] B. Levine Depo., Exhibit 1, at 10:15-16; 15:21-23.
[37] Id. at 15:8 – 19:3.
[38] Id. at 8:7 – 9:9.
[39] Id. at 16:19-25.
[40] Id. at 82:13-17.
[41] Declaration of B. Levine, Exhibit 7, at ¶4,5.
[42] B. Levine Depo., Exhibit 1, at 99:2-7; 184:4-16.
[43] Id. at 100:24 – 101:8. Plaintiff's Responses to Defendant's February 20, 2004 Requests for Admissions, Exhibit 10, Response No. 6. Employment Agreement of B. Levine, Exhibit 11, at 1-5.

1999, and continued to takes clients' calls and meet with clients during this time.[44]  In late 1996, while Levine was still an employee of the Levine companies under the Agreement, he received a call from his father, who told him that the Louis Levine Agency had started a 401(k) Plan.[45]  Although he was eligible to participate, neither Carter nor anyone else informed Levine of the Plan's existence prior to the phone call from his father.[46]

On June 3, 2002, Levine filed an administrative claim with Webster Insurance, Inc., for his Profit Sharing Plan and 401(k) Plan benefits.[47]  Following an October 22, 2004 hearing on the matter, Carter, through counsel, informed Levine on November 8, 2002 that his administrative claim had been denied.[48]  On January 20, 2003, Levine filed suit against Webster Insurance, Inc., for breach of fiduciary duty and breach of plan terms under ERISA.[49]

## III.    LAW AND ARGUMENT

### A.  Summary Judgment Generally

A motion for summary judgment will only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[50]  The moving party

---

[44]    Employment Agreement of B. Levine, Exhibit 11, at 1.  B. Levine Depo., Exhibit 1, at 82:21-24. Declaration of B. Levine, Exhibit 7, at ¶4,5.

[45]    B. Levine Depo., Exhibit 1, at 187:13-18.

[46]    Declaration of B. Levine, Exhibit 7, at ¶7.

[47]    June 3, 2002 letter from Thomas G. Moukawsher, Esquire, to Walter R. Griffin, Esquire, Exhibit 12.

[48]    November 8, 2002 letter from Charles F. Corcoran, Esquire, to Thomas G. Moukawsher, Esquire, Exhibit 13.

[49]    January 20, 2003 Complaint, Exhibit 14.

[50]    Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

carries the burden of demonstrating an absence of a genuine issue of material fact.[51] "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."[52]  Furthermore, "facts, inferences therefrom, and *ambiguities* must be viewed in a light most favorable to the *non-moving* party."[53]  This is true even where the evidence is capable of supporting competing inferences.[54]

## B.  Webster May be Held Liable for the Actions of its Subsidiary.

Webster correctly states the well-settled principle that parent and subsidiary corporations have separate identities.  However, Webster fails to acknowledge that Connecticut courts will disregard the fiction of separate legal identities under two different rules: the identity rule or the instrumentality rule.[55]  The identity rule, which is also referred to as the "alter ego" theory,[56] applies if it can be shown that

> such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.[57]

The purpose of this rule is to "prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities."[58]  The Connecticut Supreme Court in

---

[51]  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[52]  Bryant v. Marffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

[53]  Soras v. University of New Haven, 154 F. Supp. 2d (D. Conn. 2001) (emphasis added).

[54]  Heyman v. Commerce and Industry Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).

[55]  E.g., Tomasso, Inc. v. Armor Constructing & Paving, Inc., 187 Conn. 544, 553-54 (1982); Zaist v. Olson, 154 Conn. 563, 575 (1967).

[56]  See Tomasso, 187 Conn. at 560 n.10.

[57]  Id. at 554 (quoting Zaist, 154 Conn. at 576).

[58]  Id. at 560.

SFA Folio Collections, Inc. v. Bannon stated that it would disregard the separate corporate entities of affiliated corporations if: "(a) the business transactions, property, employees, bank and other accounts and records are intermingled; . . . (d) the respective enterprises are not held out to the public as separate enterprises . . . ."[59]

Courts have consistently held that the identity rule is satisfied when business property, employees, and bank accounts are intermingled. For example, in Zaist the court pierced the corporate veil under the identity rule due in part to the fact that all the corporations controlled by the defendant shared the same office and corporate formalities were disregarded.[60] Further, in Davenport v. Quinn, the court held that the identity rule was satisfied because not only were corporate formalities disregarded, but corporate funds were intermingled among sibling corporations and for personal uses.[61]

In re Silicone Gel Breast Implants Product Liability Litigation[62] demonstrates another of the SFA Folio conditions for disregarding the corporate entity – the enterprise is not held out to the public as being separate. In this case, the plaintiffs sought to pierce the corporate veil of a Bristol-Myers Squibb Co. wholly-owned subsidiary.[63] Although, it was decided in the Northern District of Alabama, the court applied an amalgam of the veil piercing law of "virtually every state."[64] The court, rejecting defendant's motion for summary judgment, held that under both the instrumentality and alter ego theories there

---

[59] 217 Conn. 220, 232-33 (1991) (quoting H. Henn & J. Alexander, Laws of Corporations § 149, at 355-56 (3d ed. 1983)).

[60] 154 Conn. at 576-77; see also Saphir v. Neustadt, 177 Conn. 191, 211 (1979) (noting that no minutes of board of director's meeting were kept, no record of annual elections, and never filed tax return).

[61] 53 Conn. App. 282, 301-03 (1999); see also Toshiba Am. Medical Sys., Inc. v. Mobile Medical Sys., Inc., 53 Conn. App. 484, 488-92 (1999) (piercing the corporate veil due in part to the intermingling of funds between sibling corporations, using corporate funds for personal purposes, not abiding by corporate formalities, and not filing income tax returns).

[62] 887 F. Supp. 1447 (N.D. Ala. 1995).

[63] Id. at 1450.

[64] Id. at 1449.

was sufficient evidence to support piercing the corporate veil.[65]  Particularly, the court found it to be significant that MEC had advertised and branded its products under Bristol's name.[66]

In the instant case, there is a genuine issue of material fact as to whether the corporate veil could be pierced because two of the <u>SFA Folio</u> conditions for disregarding the corporate entity are present.  First, as was the case in <u>Zaist</u> and <u>Davenport</u>, business property, employees, and bank accounts are commingled among the affiliated corporations.  LLIA, Inc., Louis Levine Agency, Inc., and Retirement Planning Associates, Inc. ("RPA") all operate out of the same office.[67]  Further, both Gerald Levine and Carter, who are executives at Webster Insurance, identify this office as their business address.[68]  In addition, key officers are shared between the corporations. Notably, Webster Insurance's President and Chief Executive Officer, John J. Queirolo, also serves as the president of LLIA, Louis Levine Agency, and RPA.[69]  Further, LLIA and Louis Levine Agency's Vice President, Gerald U. Levine, is also an Executive Vice President at Webster Insurance.[70]  LLIA's treasurer, Carter, is also Senior Vice President at Webster Insurance.[71]  Finally, bank accounts were intermingled among the Levine

---

[65] <u>Id</u>. at 1452-53.

[66] <u>Id</u>. at 1453.

[67] Connecticut Secretary of the State Concord website, Corporation Address Detail for LLIA, Inc., <u>Exhibit 15</u>. Connecticut Secretary of the State Concord website, Corporation Address Detail for Louis Levine Agency, Inc., <u>Exhibit 16</u>. Connecticut Secretary of the State Concord website, Corporation Address Detail for Retirement Planning Associates, Inc., <u>Exhibit 17</u>.

[68] Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, <u>Exhibit 5</u>, Answer to Interrogatory No. 1; <u>Exhibits 15, 16 & 17</u>.

[69] Connecticut Secretary of the State Concord website, Principals of LLIA, Inc., <u>Exhibit 18</u>.  Connecticut Secretary of the State Concord website, Principals of Louis Levine Agency, Inc., <u>Exhibit 19</u>. Connecticut Secretary of the State Concord website, Principals of Retirement Planning Associates, Inc., <u>Exhibit 20</u>. Affidavit of John J. Queirolo, Exhibit A of Webster's Local Rule 56(a)(1) Statement, at ¶ 3.

[70] <u>Exhibits 18 & 19</u>.  Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, <u>Exhibit 5</u>, Answer to Interrogatory No. 1.

[71] <u>Exhibit 18</u>; Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, <u>Exhibit 5</u>, Answer to Interrogatory No. 1.

Companies. This is shown by the undisputed facts that the various Levine Companies commingled their income, assets and profits, filed joint tax returns, and paid the salaries of individuals who worked at the various Levine companies out of either Levine Financial Services or Louis Levine Agency.[72] Second, as in In re Silicone, the various Levine Companies are not held out as separate entities from Webster Insurance. For example, in a newspaper advertisement the Webster Insurance name and trademark are both prominently displayed.[73] Furthermore, the advertisement identifies the various business lines represented by each of the Levine Companies as being divisions of Webster.[74]

For the reasons discussed above, Levine submits that Webster Insurance, Inc.,is the proper defendant in this action. However, even if Webster is correct in its argument that Levine has sued the wrong entity, this is not reason to grant its motion for summary judgment and altogether deny Levine legal recourse. The relationships among Webster Financial Corporation, Webster Insurance, Inc., Damman Associates, Inc., and the Levine companies are far from straightforward. Indeed, much about the corporate structure has been revealed to Levine only through the Affidavits and supporting documents supplied to Levine in September 17, 2004 Motion for Summary Judgment.[75] Levine is entitled at trial to examine and cross-examine Webster's witnesses to determine the exact relationship between the entities and in the end move under Rule 15 to conform his Complaint to the proof. Alternatively, if the Court concludes that the information Webster has provided to Levine adequately explains all facets of the business

---

[72] M. Levine Depo., Exhibit 3, at 54:21-55:5.
[73] New London Day advertisement, Mar. 28, 2001, Exhibit 22.
[74] Id.
[75] See Affidavits of John J. Queirolo, Gerald U. Levine, and Daniel M. Carter and supporting documents, Exhibits A, B & G of Webster's Local Rule 56(a)(1) Statement.

relationships, and determines that Levine has not sued the correct entity or entities, it should permit Levine to move under Rule 15 to conform his Complaint to the proof considering his mistake as to the identify of the proper defendant.[76]

## C.  Webster is Not Entitled to Summary Judgment on the Breach of Fiduciary Duty Count in Plaintiff's Complaint.

### 1.  Plaintiff's claim for breach of fiduciary duty is timely and hence not barred by the statute of limitations contained in ERISA §413.

As Webster correctly points out, Section 413 of ERISA gives a plaintiff, in the event of fraud or concealment, six years from the date of discovery of breach or violation to bring an action for such breach of fiduciary duty.  Levine did not discover until February of 2002 that Carter and Gerald Levine did not in fact waive their Plan contributions as Carter had previously represented to him.[77]  He brought his action against Webster in January 2003, less than one year later.  Webster first attempts to undermine Levine's timely action by claiming that he failed to meet Federal Rule of Civil Procedure 9(b)'s requirement that such a fraud claim be plead with particularity.  A 9(b) claim is inappropriate under the circumstances, and furthermore Levine has met the Rule's requirements.

Rule 9(b) requires that a plaintiff allege with particularity the circumstances surrounding the fraud, including "the time, place, speaker, and sometimes even the content of the alleged misrepresentation."[78]  The purpose of the rule is to give the

---

[76] See Fed. R. Civ. P. 15(c)(3).  <u>Villani v. New York Stock Exchange, Inc.</u>,348 F. Supp. 1185, modified rargument granted, aff'd. 489 F.2d 1.  (Leave to amend a complaint by adding a party defendant should ordinarily freely be given).  <u>City of Orangeburg v. Southern Ry. Co.</u>, 45 F. Supp. 734, aff'd. 134 F.2d 890. (Under practice in federal district court, amendments are frequently allowed to bring in the proper parties).
[77] Declaration of B. Levine, <u>Exhibit 7</u>, at ¶6.
[78] <u>Quakine v. MacFarlane</u>, 897 75, 79 (2d Cir. 1990).

defendant proper notice of the factual grounds on which the plaintiff bases his claim of fraud, and to protect defendants from improvident charges of wrongdoing.[79]

None of the elements of fraud in the present case is a mystery to Webster. They have been fully revealed in discovery – particularly through Levine's deposition – and are adequately spelled out in the Complaint. Levine alleges that during December of each year (*time*) Carter (*speaker*) would meet with him in the Levine companies' Waterford offices (*place*) and would falsely lead him to believe that he (Carter) and Gerald Levine were waiving their profit sharing contributions and that Barry was to do so also (*content* of the misrepresentation).

A claim under Rule 9(b) is particularly inapplicable under the present circumstances. Rule 9(b) motions are typically made at the outset of litigation when legal challenges to the sufficiency of the complaint are made and when defendants are trying to find the information they need to mount a legal challenge to the sufficiency of the pleadings. Here, Webster has taken the deposition of Barry Levine, discovery has been completed, and the matter is ready for trial. Presumably, Webster has satisfied its desire for information about the factual basis of the plaintiff's claim. Indeed, if it had not satisfied its desire for factual information, the company surely would have moved for additional time to discover such evidence.

Webster cites Kirk v. Liberty Mut. Ins. Co.[80] as the standard for compliance with Rule 9(b). Webster claims that "[l]ike the plaintiff in Kirk, the plaintiff in this matter has failed to allege how such representation is fraudulent."[81] As stated above, Barry Levine

---

[79] Ross v. Bolton, 904 F. 2d 819 (2d Cir. 1990).
[80] 28 F. Supp. 2d 696 (D. Conn. 1998).
[81] Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 16.

complied with the particularity requirement of Rule 9(b).  A reading of the Kirk decision reveals that the plaintiff in that case does not plead in his complaint the identity, content, or location of the fraud, and that is why the Court determined that the plaintiff's complaint was inadequate.[82]  In addition, Webster states that Kirk also requires that the plaintiff "specifically plead those events which give rise to a strong inference that the defendant [] had an *intent* to defraud, *knowledge of the falsity*, or a reckless disregard for the truth."[83]  Again, while Mr. Kirk did not do so in his complaint,[84] Levine stated that Carter "fraudulently induced Levine to waive" and "knowingly, intentionally and falsely" told Levine that he and Gerald Levine were waiving off their Plan contributions.[85]

Clearly the purpose of Rule 9 (b) has been served and Webster's argument on this point should be rejected. However, should the Court find that additional factual allegations are needed, the plaintiffs respectfully request an opportunity to re-plead the Complaint to add more specific factual allegations.[86]

Webster next attempts to demonstrate that Levine is disqualified under ERISA's six-year limitation by focusing on the word "Waived" that Levine wrote next to his name (and failed to write it next to Carter and Gerald Levine's names) on a sheet depicting Plan contribution figures for one year, 1982, out of the *eight* years Carter induced him to waive Plan contributions.  Webster claims that this notation demonstrates that Levine had

---

[82]  Id.  Kirk, 28 F. Supp. 2d at 701.

[83]  Id. at 700.

[84]  Id. at 701.

[85]  Complaint, Exhibit 14, at 2,4.

[86]  2 Moore's Federal Practice, §9.03[4] (Matthew Bender 3d ed.)(Citing, In re Burlington Coat Factory Securities Litig., 114 F.3d 1410, 1418-1419 (3d Cir. 1997); Firestone v. Firestone, 76 F.3d 1205 (D.C. 1996); Luce v. Edelstein, 802 49 (2d Cir. 1986).  See also, Olsen v. Pratt & Whitney Aircraft, 136 F.3d 273, 276 (2d Cir. 1998)( Where a complaint is dismissed pursuant to Rule 9 (b), the plaintiff is typically given an opportunity to amend the complaint. See e.g. Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986)("Accordingly, although we agree with the district court that the complaint should have been dismissed, we vacated the judgment and remand with directions to the district court to afford the plaintiff the opportunity to file an amended complaint that complied with Rule 9 (b).")

knowledge of the falsity of Carter's statements 20 years before he filed his suit.  As it did in its 9(b) argument, Webster again fails.  Levine did not learn that Carter misled him until February 2002,[87] and the arguments Webster raises in its brief do not demonstrate that he had knowledge earlier than that date.

Webster characterizes the document containing the word "Waived" as a "spreadsheet" prepared by Levine, a term that implies it is a *set of calculations*, even though Levine has denied having performed the computations which appear on the sheet.[88]  By labeling it as such, Webster creates the impression that Levine was an employee who had a role in performing Plan calculations (which he never was) and therefore must have known that Carter and Gerald Levine did not waive.  In reality, this document[89] is nothing more than a set of notes Levine took at a meeting.[90]  At most, these notes and the word "Waived" raise the possibility that Levine did receive cash in 1982 (just as he may have in 1998), and perhaps was not misled by Carter that year.  They do not demonstrate that Levine had, back then, knowledge concerning a whole series of misrepresentations made by Carter over the course of a decade.

Webster attempts to bolster its argument that Levine had knowledge as far back as the early 1980's that others did not waive by stating "*between 1981 and 1984*" Levine's "*employment duties included* accessing, reviewing, analyzing, calculating, and making handwritten entries in payroll ledgers" for the Levine companies.[91]  Like the "spreadsheet" label, this is a mischaracterization of Levine's job at Levine Life

---

[87]  Declaration of B. Levine, Exhibit 7, at ¶6.
[88]   See Plaintiff's Responses to Defendant's February 20, 2004 Requests for Admissions, Exhibit 10, Response No. 33.
[89]  Barry's Levine's handwritten notes, Exhibit 23.
[90]  B. Levine Depo., Exhibit 1, at 171:15 – 178:13.
[91]   Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 18.

Associates is concocted by Webster to make it appear that Levine was the main payroll person. It ignores Levine's deposition testimony stating that he was never solely responsible for "maintaining" payroll records at the Levine companies.[92] It also improperly alters the contents of Levine's responses to Webster's requests for admissions, in which Levine admits only that he did "from time to time" access, review, analyze, calculate, and make handwritten entries in payroll ledgers in 1981 and 1982, but may have stopped as early as 1983.[93] This is quite different from saying Levine's *duties* (a word not contained in Webster's requests for admissions) *were to perform these tasks* during the entire four-year period Webster cites. In addition, Webster states that it "cannot be undisputed [sic]" that Levine handwrote the majority of payroll records from 1981 through 1983.[94] In fact, this *can* be disputed, for Levine states in his deposition testimony that he worked with the payroll ledger for a "short period of time" in connection with writing checks for other employees – such a short period that Michael Levine, the "boss", does not recall him *ever* having done this as part of his job at the Levine companies.[95]

Webster's argument that it should be granted summary judgment based on ERISA Section 413's six-year time limitation should be rejected because it is a subject of this litigation fraught with factual ambiguities in countless places in the record concerning

---

[92] Id. at 68:22 – 69:13; 179:19-21.
[93] See Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental Requests for Admissions, Exhibit 2, Response Nos. 18 – 19C.
[94] Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 18.
[95] M. Levine Depo., Exhibit 3, at 107:24-25. B. Levine Depo., Exhibit 1, at 180:18.

when Levine knew that he had been misled by Carter.  These ambiguities should be construed in Levine's favor because they lead to competing inferences.[96]

**2.  As the agent of and decision maker for the plan administrator Carter was a Plan fiduciary for purposes of plaintiff's claims.**

As Webster contends, whether a person is a fiduciary depends on the functions performed by that person and whether he has discretion or control regarding the management of a plan.[97]  According to Michael Levine, who ran the Levine companies, Carter was the "planning administrator" and "trustee" who "did almost anything he wanted to" with respect to the Profit Sharing Plan, "without [Michael Levine] knowing about it."[98]  Nonetheless, Webster claims that Michael Levine was the only fiduciary connected with the administration of the Profit Sharing Plan, and that any duties Carter had relating to the Plan were "purely ministerial."[99]  It states in its September 17, 2004 summary judgment brief that Dan Carter was the "*technical and clerical* administrator" of the Plan, and insists that Carter "took direction from Michael Levine."[100] Interestingly, more than a year earlier, in its June 4, 2003 interrogatory answers, Webster stated that Celeste Calabria "was responsible for the administration of the Profit Sharing and 401(k) Plans in the *technical and clerical* sense" and "worked under the supervision of Daniel Carter."[101]  This suggests that Calabria "took direction from" Carter (as opposed to Carter taking it from Michael Levine), and is consistent with Michael

---

[96]  Soras v. University of New Haven, 154 F. Supp. 2d (D. Conn. 2001).  Heyman v. Commerce and Industry Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).

[97]  Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 19.

[98]  M. Levine Depo., Exhibit 3, at 109:11-17; 119:7-13.

[99]  Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 16.

[100]  Id. at 21-22.

[101]  Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 1(e).

Levine's deposition testimony that Carter was the decision maker with respect to the Plan.

In its attempt to deny Carter's fiduciary status, Webster also points to the fact that although Carter is named in the SPD as a "Trustee," such duties are "limited to holding and investing plan asset."[102]  This argument is of no use to Webster in resolving the debate over who is the Plan's primary fiduciary agent, because Michael Levine, who is listed *along with* Carter as a Trustee, could point to the same limitation to support *his* position that he is not a Plan fiduciary.  Furthermore, their citation of these Trustees' responsibilities is incompatible with their argument that Carter applied the rules[103] *developed by Michael Levine*, because *both Trustees* have the duty to hold and invest Plan assets "according to policy instructions from the employer."[104]  Again, Michael Levine could deny fiduciary status on these grounds.

Webster is correct that the SPD lists an entity ("the employer") as the administrator, and concedes that some *individual* must actually serve as an agent of the fiduciary.  The disagreement is to who that person was during the time Carter made the misrepresentations to Levine: Carter or Michael Levine.  The SPD does not resolve the issue, but the evidence in the record does point to Carter as being the primary agent of the third party administrator.  Therefore, based on this area of disputed fact, it is not appropriate that this issue be resolved in favor of Webster on summary judgment.

---

[102]  Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 21-22.
[103]  Id. at 21.
[104]  See Summary Plan Description for Levine Life Associates, Inc. Profit Sharing Trust, Exhibit G (Schedule A) of Webster's Local Rule 56(a)(1) Statement.

### 3.   The statements Carter made to Levine were material.

Under Second Circuit law, "misrepresentations are material if they would induce a *reasonable person to rely* upon them."[105]   As Webster asserts in its brief, Michael Levine was the "boss" of the Levine companies.[106]   However, according to the boss, Carter was the "planning administrator" who "did almost anything he wanted to" with respect to the Profit Sharing Plan, "without [Michael Levine] knowing about it."[107] Levine considered Carter, not his father, Michael, to be the person who made the major decisions about how the Plan was run.[108]   And as evidenced by Michael Levine's assessment, as well as Levine's belief, of Carter's role with respect to administration of the Plan, Webster's statement that Carter is "an individual with *no more discretion or authority than the plaintiff over any matter* of the Levine Companies"[109] is not accurate. It was therefore not unreasonable for Levine to have relied on Carter's misrepresentations about others waiving their Plan contributions, especially when the reason Carter gave for himself and Gerald Levine waiving was to reduce plan contributions and thereby increase reinvestment of profits in the Levine companies.[110]

Regardless of whether Carter was "required to disclose" that others were waiving off contributions, he did indeed make such statements to Levine repeatedly over the course of a decade.  Webster is correct that if Carter approached Levine and told him that other similarly-situated Plan participants were jumping off the Brooklyn Bridge,[111] such a

---

[105]   Ballone v. Eastman Kodak Company, 1997 U.S. App. LEXIS *11.  (emphasis added).
[106]   M. Levine Depo., Exhibit 3, at 108-111.
[107]   Id. at 109:11-17; 119:7-13.
[108]   Declaration of B. Levine, Exhibit 7, at ¶2.
[109]   Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 23.
[110]   Declaration of B. Levine, Exhibit 7, at ¶3.
[111]   Webster's September 17, 2004 Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 23.

statement would not be a material misrepresentation with respect to making a decision about Plan participation.    It wouldn't be reasonable for anyone to make a Plan participation decision in reliance on a statement whose subject matter that had nothing to do with the Plan or any aspect of investing or retirement planning.    Likewise, if a 19-year-old student intern at the Levine companies approached Levine and told him that others were waiving Plan contributions and he should too, this statement would not be material, for it would not be reasonable for Levine to rely on the representations of someone with no connection to the Plan's administration.    However, it is not unreasonable for Levine to have relied on statements about the Plan coming from the person who controlled the plan's administration.    Carter's statements were thus material and Webster's motion for summary judgment should be denied on this point.

**D.  Webster is Not Entitled to Summary Judgment on Plaintiff's Claim for Benefits Under the 401(k) Plan.**

**1.  Plaintiff was an employee of the Levine companies and therefore a plan participant.**

Webster contends that Levine was not an employee under ERISA, and was thus not eligible to participate in the 401(k) plan when it was formed in 1996.  However, the Employment Agreement under which Levine was employed, as well as his and his father's testimony, indicates that he was indeed an employee from January 1, 1993 through December 31, 1999.  He had identifiable duties under the Agreement and for such services received compensation and benefits.

Webster tries to characterize the Employment Agreement as a buyout agreement through which Levine was severing his relationship with the Levine companies, and analogizes it to the "Employment Agreements" under which Michael and Herbert Levine

retired from the companies. Michael and Herbert Levine's separation agreements may have been captioned "Employment Agreements," as Levine's was, but it is the content of the agreement that is most critical to the Court's analysis of whether Barry was an employee of the Levine Agency during the period stated in the Agreement. As Michael Levine stated in his deposition, Levine's agreement was "not the same kind of agreement" as his and his brother Herbert's and the "key to the agreement is verbiage dealing with his availability of service."[112] Barry Levine's Agreement states,

> In consideration for his availability *and performance of services*, the Company shall pay to Employee during the term of this Agreement a salary of $45,760.00 per year [. . . .][113]
> . . . .
> In consideration for his services hereunder, the Company agrees to pay Employee fringe benefits comparable to the fringe benefits provided to executive officers of the Company, including group health, dental, accident, life and disability insurance [. . . .] [114]
> . . . .
> The Company shall pay all fees costs and expenses associated with the Employee's licenses which may be required for the sale or servicing of investment and insurance products [. . . .][115]
> . . . .
> Employee shall work at his own schedule with no restrictions and at such location as Employee shall select [. . . .][116]
> . . . .

Levine was an employee under the terms of the Agreement. While the Agreement did not require him to perform specific services within the Levine companies' offices in order to be compensated, it did require him to be available to perform and to perform services at his own schedule. And Levine did actually perform services from the point of his leave of absence in 1992 through 1999 taking clients' calls from home and meeting

---

[112] M. Levine Depo., <u>Exhibit 3</u> at 45:17-18; 70:17-19.
[113] B. Levine Employment Agreement, <u>Exhibit 11</u> 1. (emphasis added).
[114] <u>Id.</u> at 2.
[115] <u>Id.</u>
[116] <u>Id.</u>

with clients.[117]   In return he received compensation and benefits.   At the time the Agreement was executed, the Agency had no 401(k) plan, but if it did this surely would have been included as one of Levine's benefits.   That Levine was free to "engage in alternate employment"[118] (or "seek employment" as Webster characterizes the language) has no bearing on the fact that he was employed by the Agency.   Taking a second job does not negate your employment in your "first" job.

Levine contends that he was an employee pursuant of the Levine companies under an Employment Agreement.   Webster is seeking to characterize the Agreement as another type of agreement in order to deny Levine's employee status and plan participant status under ERISA.   This issue is not appropriate for summary judgment in Webster's favor because both the nature and terms of the Agreement and the duties Levine performed are in dispute, and a reasonable inference could be drawn that Levine was an employee of the Levine companies under the Agreement.

### 2.  Plaintiff's claims are timely and not barred by the statute of limitations.

As Levine stated in his deposition, he found out about the existence of the 401(k) Plan in *late* 1996.[119]   It is not clear whether "late" means at any time after mid-year or on December 31.   Webster claims in its brief that "at [the] time" Levine found out about the Plan he made, through his father, "a claim for benefits under the Plan to Levine Companies."   Levine denies that Michael Levine's informal "oral" inquiry to Gerald Levine or Carter, and the response Michael received that "they weren't going to spend one more penny" on Levine, constituted a formal claim and claim denial.   But even if this exchange *were* an administrative claim and denial, it is not certain how soon after

---

[117]  Declaration of B. Levine, <u>Exhibit 7</u> at ¶4,5.
[118]  B. Levine Employment Agreement, <u>Exhibit 11</u> at 2.
[119]  B. Levine Depo., <u>Exhibit 1</u> at 187:13-18.

Levine's late-1996 discovery of the Plan's existence Michael Levine made his oral inquiry and Gerald Levine or Carter responded.  The exchange may not have been completed until some point in January 1997.  So even if this exchange were a formal claim and denial, it is likely that Levine's January 20, 2003 Complaint[120] *was* filed within the six year limitation period.  Levine certainly did not file his Complaint "approximately seven years" after he learned of the plan's existence, as Webster contends he did – that would be *late* 2003.

Furthermore, it is well-established that a suit for wrongful denial of employee benefits cannot succeed unless a plaintiff has exhausted his administrative remedies first.  Kennedy v. Empire Blue Cross & Blue Shield.[121]  And Levine did file a formal administrative claim in June 2002, which was denied in November 2002.  In Larsen v. NMU Pension Trust,[122] the Court held that the statute of limitations did not begin to run until a pension claimant received a clear written repudiation from the plan fiduciary of her benefit rights.[123]  The court held further that an unclear letter received by the claimant five years earlier did not satisfy the repudiation requirement.[124]  Therefore, aside from the likelihood that Levine did indeed file his suit within six years of the date his father received what Webster asserts is an oral "claim denial" from Carter or Gerald Levine, he may also rely on case law which supports that a clear repudiation is necessary to start the six-year period running, and he did not receive such a repudiation until November 2002, two months before he filed suit against Webster.  Webster is therefore not entitled to summary judgment in its favor on this issue.

---

[120] Webster incorrectly identifies Levine's Complaint as being dated January 23.
[121] 989 F.2d 588 (2d Cir. 1993).
[122] 902 F.2d 1069 (2d Cir 1990).
[123] Id. at 1074.
[124] Id.

**E.  Plaintiff's Claim for Relief Under §502(a)(3) is Equitable in Nature and Appropriate Under ERISA.**

With respect to Levine's claim for individual relief under ERISA §502 (a)(3), Webster claims that individual equitable relief of any kind was denied Levine by virtue of the Supreme Court's decision in <u>Great-West Life Ins. Co. v. Knudson</u>.[125]

Webster's reliance on <u>Great-West Life Ins. Co. v. Knudson</u>[126] is misplaced because it confuses the Supreme Court's declarations in contract-based ERISA claims with its declarations in breach of fiduciary duty cases like <u>Varity Corp. v. Howe</u>.[127] Regardless whether Levine can seek a traditional form of equitable restitution, Webster can seek an injunction ordering plan reinstatement and the payment of additional benefits lost through a breach of fiduciary duty.  The plaintiffs in <u>Varity</u> sought and received exactly that.

The plaintiffs in <u>Varity</u> claimed their employer, acting in its fiduciary capacity, misled them concerning the likely future of the company's benefit plans, causing them to make an ill-informed and ultimately damaging decision regarding their employment status.  The Supreme Court upheld the Eighth Circuit Court of Appeals' ruling that ERISA Section 502 (a)(3) provided individual relief to the plan participants and let stand the unchallenged form of equitable relief crafted by the Eighth Circuit.[128] That relief consisted of a kind of reinstatement, ordering the plaintiffs' former employer to permit their participation in the company benefit program during retirement in the face of both

---

[125]  534 U.S. 204 (2002).
[126]  534 U.S. 204 (2002)
[127]  516 U.S. 489 (1996).
[128]  516 U.S at 515.

their departure from the company and their failure to qualify under the terms of the plan at issue.[129]

In contrast to the <u>Varity</u> plaintiffs, the plaintiff in <u>Great West</u> sought the assistance of the Court in enforcing a contractual provision of its benefit plan requiring plan participants to reimburse the plaintiff insurer for medical payments should the participant recover money for such costs in personal injury litigation.[130]   The Court held that the relief sought by the plaintiff-insurer was not equitable because it was essentially an action in contract seeking damages (as  opposed to benefits), a classic legal action that could not be dressed up as an action in equity regardless of the label placed upon the amounts awarded.[131]   The Court additionally rejected the plaintiff's argument that the money could be deemed restitution because, at least in equity, that remedy typically seeks money that should rightfully be the plaintiffs from an identifiable pool of funds in the possession and control of the defendant.[132]   The contract basis of the claim was at least half the plaintiff's problem in <u>Great West</u>:

> Here, petitioners seek, in essence, to impose personal liability on respondents ***for a contractual obligation to pay money*** -- relief that was not typically available in equity."   A claim for money due and owing under a contract is 'quintessentially an action at law.'"[133]

In contrast to contract remedies, the remedies of a plan participant against a fiduciary are ***exclusively equitable***, and "The most common equitable remedies are [like the one

---

[129]   <u>Howe v. Varity Corp.</u>, 36 F.3d 746, 754-55 (8th Cir. 1994).
[130]   534 U.S. at 206-09.
[131]   <u>Id</u>. at 210-11.
[132]   <u>Id</u>. at 212-14.
[133]    534 U.S. at 210 (citing, <u>Wal-Mart Stores, Inc. v. Wells</u>, 213 F.3d 398, 401 (7th Cir. 2000) (Posner, J.)(emphasis added).

Levine suggests] coercive remedies which force a defendant to act or cease from acting in specified ways."[134]

As Webster points out, since Great-West the Courts have continued to strike down Section 502 (a)(3) claims for damages and claims for remedies of any kind in contract-based claims.  The same holds true for similar rulings from other jurisdictions.[135] Likewise, notwithstanding Great-West, in traditional breach of fiduciary duty cases as opposed to contract cases, the courts have not hesitated to craft appropriate equitable relief. Declaring the payment of interest in a breach of fiduciary duty case appropriate ERISA §502 (a)(3) relief this Court (Arterton, J.) recently employed the distinction advocated here by Levine:

> Further supporting the Court's conclusion that the relief sought here is "appropriate equitable relief" is the fact that the conduct alleged here is a breach of fiduciary duty, rather than a breach of contract. While the Court recognizes that the Supreme Court has made clear that equitable relief under § 502(a)(3) does not mean all relief available for a breach of trust at common law, but instead only "'those categories of relief that were typically available in equity,'" Knudson, 122 S. Ct. at 718 (quoting Mertens, 508 U.S. at 256)), the relief sought by plaintiff here was typically available in equity, and is being sought in a case that could only have gone forward in equity. See 1 Dan B. Dobbs, Law of Remedies, § 4.3(5), at 613 ("The fiduciary accounting for profits was traditionally an equitable claim.").[136]

---

[134]  Restatement (Second) of Trusts  §19, at 433 (1959) and at 7-8 (citing 1 Dan Dobbs, Law of Remedies §2.1 (2) at 59.

[135]   Kishter v. Principal Life Ins. Co., 186 F.Supp. 2d 438,445 (S.D.N.Y. 2002 February 20, 2002)(life insurance benefits lost from third party); Augenello v. Coast-to-Coast Financial Corp., 2002 U.S. Dist LEXIS 14584 *14 (S.D.N.Y. August 7, 2002)(contract-based claim); Arevelo v. Herman, 2002 U.S. Dist. LEXIS 7076 *28-*29 (E.D. Va. April 12, 2002)(damages sought not benefits under defendant's control); DeFelice v. Daspin, 2002 U.S. Dist. LEXIS 11334 *20 (E.D.Pa. June 25, 2002)(damages sought not benefits under defendant's control); Neidich v. Estate of Henry K. Neidich, 2002 WL 31014831 (S.D.N.Y. Sept. 6, 2002)(damages sought not benefits under defendant's control).

[136]   Dobson v. Hartford Fin. Servs., 196 F. Supp. 2d 152, 172 (D.Conn. March 11,  2002).

In <u>Mathews v. Chevron</u>,[137] the Northern District of California addressed a claim for Section 502 (a)(3) relief for breach of fiduciary duty against the requirements of <u>Varity</u> and <u>Great West</u>.  It concluded by creating a remedy analogous to the one Levine seeks here – an injunction ordering plaintiffs be instated into the plan at issue and assured of its benefit:

> A money-damage award is prohibited by ERISA. <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 151 L. Ed. 2d 635, 122 S. Ct. 708, 713 (2002). Equitable relief, however, is not proscribed. <u>Ibid</u>. To do equity and to cure its breach of its own fiduciary duties (based on acts and omissions of its agents), Chevron**,** as the plan administrator and sponsor, is hereby ORDERED to take all steps within its authority to modify the plan records to show that the foregoing six plaintiffs were involuntarily discharged as of the date of their separations, and to ensure that said six plaintiffs are provided the SITE benefit.[138]

Even more recently a similar conclusion was reached by the Northern District of Illinois in <u>Beach v. Commonwealth Edison</u> [139] :

> In his complaint, Beach requests equitable relief in the form of a declaration and injunction that he participate in the Plan. (*See also* "Special damages" under Schedule G of the Am. Final Pretrial Order); <u>Anweiler v. Am. Elec. Power Serv. Corp.</u>, 3 F.3d 986, 993 (7th Cir. 1993)("Equitable relief running to an individual falls within the scope of both [29 U.S.C.] § 1132(a)(3)'s language and ERISA's broad remedial purpose."). The Plan included severance pay, extended health care coverage, life insurance, education assistance and outplacement assistance. (Facts P49.) The parties agree that, had Beach participated in the Plan, he would have received severance pay in the amount of $ 96,091.71. (<u>Id</u>. P50.)[140]

Accordingly, to the extent it rests on a challenge to Levine's claim for relief under ERISA §502(a)(3), Webster's motion for summary judgment should be denied.

---

[137] 2002 U.S. Dist. LEXIS 7738 (April 23, 2002)
[138] Id. at *44-*45.
[139] 2003 U.S. Dist. LEXIS 17675 (October 3, 2003).
[140] Id. at *15-*16.

IV.    **CONCLUSION**

For all of the foregoing reasons, the plaintiff respectfully submits that the Court should deny the defendant's motion for summary judgment.


Respectfully submitted,

THE PLAINTIFF: BARRY LEVINE


By    /s/ Ian O. Smith
        Thomas G. Moukawsher (ct08940)
        Ian O. Smith (ct24135)
        Moukawsher & Walsh, LLC
        328 Mitchell Street, PO Box 966
        Groton, CT  06340
        (860) 445-1809
        His Attorneys

## CERTIFICATION

I hereby certify that on November 5, 2004, a copy of foregoing Plaintiff's Memorandum of Law In Opposition To Defendant's Motion For Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Kristi Dawn Aalberg
Carmody & Torrance
50 Leavenworth St., Po Box 1110
Waterbury, CT 06721-1110
kaalberg@carmodylaw.com

Charles F. Corcoran, III
Carmody & Torrance
195 Church St., PO Box 1950, 18th Floor
New Haven, CT 06509-1950
ccorcoran@carmodylaw.com

/s/ Ian O. Smith
Thomas G. Moukawsher (ct08940)
Ian O. Smith (ct24135)
Moukawsher & Walsh, LLC
21 Oak Street; Suite 209
Hartford, CT 06106
(860) 278-7000