# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BARRY LEVINE | : | CIVIL ACTION NO. |
| | : | 3:03 CV 148 (SRU) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| WEBSTER INSURANCE | : | |
| | : | |
| Defendant | : | NOVEMBER 5, 2004 |

### PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**a. Plaintiff, Barry Levine, hereby submits the following responses, admitting or denying the facts asserted by Webster Insurance, Inc., in its Local Rule 56(a)(1) Statement of Undisputed Facts in Support of its Motion for Summary Judgment:**

1. **Admit.**

2. **Admit.**

3. **Deny.** The totality of facts demonstrates that Webster is not legally separate and distinct from its wholly-owned subsidiary LLIA, Inc. or LLIA's subsidiaries. (Exhibits 15-20, 22. Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 1. Affidavit of John J. Queirolo, Exhibit A of Webster's Local Rule 56(a)(1) Statement, at ¶ 3).

4. **Deny.** Webster has locations in seven different locations in New York and Connecticut, including in Waterford, Connecticut, it is undeterminable which if any is Webster's principal place of business. (Exhibit 21.)

5. **Admit.**

6. **Admit.**

7. **Admit.**

8. **Admit.**

9. **Admit.**

10. **Deny.** The totality of facts demonstrates that Louis Levine Agency, Inc. is not legally separate and distinct from Webster. (Exhibits 15-20, 22. Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 1. Affidavit of John J. Queirolo, Exhibit A of Webster's Local Rule 56(a)(1) Statement, at ¶ 3).

11. **Admit.**

12. **Admit.**

13. **Deny.** The totality of facts demonstrates that Retirement Planning Associates, Inc. is not legally separate and distinct from Webster. (Exhibits 15-20, 22. Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 1. Affidavit of John J. Queirolo, Exhibit A of Webster's Local Rule 56(a)(1) Statement, at ¶ 3).

14. **Admit.**

15. **Admit.**

16. **Admit.**

17. **Admit.**

18. **Admit.**

19. **Admit.**

20. **Admit.**

21. **Admit.**

22. **Deny.** While the business was run under one roof and assets may have been commingled there were still processes that were followed. For example, Barry Levine needed Gerald Levine and Herbert Levine's permission to transfer to Levine Financial. (M. Levine Depo., Exhibit 3, at 105:10-13).

23. **Deny.** Michael Levine made business decisions concerning compensation levels and bonuses, but he was not in charge of operations for all of the Levine Companies. (M. Levine Depo., Exhibit 3, at 37:7-10; 109:12-17; 114:20-23).

24. **Deny.** Michael Levine made business decisions concerning compensation levels and bonuses, but did not make all of the decisions concerning the administration of the Profit Sharing Plan. (M. Levine Depo., Exhibit 3, at Depo. p. 55:16 – 56:2; 109:12-17; 114:20-23).

25. **Admit.**

26. **Admit.**

27. **Deny.** Dan Carter took no direction from Michael Levine concerning the administration of the Profit Sharing Plan. (M. Levine Depo., Exhibit 3, at 109:12-17; 114:20-23).

28. **Admit.**

29. **Deny.** Daniel Carter had authority over the plaintiff concerning decisions relating to the Profit Sharing Plan. (M. Levine Depo., Exhibit 3, at 109:12-17; 114:20-23).

30.   **Deny.**   Between 1980 and 1982, the Levine companies maintained only Leveine Life Associates, Inc. Profit Sharing Trust.  However, in approximately 1983 the name of this plan was changed to Louis Levine Agency, Inc. Profit Sharing Plan & Trust. (Affidavit of Daniel Carter, Exhibit G of Webster's Local Rule 56(a)(1) Statement, at ¶¶ 6-7.)

31.  **Admit.**

32.  **Admit.**

33.  **Admit.**

34.  **Admit.**

35.   **Deny.**   At all times between 1980 and 1982 the Profit Sharing Plan was administered in the technical and clerical sense by Celeste Calabria, who was supervised by Daniel Carter, who "did almost anything he wanted to do" with respect to running the Plan.  (Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 3. M. Levine Depo., Exhibit 3, at 109:12-17; 114:20-23).

36.  **Admit.**

37.  **Admit.**

38.  **Deny.**  Michael Levine did not have "final approval of all of the decisions as to the operation of the plan."  (M. Levine Depo., Exhibit 3, at 109:12-17; 114:20-23).

39.   **Deny.**   Michael Levine determined the amount of contributions but did not direct Carter to make them, as Carter was the Plan administrator who "did almost anything he wanted to do" with respect to running the Plan.  (M. Levine Depo., Exhibit 3, at 109:12-17; 114:20-23).

40. **Deny.** Daniel Carter "did almost anything he wanted to do" with respect to running the Plan, often "without [Michael Levine] knowing about it." (M. Levine Depo., Exhibit 3, at 109:12-17; 114:20-23).

41. **Deny.** Daniel Carter "did almost anything he wanted to do" with respect to running the Plan, often "without [Michael Levine] knowing about it." (M. Levine Depo., Exhibit 3, at 109:12-17; 114:20-23).

42. **Admit.**

43. **Admit.**

44. **Deny.** Michael Levine did not know his son was waiving contributions, and did not direct Daniel Carter to obtain waivers from Barry Levine. (M. Levine Depo., Exhibit 3, at 79:9 – 80:5; 88:11-15; 113:14 – 114:6).

45. **Deny.** With the exception of possibly one year (1988) plaintiff did not take the amount that would have been contributed to his profit sharing plan account as taxable income in any year. (Declaration of B. Levine, Exhibit 1, at ¶ X. B. Levine Depo., Exhibit 1, at 116:15-19. M. Levine Depo., Exhibit 3, at 116:2 – 117:13. D. Carter Depo., Exhibit 4, at 35:10-20; 37:9 – 38:9. Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental Requests for Admissions, Exhibit 2, Response No. 30F).

46. **Admit.**

47. **Admit.**

48. **Admit.**

49. **Admit.**

50. **Admit.**

51. **Deny.** Plaintiff's duties never included "maintaining" the payroll records for the Levine Companies. (B. Levine Depo., Exhibit 1, at 179:19-21).

52. **Deny.** Based on the payroll records, plaintiff did from time to time access, open, look at, read, review, analyze, conduct calculations, and make handwritten entries or notations in the payroll records for the Levine Agency for the years 1981 and 1982, but may have stopped doing such things at some in 1983 or 1984. (Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental Requests for Admissions, Exhibit 2, Response Nos. 18 – 18C).

53. **Admit.**

54. **Admit.**

55. **Admit.**

56. **Deny.** In the late summer or fall of 1992, while plaintiff was on a leave of absence, he learned that he was not allowed to return to the offices of the Levine Agency. (Plaintiff's March 25, 2004 Responses to Defendant's February 20, 2004 Requests for Admissions Directed to Plaintiff, Exhibit 10, Response No. 4).

57. **Deny.** Subsequent to learning in the late summer or fall of 1992 that he would not be allowed to return to the Levine Agency offices he never performed services for the Agency in the Agency's offices, but did perform services on behalf of the Agency taking clients' calls at home and answering their questions. (B. Levine Depo., Exhibit 1, at 99:2-7; 184:4-16).

58. **Deny.** The plaintiff and the Levine Agency executed an agreement captioned "Employment Agreement" dated January 1, 1993. But this agreement did not evidence plaintiff's termination from the Levine Companies because it paid him a weekly salary,

allowed him to be covered by company health benefits, and assigned him the duties of being able to perform service at the agency.  (B. Levine Depo., Exhibit 1, at 100:24 – 101:8.  Plaintiff's March 25, 2004 Responses to Defendant's February 20, 2004 Requests for Admissions Directed to Plaintiff, Exhibit 10, Response No. 6.   Employment Agreement of B. Levine, Exhibit 11, at 1-5.).

59.  **Deny.**  The Employment Agreement was indeed an employment agreement, and not a severance or "salary-continuation agreement."  (B. Levine Depo., Exhibit 1, at 100:24 – 101:8.  Plaintiff's March 25, 2004 Responses to Defendant's February 20, 2004 Requests for Admissions Directed to Plaintiff, Exhibit 10, Response No. 6.  Employment Agreement of B. Levine, Exhibit 11, at 1-5.).

60.  **Admit.**

61.  **Deny.**  The stock served as some of the consideration for the plaintiff's Employment Agreement (not his "so-called" Employment Agreement, as Webster characterizes it).  (Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental Requests for Admissions, Exhibit 2, Response No. 9A).

62.  **Admit.**

63.  **Deny.**  The Employment agreement (not the "so-called" Employment Agreement, as Webster characterizes it) states "in consideration for [Levine's] availability and performance of services [. . . .]" and allowed him to "work at his own schedule" and therefore required Levine to perform services.  (Employment Agreement of B. Levine, Exhibit 11, at 1, 2).

64.  **Admit.**

65.  **Admit.**

66. **Admit.**

67. **Admit.**

68. **Deny.**  Plaintiff must deny this statement because Webster has not supplied him with a copy of Herbert Levine's Agreement and does not provide a cite for or exhibit in support of the statement contained in paragraph 68 of its 56(a)(1) statement.

69. **Deny.**  Plaintiff must deny this statement because the page of Michael Levine's deposition transcript to which Webster cite does not support this statement, and Webster has also failed to supply a copy of the Agreement to which it refers (*see* Paragraph 68, above).

70. **Admit.**

71. **Deny.**  During the period covered by the Employment Agreement, Levine was employed by the Levine companies and applied for and received unemployment compensation because he was advised to do so by his father because of a delay in his paycheck.  (Employment Agreement of B. Levine, <u>Exhibit 11</u>.  B. Levine Depo., <u>Exhibit 1</u>, at 183:19-24).

72. **Admit.**

73. **Deny.**  Michael Levine's oral inquiry to Carter and/or Gerald Levine about the 401(k) Plan was not an administrative claim on behalf of Levine.  Levine first filed a formal administrative claim with Webster on June 3, 2002.  Following a hearing, this claim was denied on November 8, 2002.  (June 3, 2002 letter from Thomas G. Moukawsher, Esquire, to Walter R. Griffin, Esquire, <u>Exhibit 12</u>.  November 8, 2002 letter from Charles F. Corcoran, Esquire, to Thomas G. Moukawsher, Esquire, <u>Exhibit 13.</u>)

74.  **Deny.**  Michael Levine's oral inquiry to Carter and/or Gerald Levine about the 401(k) Plan was not an administrative claim on behalf of Levine.  Levine first filed a formal administrative claim with Webster on June 3, 2002.  Following a hearing, this claim was denied on November 8, 2002.  (June 3, 2002 letter from Thomas G. Moukawsher, Esquire, to Walter R. Griffin, Esquire, Exhibit 12.  November 8, 2002 letter from Charles F. Corcoran, Esquire, to Thomas G. Moukawsher, Esquire, Exhibit 13.)

**b.  Barry Levine hereby lists the following issues of material fact as to which he contends there is a genuine issue to be tried:**

1.  Levine started at Levine Life Associates in early 1975 after attending the University of Vermont.[1]

2.  When Levine began his job, his first responsibility was studying for insurance licensing exams and obtaining the licenses that would enable him to sell insurance products.[2]

3.  As soon as he was licensed to sell insurance, he began a successful career of selling insurance.[3]

4.  In 1990 or 1991 Levine switched to the Louis Levine Agency, where he continued to do the same type of insurance sales work.[4]

5.  As a life insurance specialist and "salesman" with various industry certificates and designations, Levine was never solely responsible for "maintaining" payroll records at the Levine companies.[5]

---

[1]  B. Levine Depo., Exhibit 1, at 66:23 – 67:4; 72:9-16.
[2]  Id.. at 77:18-22.
[3]  Id. at 78:9-12.
[4]  Id. at 78:11-22.
[5]  Id. at 68:22 – 69:13; 179:19-21.

6.  Like many Levine company employees, Levine did from time to time access and make handwritten entries in the payroll ledger.[6]

7.  Levine these accessed and made handwritten notations in the payroll ledger in connection with writing checks for employees and did so for only a short period of time.[7]

8.  It was the agency accountants Anthony Martone, Joseph Cushner, and John Crown, not Levine, who were responsible for maintaining the companies' payroll and accounting records.[8]

9.  Levine's father, Michael Levine, was president of Levine Life Associates, and he made all decisions with respect to compensation and bonuses Levine companies' employees received.[9]

10.  Michael Levine did not have anything to do with the administration of the Profit Sharing Plan.[10]

11.  Retirement Planning Associates, Inc., was the third-party administrator of the Plan.[11]

12.  Carter, who was co-owner (and later President) of Retirement Planning Associates, did almost anything he wanted to do with respect to administering the Profit Sharing Plan without Michael Levine knowledge.[12]

---

[6]  Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental Requests for Admissions, Exhibit 2, Response Nos. 18 – 19A.

[7]  M. Levine Depo., Exhibit 3, at 107:24-25. B. Levine Depo., Exhibit 1, at 180:18.

[8]  M. Levine Depo., Exhibit 3, at 26:12-14.  D. Carter Depo., Exhibit 4, at 35:24 – 36:5.

[9]  M. Levine Depo., Exhibit 3, at 28:3-4; 50; 55:16-20.

[10]  Id. at 109:11-17; 119:7-13.

[11]  Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 4.

[12]  Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 4.  M. Levine Depo., Exhibit 3, at 109:11-17; 119:7-13.  (emphasis added).

13.  In his role as Plan administrator, Carter supervised another employee, Celeste Calabria, who handled the technical and clerical aspects of the plan.[13]

14.  During almost every year from 1980 through 1988 (usually in December), at the companies' offices in Waterford, Connecticut, Carter would approach Levine and tell him that he should waive off his contributions to the Profit Sharing Plan because he (Carter) and Gerald Levine were doing so.[14]

15.  During almost every year from 1980 through 1988 (usually in December), at the companies' offices in Waterford, Connecticut, Carter would present Levine with waiver forms indicating that he agreed to waive his Plan contributions for the previous calendar year.[15]

16.  Relying on what Carter told him about Carter and Gerald Levine waiving Plan contributions, Levine signed waivers in 1980, 1981, 1982, 1983, 1984, 1985, 1987, and 1988.[16]

17.  Carter resented Levine because he was receiving roughly the same compensation as Carter (even though he was younger and had been with the Levine companies for fewer years)[17] so he got back at him the only way he could: by inducing him to waive his plan contributions.[18]

---

[13]    Defendant's June 24, 2003 Answers and Objections to Plaintiff's First Set of Interrogatories and Production Requests to Defendant, Exhibit 5, Answer to Interrogatory No. 3.

[14]  B. Levine Depo., Exhibit 1, at 116:6 – 117:8; 126:25 – 127:4.

[15]  Id. at 117:4-20.

[16]  Id. at 119:21 – 122:7.

[17]  M. Levine Depo., Exhibit 3, at 67:2 – 68:4.

[18]  Id. at 117:15 – 118:6.

18.   Levine first discovered that Carter misled him about the Profit Sharing Plan in February 2002, when his father gave him a document called Reallocation of Earnings.[19]

19.   The Reallocation of Earnings document reflects participants' Profit Sharing Plan balances and shows that Levine's balance was far short of where it should have been because of his years of waiving, and much smaller than Carter's and Gerald's, whom he then discovered did not actually waive contributions.[20]

20.   Testimony from both Levine and Carter, as well as payroll records, establish that for seven out of the eight years Carter convinced Levine to waive Plan contributions Levine *never* received additional taxable income in lieu of contributions.[21]

23.   For several of the years for which Levine waived, and for which Webster claims that he received substantial sums of cash instead of Plan contributions, Levine's "non-salary" compensation itemized in the payroll records matches *almost exactly* that of Carter's, who was on the same salary tier as Levine and did not waive.[22]

24.   Webster claims that in 1983 Levine received a $13,552.73 bonus payment in lieu of a Plan contribution, and that this figure is reflected in the payroll records.[23]

25.   Payroll records show that Carter's and Levine's non-salary compensation sums were *nearly identical* that year ($77,999 and $77,680, respectively), and did not vary by $13,552.73.[24]

---

[19]  Declaration of B. Levine, Exhibit 1, at ¶6.

[20]  Reallocation of Earnings spreadsheet, Exhibit 6.

[21]  B. Levine Depo., Exhibit 1, at 116:15-19.  M. Levine Depo., Exhibit 3, at 116:2 – 117:13.  D. Carter Depo., Exhibit 4, at 35:10-20; 37:9 – 38:9.  Barry does not recall whether he received cash in lieu of his 1987 Plan contribution (Plaintiff's May 12, 2004 Responses to Defendant's Modified and Supplemental Requests for Admissions, Exhibit 2, Response No. 30F).  He might have taken such payment in 1988 in order to purchase the condominiums mentioned below (Declaration of B. Levine, Exhibit 1, at ¶1).

[22]  M. Levine Depo., Exhibit 3, at 90:24 – 91:1; 92:2-15.

[23]  Defendant's October 3, 2003 Supplemental Answer to Plaintiff's Interrogatory 14, Exhibit 8.

26. According to Michael Levine, any additional bonus paid to an employee due to a Profit Sharing Plan waive-off would be listed as a separate "line item" on a ledger sheet, apart from any ordinary year-end bonus.[25]

27. Levine had no reason to waive his Plan contributions because from 1980 through 1988 (or later), he was not experiencing any sort financial hardship but was doing very well, making over $200,000 per year.[26]

28. While Levine's income was high throughout the 1980's, his living expenses were low.[27]

29. Throughout the 1980's Levine had extra cash on hand to invest, and did so through CDs, stocks, and limited partnerships.[28]

30. Levine's father never even knew that Levine waived off his contributions and as an experienced financial planner Michael Levine would never have encouraged Levine to not contribute to a retirement plan.[29]

31. The genesis of Levine's eventual financial troubles was not until 1988 or 1989 when he purchased 21 condominiums as rental properties.[30]

32. Because of increases in taxes, oil prices, and condo fees around the same time he purchased the condos, Levine began to lose money on his investment (he eventually filed for bankruptcy in 1991).[31]

---

[24] D. Carter Depo., Exhibit 4, at 43:1-5. 1983 Levine Life Associates payroll ledger, Exhibit 9. (The 1983 ledger reflects that non-salary payments were received by Carter on February 18, September 15, October 31, November 28, and December 16; and by Levine on February 18, June 23, September 15, October 31, November 28, December 20, and December 28).

[25] M. Levine Depo., Exhibit 3, at 116:22 – 117:13.

[26] B. Levine Depo., Exhibit 1, at 113:4-8.

[27] Id. at 112:10-16. M. Levine Depo., Exhibit 3, at 97:18 – 98:4.

[28] B. Levine Depo., Exhibit 1, at 114:12 – 115:1.

[29] M. Levine Depo., Exhibit 3, at 79:9 – 80:5; 88:11-15; 113:14 – 114:6.

[30] B. Levine Depo., Exhibit 1, at 10:15-16; 15:21-23.

[31] Id. at 15:8 – 19:3.

Case 3:03-cv-00148-SRU    Document 45    Filed 11/05/2004    Page 14 of 16

33.   In approximately August of 1990 the stress Levine experienced from a combination of his financial pressures from the condos, a serious illness his father suffered, and his ex-wife moving out of town with his two young sons caused Levine to suffer from severe depression.[32]

34.   Around August of 1990 Levine's depression made him temporarily unable to interact with his co-workers and clients in an upbeat or positive way.[33]

35.   In summer 1992 Levine took a paid leave of absence from the Agency.[34]

36.   Levine continued to work from home during his paid leave of absence.[35]

37.   While Levine never returned physically to the Levine companies after his summer 1992 leave of absence (except perhaps to pick up a pay check), and did not perform insurance sales work *at* the companies' offices, he continued to work from home taking clients' calls and answering their questions.[36]

38.   In February or March of 1995 Levine signed an Employment Agreement, under which he would receive, for seven years, a weekly salary and company benefits in exchange for being available to perform services for the Levine companies.[37]

39.   Levine continued to work under the Employment Agreement as a W2 employee of the Levine companies through the end of 1999, and continued to takes clients' calls and meet with clients during this time.[38]

---

[32] Id. at 8:7 – 9:9.
[33] Id. at 16:19-25.
[34] Id. at 82:13-17.
[35] Declaration of B. Levine, Exhibit 7, at ¶4,5.
[36] B. Levine Depo., Exhibit 1, at 99:2-7; 184:4-16.
[37] Id. at 100:24 – 101:8.  Plaintiff's Responses to Defendant's February 20, 2004 Requests for Admissions, Exhibit 10, Response No. 6.  Employment Agreement of B. Levine, Exhibit 11, at 1-5.
[38]   Employment Agreement of B. Levine, Exhibit 11, at 1.  B. Levine Depo., Exhibit 1, at 82:21-24. Declaration of B. Levine, Exhibit 7, at ¶4,5.

40.  In late 1996, while Levine was still an employee of the Levine companies under the Agreement, he received a call from his father, who told him that the Louis Levine Agency had started a 401(k) Plan.[39]

41.  Although he was eligible to participate, neither Carter nor anyone else informed Levine of the Plan's existence prior to the phone call from his father.[40]

42.  On June 3, 2002, Levine filed an administrative claim with Webster Insurance, Inc., for his Profit Sharing Plan and 401(k) Plan benefits.[41]

43.  Following an October 22, 2004 hearing on the matter, Carter, through counsel, informed Levine on November 8, 2002 that his administrative claim had been denied.[42]

44.  On January 20, 2003, Levine filed suit against Webster Insurance, Inc., for breach of fiduciary duty and breach of plan terms under ERISA.[43]


Respectfully submitted,

THE PLAINTIFF: BARRY LEVINE


By /s/ Ian O. Smith
     Thomas G. Moukawsher (ct08940)
     Ian O. Smith (ct24135)
     Moukawsher & Walsh, LLC
     328 Mitchell Street, PO Box 966
     Groton, CT  06340
     (860) 445-1809
     His Attorneys

---

[39]  B. Levine Depo., Exhibit 1, at 187:13-18.
[40]  Declaration of B. Levine, Exhibit 7, at ¶7.
[41]  June 3, 2002 letter from Thomas G. Moukawsher, Esquire, to Walter R. Griffin, Esquire, Exhibit 12.
[42]  November 8, 2002 letter from Charles F. Corcoran, Esquire, to Thomas G. Moukawsher, Esquire, Exhibit 13.
[43]  January 20, 2003 Complaint, Exhibit 14.

**CERTIFICATION**

I hereby certify that on November 5, 2004, a copy of foregoing Plaintiff's Local Rule 56(A)(2) Statement of Undisputed Facts in Support of its Objection to Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Kristi Dawn Aalberg
Carmody & Torrance
50 Leavenworth St., Po Box 1110
Waterbury, CT 06721-1110
kaalberg@carmodylaw.com

Charles F. Corcoran, III
Carmody & Torrance
195 Church St., PO Box 1950, 18th Floor
New Haven, CT 06509-1950
ccorcoran@carmodylaw.com

                              /s/ Ian O. Smith
                              Thomas G. Moukawsher (ct08940)
                              Ian O. Smith (ct24135)
                              Moukawsher & Walsh, LLC
                              21 Oak Street; Suite 209
                              Hartford, CT 06106
                              (860) 278-7000