# EXHIBIT 1

1          UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2

3   - - - - - - - -  - - - - - -X
                                 :
4   BARRY LEVINE,                :
                Plaintiff,       :
5                                :
    VS                           :CIVIL ACTION NO:
6                                : 3:03CV148(SRU)
    WEBSTER INSURANCE,           :
7              Defendant.        :
                                 :
8   - - - - - - - - - - - - - -X

9                                    *COPY*

10

11

12

13     Deposition of BARRY LEVINE, taken pursuant to the
    *Federal Rules of Civil Procedure*, before Kimberly M.
14  White, CSR, LSR, (Lic#SHR433) Licensed Shorthand
    Reporter and Notary Public within and for the State
15  of Connecticut, held at the law offices of Carmody &
    Torrance LLP, 195 Church Street, New Haven,
16  Connecticut, on Tuesday, December 23, 2003 at 10:14
    a.m.
17

18

19

20

21

22          DEL VECCHIO REPORTING SERVICES
            LICENSED SHORTHAND REPORTERS
23               117 RANDI DRIVE
               MADISON, CT 06443
24     203-245-9583 FAX 203-245-2760   800-839-6867

25   HARTFORD                              STAMFORD

1      A    Generally, it just falls into the category

2   of depression -- is basically the general description

3   that I can give.

4      Q    Okay.  And, again, going back in your

5   memory, can you tell me when it was that you first

6   became -- break this into two parts -- first of all,

7   did you suffer from depression in general before you

8   claim that it was so severe as to be disabling?

9      A    Not that I believe.

10     Q    Okay.  So there was a point in time when you

11  became, in effect, cripplingly depressed and,

12  therefore, disabled?  Is that --

13     A    I don't know if I would use the word

14  "crippling."

15     Q    Don't take my word.

16     A    Okay.  But --

17     Q    Severely depressed.

18     A    Yes.

19     Q    Okay.  And about when was that?

20     A    That was August, 1990.

21     Q    And was -- as you look back on it, was there

22  a reason for that that you can attribute to it or as

23  a complete or partial explanation for what happened

24  to you?  Is there something that happened in your

25  life at that point?

*** CONFIDENTIAL ***

1    A    I mean, probably many things happening.

2    Q    Okay.

3    A    So, you know, that's probably the reason for

4    it.  I was experiencing many emotional problems at

5    the same time.

6    Q    And that was in August of 1990?

7    A    Yes.

8    Q    Before that were you generally okay?

9    A    Yes.

10    Q    Were you able to function generally

11    speaking?

12    A    Yes.

13    Q    Okay.  So something -- a series of things in

14    your life came together in August of 1990 which made

15    it --  I'm asking you; I'm not telling you -- which

16    made it impossible for you to function?

17    A    In my usual manner, that's correct.

18    Q    Okay.  Can you tell me what they were.

19    A    I was experiencing tremendous financial

20    pressures.  That's one.  Secondly, my children were

21    moved out of town; and thirdly, my father became ill.

22    Q    Okay.  All around the summer of 1990?

23    A    All in August of 1990.

24    Q    Okay.  Which was the biggest -- if you can

25    look back on it, which was the biggest of the three?

1      A      I wouldn't necessarily say that any of them

2    were big.  They were all major incidents in my life.

3    Each one --

4      Q      All right.

5      A      -- not more or less important than the

6    other.

7      Q      Fine.  I understand.

8            Tell me what the financial -- tell me in

9    general what was the source of the financial

10   pressures which you were experiencing in August of

11   1990.

12     A      My financial pressures were related to the

13   ownership I had in real estate.

14     Q      Okay.  And what was that?

15     A      Specifically, the 21 condominiums that I had

16   purchased.

17     Q      You bought 21 condos?

18     A      Yes.

19     Q      Okay.  And when did you do that?

20     A      I believe they were purchased throughout, on

21   four separate occasions in 1988.

22     Q      This was during the boom market when condos

23   were being built in great numbers?

24     A      Actually, they were conversions.

25     Q      Uh-huh.

1      A     So they weren't new construction.  But, yes,

2   it was during the time of the real estate boom --

3      Q     Okay.

4      A     -- so to speak.

5      Q     Were -- there were four different purchasing

6   events?  Is that what you're saying?

7      A     Yes.

8      Q     You bought them in clumps, in other words,

9   four clumps?

10     A     Four different occasions, purchases, yes.

11     Q     Can you remember where they were and about

12  when you bought them?  Withdrawn.

13           Let's talk about the first clump, about when

14  that was and what you bought and what you paid.

15     A     Well, the first one wasn't exactly a clump

16  because I purchased one condominium --

17     Q     Okay.

18     A     -- in early 1988, I believe was the date.  I

19  can't be exactly sure of when that date was, but I

20  believe it was earlier in 1988 I purchased one condo

21  unit.

22     Q     Where?

23     A     Pine Ridge Condominiums, Norwich,

24  Connecticut.

25     Q     Okay.  And how much did you pay?

```
 1     A     $106,000.

 2     Q     Okay.  And did you subsequently sell that

 3   unit?

 4     A     No.

 5     Q     What happened?

 6     A     It was foreclosure.

 7     Q     Okay.  And when was the foreclosure?

 8     A     Well, I don't know if it was exactly fully

 9   foreclosed.  It was part of the bankruptcy

10   proceedings.

11     Q     Okay.  You filed bankruptcy and it was taken

12   from you?

13     A     Yes.  I surrendered it during the bankruptcy

14   period.

15     Q     Let's talk about the second purchase event.

16   Did you buy more than one the second time?

17     A     Yes.  Well, what happened was, the -- I

18   purchased the first one for 106,000.  That included

19   the fees are all paid for one year, and I had it

20   appraised.  It was appraised at $130,000.  So I did

21   the math and realized just by making this purchase, I

22   had, essentially, made a paper profit of 24,000.  So

23   I purchased four condominiums within the three months

24   following that time.

25     Q     Same place?
```

1      A     Same place; same price; same terms.

2      Q     So that was 424?

3      A     $424,000.

4      Q     And they were ultimately lost by foreclosure

5  or through bankruptcy?

6      A     All 21 condominiums got treated exactly the

7  same --

8      Q     Okay.

9      A     --  in terms of the -- when I forfeited the

10  property.

11      Q     Let's take the third clump.  When was that?

12      A     The third clump was within three months of

13  the second purchase, and I purchased eight

14  condominiums.

15      Q     Pine Ridge?

16      A     Pine Ridge, Norwich, Connecticut.

17      Q     What was it about Pine Ridge that you liked?

18      A     They were beautiful three-bedroom

19  townhouses, two full baths, in a good location; and

20  like I mentioned, they appraised at a high-dollar

21  value, and they were easily rentable.

22            And, actually, part of the reason was, I

23  was -- when I purchased those units, I was given a

24  one-year lease with a tenant right from the start.

25      Q     Okay.  And then the fourth clump.

*** CONFIDENTIAL ***

```
 1        A     The fourth clump was another purchase of
 2   eight condominiums --
 3        Q     Okay.
 4        A     -- within a two- or three-month period of
 5   the third purchase --
 6        Q     All right.
 7        A     -- bringing the total to 21.
 8        Q     And at some point -- okay.  Withdrawn.
 9              Were they all rented when you bought them?
10        A     Every one of them.
11        Q     They all had tenants?
12        A     Yes.
13        Q     Were they all carrying themselves
14   financially or did you have to include some
15   additional --
16        A     No.  Actually, there was a -- there was a
17   cash flow to me during the first year.
18        Q     Okay.  So what happened after that?
19        A     What happened to make them more costly was
20   two events actually:  Firstly, the City of Norwich
21   revised the method of upon which the property taxes
22   were calculated.  Initially, they were taxed as
23   apartments with a low property tax, and they decided
24   to now tax them as condominiums -- I guess rightfully
25   so because that's what they were -- and that expense
```

1    jumped.

2        Q    Okay.

3        A    In addition, which I mentioned earlier that

4    the fees were included in the first year, some of

5    those fees included heat and hot water provided for

6    the tenants, and oil prices increased tremendously in

7    the late 80s.

8             So I was crippled by increased oil through

9    the condominium fee and increased property taxes by

10   the City of Norwich.

11       Q    Did you lose tenants?

12       A    No, I didn't lose tenants.  Actually, I

13   entered into a contract with the Coast Guard Academy,

14   and they rented as many as I could provide them at a

15   higher rate.

16       Q    But there was still a cash flow -- there was

17   still a gap?

18       A    There was a gap, but I never experienced --

19   it would have been rare to have a month of being

20   empty.  It just -- it --

21       Q    Okay.  These purchases were completed by

22   late 1989, correct?

23       A    Or even earlier than that.

24       Q    Okay.  But that was about the same --

25   shortly after to you bought the fourth clump, your

```
 1    taxes shot up and your heating costs shot up?

 2         A    Yes.

 3         Q    So what was the -- again, this is a long

 4    time ago; and if you don't remember specifically, I

 5    understand.  If you do remember generally, I would

 6    appreciate you telling me.  What was, on a per-unit

 7    basis, what were you having to put in to keep it

 8    going as of 1990 when you became depressed?

 9         A    Well, I don't have those exact math

10    numbers --

11         Q    I understand.

12         A    -- but I know for every $100 a month

13    per-unit cost increased, it turned into $2,100.

14         Q    Right.

15         A    So I was experiencing an increased cost of,

16    maybe, in the oil, it would have been somewhat less

17    than that, and the property taxes somewhat more.  So

18    roughly, to answer your question, approximately 200 a

19    month more cost per-unit times 21.  So I was looking

20    at 4,000 additional expense that I hadn't incurred

21    the year before.

22         Q    Okay.  Did it get worse or was that as bad

23    as it got?

24         A    No, that was as bad as it got.

25         Q    It was bad enough?
```

1        A       It was bad enough.

2        Q       All right.  It looks like -- is that

3    possible?  It looks like you were running -- it looks

4    like you had a shortfall of about 90,000 a year.

5        A       No.  I think the number's closer to 50.

6        Q       Well, what you told me was -- and I'm doing

7    this with you, and I understand it's approximate and

8    we could be -- we could be off -- but you said that

9    oil was a little less than 100 and taxes were a

10   little more than a 100.  So it was about a $200

11   shortfall per unit.

12       A       200, that's correct.

13       Q       Okay.  So you had 21 units.  So that's a

14   short- -- you're right.  I did the math wrong.  So

15   there was a shortfall of about 4,200 a month; and if

16   you multiply 4,200 by 12, you get --

17       A       -- approximately 50,000.

18       Q       You get -- yeah, it's a little over 50,000.

19   So you were having to shell out about $50,000 --

20       A       No, I didn't have to shell out.  That's what

21   was projected that my problem was going to be.

22       Q       Okay.

23       A       So being a business person and fairly good

24   with mathematics, I realized that it was going to

25   eventually become a big problem.  So at that point in

1   time, I approached the banks and explained to them

2   what my dilemma was going to be and engaged some

3   workout individuals -- they were in the workout

4   area -- and we tried to eventually -- tried to market

5   the units to sell them --

6       Q    Right.

7       A    -- to unwind the problem.  At that point in

8   time, the values dropped off.

9       Q    They were no longer worth 106?

10      A    They were never worth the 130 that they were

11  appraised for, and they -- I probably could not sell

12  them for 106.  So I think we asked 89 -- or I asked

13  $89,000 and $79,000 and it was a tough sell then.

14      Q    So at what point did you decide that you had

15  to file bankruptcy?

16      A    Well, I actually filed the petition for

17  bankruptcy --

18              (Fire alarm going off.)

19          MR. CORCORAN:  The record should reflect

20          that the fire alarm is going off.

21      (A recess was taken from 10:32 to 10:54 a.m.)

22      (The last question and answer was read back.)

23  BY MR. CORCORAN:

24      Q    Can you finish that answer.  I think you

25  were about to tell me when.

```
 1      A    Oh, when I filed?

 2      Q    Right.

 3      A    I filed the petition in late 1991.

 4      Q    Okay.  Was there a point when you put second

 5   mortgages on the condos?

 6      A    Yes.

 7      Q    Okay.  When was that?

 8      A    Throughout the purchase period.

 9      Q    Okay.  And what was the purpose of that?

10      A    Okay.  If I could explain?

11      Q    Absolutely.

12      A    As I expressed earlier, the condominiums

13   appraised out higher than --

14      Q    Right.

15      A    -- the purchase price.  So what I did was,

16   when my first second mortgage occurred after the

17   second closing when I now owned five --

18      Q    Okay.  So what did you do?

19      A    -- I got a second mortgage on the newly

20   created equity and took that money and used it as the

21   down payment for the third closing, which was the

22   group of eight.

23      Q    Okay.  And how much money did you -- okay.

24   So you bought eight, and so that was about $160,000.

25           Were you putting down 20 percent or 10
```

```
 1   time.  So I don't need a lot of income.
 2        Q    And how do you spend your days, sir?
 3        A    I spend my days tending to the house,
 4   tending to the yard, going on the computer.  I see a
 5   chiropractor once a week.  Oh, that's another
 6   physician.  I see a chiropractor.
 7        Q    Uh-huh.
 8        A    I'm involved in my children's lives, often
 9   visit them at school; help my parents, if they pick
10   up groceries from the store, carry things that are
11   heavy for them.  I was working on remodeling a
12   bathroom in my house, scrapping wallpaper off, that
13   type of thing.  So I manager to have a full day's
14   worth of things to do that are not -- you know, being
15   gainfully employed isn't one of them.
16        Q    Can you tell me -- can you give me a brief
17   summary of your educational background, sir.
18        A    Oh, absolutely.  For high school, I attended
19   a college prepor- -- college preparatory school named
20   Northfield Mount Hermon School in Mount Hermon,
21   Massachusetts; and I attended that school from 1969
22   to 1973, where I graduated.
23             Next, I went to college.  I attended the
24   University of Vermont from September of 1973 and
25   finished my first semester only of my sophomore year,
```

***CONFIDENTIAL***

1    which ended on December of '74.

2        Q    And then where did you go for further

3    education?

4        A    I entered the business in April 1 of 1975.

5        Q    So you entered without a bachelor's degree?

6    You never graduated from the University of Vermont?

7        A    That's correct.

8        Q    Okay.

9        A    My father had spoken to his colleagues and

10   said, you know, Wait until he graduates or you can

11   bring him in earlier and train him; and he chose --

12   he chose to go along with the fact that he would

13   allow me to come in and train me, and then my

14   educational background continued.

15       Q    Why did you drop out of University of

16   Vermont?

17       A    I was basically bored with school.  I had

18   been away for school now for five and a half years.

19   It wasn't very exciting to me; and since I wasn't

20   pursuing a career the required a college diploma,

21   knowing I had the opportunity to come into the family

22   business, I was very excited about that opportunity.

23   At age 20, I entered the business

24       Q    Did you fail your courses at the University

25   of Vermont?

1        A    No, I didn't fail any courses.  Actually, I

2   only failed one course in prep school the first time

3   around -- I got an "A" the second time -- because it

4   was the *New Testament*; and being Jewish --

5        Q    I understand.

6        A    -- I failed the final exam question because

7   I just was unable to write about the *New Testament*.

8   And I should have just told the teacher straight out

9   on the exam my feelings; and instead, I tried to

10   describe one of the chapters in the *New Testament*,

11   and it was a total flop.  Other than that, I was -- I

12   was a very good student.

13        Q    Very good student.  You just loss interest?

14        A    Well, I was away from school for too long;

15   and it was brutally cold in Burlington, Vermont and

16   the -- no social aspect when it's below freezing.  As

17   it turned out, I discovered people in the spring

18   because I stayed there up until March of 1975, but at

19   that point, I had already missed a semester and made

20   a commitment to leave.  So that's why I went into the

21   business April 1, 1975.

22        Q    Do you hold any professional designations?

23        A    Yes, I do.

24        Q    Can you tell us what they are.

25        A    Yes.  I hold more than one.  I first earned

1    my Chartered Life Underwriter designation, and I

2    obtained that in, I believe, the year was 1980; and I

3    went on further to obtain my Chartered Financial

4    Consultant designation, which I earned in, I believe,

5    '87; and just before that, I had been granted a

6    fellowship with the Life Underwriter Training

7    Counsel, and that was given to me in '86.

8            In addition, I attended Life Insurance

9    Marketing Institute at Purdue University on more than

10   one occasion; licensing courses at the Hartford on

11   more than one occasion. So I definitely tried to

12   learn as much as I could as fast as I could to be an

13   integral part of the business.

14       Q    Where do you live, sir?

15       A    I live in Waterford, Connecticut.

16       Q    And your father testified -- last week?

17            MS. AALBERG:   Yeah.

18   BY MR. CORCORAN:

19       Q    Yes, it was last week.

20            -- the house is owned by the Barry Levine

21   Irrevocable Family Trust; is that correct?

22       A    That's correct.

23       Q    Does the Barry Levine Irrevocable Family

24   Trust own anything else?

25       A    No.   They only own the trust, and there's a

1    the subsidiaries, I will be referring specifically to

2    that subsidiary so you'll understand.

3                    MR. CORCORAN:  Off the record for a

4              second.

5                    MR. MOUKAWSHER:  Sure.

6              (An off-the-record discussion was had.)

7         (A recess was taken from 11:58 a.m. to 12:42 p.m.)

8    BY MR. CORCORAN:

9         Q    Okay.  When you first started, Mr. Levine,

10   you worked for Levine Financial Services, right?

11        A    Initially, I worked for Levine Life

12   Associates.

13        Q    Okay.  What is the relation of Levine

14   Financial from Levine Life Associates?

15        A    It's the same company that just endured a

16   name change.

17        Q    Okay.  And who were the other agency owners

18   who worked at Levine Financial or LLIA?

19        A    Michael Levine.

20        Q    Uh-huh.

21        A    Daniel Carter.

22        Q    Okay.  And were the other owners Herbert,

23   Jerry and Andrew?

24                    MR. MOUKAWSHER:  Objection to form.

25   BY MR. CORCORAN:

1     Q    Okay.  So January, '95?

2     A    Yes.

3     Q    Okay.  And were you, in fact, unemployed at

4 that point?

5     A    Yes.

6     Q    Okay.  What did you do when you first

7 started working at -- was it Louis Levine Agency

8 Inc.?  Which was the first permutation of the company

9 which you -- what was the name of the first company?

10 You told me already.  I'm sorry.

11    A    Levine Life Associates.

12    Q    Okay.  Levine Life Associates, LLIA.

13    A    No.  LLIA is different.

14    Q    Levine Life Associates.

15          You started working there as a 20-year-old

16 in 1975.  What did you -- what were your

17 responsibilities initially?

18    A    Initially, I was responsible to obtain

19 various insurance licenses so that I would be able to

20 be an -- sell insurance.

21    Q    So your first responsibility was to study?

22    A    Yes.

23    Q    All right.  But you were paid for that?

24          MR. MOUKAWSHER:  Objection to form.

25 BY MR. CORCORAN:

```
 1        Q    You received compensation while you were
 2   studying?
 3        A    I was an employee --
 4        Q    Okay.
 5        A    -- receiving pay --
 6        Q    Okay.
 7        A    -- and part of what I was asked to do was to
 8   obtain all necessary insurance licenses.
 9        Q    Okay.  And after that, what did you then
10   next do with the company?
11        A    I began the selling of various life and
12   related insurance products.
13        Q    Okay.  Eventually, you stopped working at
14   the Levine Life Associates, Inc., and you began
15   working at the Louis Levine Agency, correct?  You
16   switched from one agency to another?
17        A    Yes.
18        Q    When did that happen?
19        A    I believe the year that I began to work for
20   Louis Levine Agency, comma, Inc, period, was
21   approximately 1990 or 1991.  I don't have the exact
22   date when that transition occurred.
23        Q    Okay.  So this was during the period when
24   you were having some kinds of personal difficulties,
25   correct?
```

1    direction from Mr. Jerry Levine when you worked in

2    the Louis Levine Agency or not?

3        A    No.   We had basically no interaction

4    whatsoever.

5        Q    Okay.   How long were you employed by the

6    Louis Levine Agency?

7        A    Approximately nine years.

8        Q    Okay.   And did there come a time, as you

9    testified to this morning, when the agency required

10   that you take a leave of absence?

11       A    I recall the leave of absence.   But what was

12   your question?

13       Q    Did there come a time when you were asked to

14   take a leave of absence?

15       A    Yes.

16       Q    Do you know when -- about when that was?

17       A    That was in the summer of 1992.

18       Q    Okay.   And did you ever return to work at

19   the Levine Agency after that as it developed?

20             MR. MOUKAWSHER:   Objection.

21       A    Two parts to that:   I didn't physically

22   return to the Levine Agency, but I was employed as a

23   W2 employee by the Levine Agency through the end of

24   1999, per my agreement.

25   BY MR. CORCORAN:

1  BY MR. CORCORAN:

2      Q     Did you ever go back into the Levine Agency

3  after January 1, 1993 physically?

4      A     There might have been an occasion or two

5  where I picked up a paycheck.

6      Q     But not to perform services?

7      A     No.

8      Q     So as a practical matter, Exhibit 2 is not

9  an employment agreement in the conventional sense

10  that we use the term "employment agreement," is it?

11          MR. MOUKAWSHER:  Objection to form.

12      A     I'm not sure what a conventional sense is.

13  BY MR. CORCORAN:

14      Q     An employment agreement is an written

15  agreement whereby an individual agrees to perform

16  services, correct?

17          MR. MOUKAWSHER:  Objection, form.

18      A     I can't say that's correct.

19  BY MR. CORCORAN:

20      Q     Why not?

21      A     My agreement refers to being available to

22  perform.  I was never asked --

23      Q     You're sort of anticipating two or three

24  questions.

25      A     No.

1    Q   Let's have the question read back, and I'd

2  ask you to focus on that.

3          MR. MOUKAWSHER:  He gave a fully

4          responsive answer.

5          MR. CORCORAN:  I'd like the question.

6          Please read it back.

7        (The last question was read back.)

8  BY MR. CORCORAN:

9    Q   You don't agree that an employment agreement

10  is an agreement whereby an individual agrees to

11  perform services; is that your testimony?

12          MR. MOUKAWSHER:  Objection to form.

13  BY MR. CORCORAN:

14    Q   In the ordinary course.

15    A   I'm not a lawyer.  You're asking about

16  agreements.  I just can discuss what I understand my

17  employment agreement --

18    Q   Did you ever perform any service --

19          MR. MOUKAWSHER:  Let him finish.  Let him

20          finish his answer.

21  BY MR. CORCORAN:

22    Q   Is there something else you wanted to say,

23  Mr. Levine?

24    A   I was in the middle of a sentence.  I was --

25  I was -- my employment agreement was to -- I was to

101

```
 1   be available.  That was the only, only wording I had
 2   to go by, was to be available.
 3   BY MR. CORCORAN:
 4       Q     And available for what?
 5       A     Available to perform duties at the Levine
 6   Agency.
 7       Q     But you were never asked to do that?
 8       A     No, I never was.
 9       Q     Okay.  Pursuant to the terms of this
10   agreement, did you agree to sell your stock in the
11   company?
12       A     Yes, I did.
13       Q     And did you sell it to your father as a
14   result of this agreement?
15       A     No.
16       Q     Whom did you sell it to?
17       A     LLIA, Inc.
18       Q     Was this -- withdrawn.
19             Did you, in fact, sign this agreement on or
20   about the date that is recited on page 1 of the
21   agreement, January 1, 1993, if you recall?
22       A     No, I did not, actually.
23       Q     When did you sign it?
24       A     This agreement wasn't signed until the
25   middle of February, beginning of March, 1995.
```

```
1      Q     How did he treat you?

2      A     Very well.

3      Q     Okay.  Knowing of your financial

4   difficulties, did your father assist you financially

5   during this period?

6                 MR. MOUKAWSHER:  Objection to form.

7      A     Well, you just have to be specific.  During

8   the period?

9   BY MR. CORCORAN:

10     Q     From -- well, did you have any financial

11  difficulties in the 1980s before you bought all those

12  condos?

13     A     No.

14     Q     Were you in need of large amounts of cash in

15  order to maintain your lifestyle?

16     A     No.

17     Q     Did your father assist you -- when you

18  became aware and he became aware that you were having

19  financial difficulties, did your father assist you

20  out of his own pocket?

21     A     There were times that he helped he out of

22  his own pocket, yes.

23     Q     Okay.  And when was that?

24     A     He helped me when he purchased my common

25  stock in the LLIA.
```

```
 1        Q     Okay.  Did he help you financially through
 2   the funds of the business?
 3        A     No.
 4        Q     All right.  There were several years in the
 5   1980s -- 1985, 1986, 1987, 1988 -- when you made well
 6   over $200,000 a year in salary and bonuses; is that
 7   not correct?
 8        A     That sounds right.
 9        Q     Between 1980 and 1992, did you invest and
10   save your money?
11        A     Yes, I did.
12        Q     Okay.  Did your father ever tell you during
13   that period that he thought you were spending too
14   much?
15        A     No.
16        Q     Did he ever tell you that it was important
17   to save your money?
18              MR. MOUKAWSHER:  Objection to form.
19        A     Ever when?
20   BY MR. CORCORAN:
21        Q     Ever.
22        A     Ever in my life important to save my money?
23        Q     Sure.
24        A     I don't recall that exact wording.
25        Q     I'm not talking about the exact wording.
```

1      A     Well, he wanted me to do well, if that's

2   what you're saying by saving money.

3      Q     No.  Saving money means saving money,

4   putting money aside.  Did he ever tell you to do that

5   or not?

6      A     No.

7      Q     Okay.  How -- and -- but you did save money

8   during the 1980s?

9      A     You asked earlier if I invested or saved

10  money, and I answered "yes" to that.

11     Q     Okay.

12     A     So I did invest in the 80s, yes, I did.

13     Q     Okay.  And we're talking about the condos,

14  correct?

15     A     That was one.

16     Q     What else did you do?

17     A     I had many investments in the 80s.  I --

18  other -- some that were real estate related; some

19  were not.

20     Q     Let's talk about those which were not real

21  estate related.

22     A     Not real estate related.  I think there was

23  a period there I had a CD at Fleet Bank.  Other --

24  and I had stocks, stocks at a different period of

25  time.  I also had limited partnerships, some were

```
 1    real estate based.

 2         Q    Did the Levine Agency, during this period,

 3    have a profit sharing plan?

 4         A    Yes.

 5         Q    What's your understanding of what that

 6    profit sharing plan was, in layman's terms?

 7         A    It was a savings plan.

 8         Q    Okay.  And were you a participant in that

 9    plan?

10         A    Yes.

11         Q    When did you begin participation?

12         A    When the plan was formed.

13         Q    Which was when, approximately?

14         A    I think it was formed approximately 1980, I

15    believe.

16         Q    Okay.  And did you receive --

17              MR. CORCORAN:  Can we go off the record

18              for a second.

19         (An off-the-record discussion was had.)

20       (A recess was taken from 1:36 to 1:42 p.m.)

21    BY MR. CORCORAN:

22         Q    Between 1980 and 1992, did you receive

23    contributions to the plan, if you recall?

24         A    Just give me a couple -- first, I want to

25    make a -- you said I could make a correction?
```

116

1    Q    Sure.

2    A    The plan -- I believe the plan may have

3  started before 1980, although I'm not sure exactly

4  which date.

5    Q    Okay.  Fine.  Thanks.

6    Did you receive contributions to the plan

7  during any of the calendar years between 1980 and

8  1992?

9    A    Yes.

10    Q    All right.  Do you know which years?

11    A    No, I don't.

12    Q    Okay.  Did you waive your right to receive

13  contributions in any years between 1980 and 1992?

14    A    Yes.

15    Q    All right.  Did you receive cash in lieu of

16  contributions?

17    A    No.

18    Q    Are you sure?

19    A    Yes.

20    Q    Okay.  Why did you waive your right

21  the receive to receive a contribution?

22    A    Because I was told by Dan Carter that he,

23  Gerald Levine and I were to waive off the profit

24  sharing plan; and I relied on what he said.

25    Q    He, Gerald Levine and you?

1      A     Yes.

2      Q     Okay.  When did -- how many times did he say

3    this to you?

4      A     I can't be sure of the exact numbers of

5    time; but he presented to me, usually, the waiver's

6    in December.  After awhile, it became rote that I

7    signed the waiver form.  So he must have mentioned it

8    to me the first couple of times.

9      Q     Okay.  So what you're saying is the first

10   couple -- he must --

11              MR. CORCORAN:  Can you read "he must

12              have" back.

13     (The indicated portion of testimony was read back.)

14   BY MR. CORCORAN:

15     Q     Okay.  Explain that to me.  You said he must

16   have mentioned --

17     A     He did mention to me on -- on -- when he

18   presented me the waivers, he explained to me that he,

19   Gerald Levine and I were to waive off the profit

20   sharing plan.

21     Q     Okay.  And he did that in 1980 and '81 or

22   the first couple years?

23     A     I can't be sure exactly which years it was.

24     Q     Okay.  But after that, you're saying it

25   became kind of rote.  So you just got the waivers and

```
 1  signed them?

 2            MR. MOUKAWSHER:  Objection to form.

 3            MR. CORCORAN:  Did you get the answer?

 4            COURT REPORTER:  No, I didn't.

 5            Did you answer?

 6            MR. CORCORAN:  He said "yes."

 7            COURT REPORTER:  Okay.

 8            MR. MOUKAWSHER:  Well, don't take it from

 9       him.  Why don't you --

10            MR. CORCORAN:  He said, "yes."

11            MR. MOUKAWSHER:  Well, I said, "Objection

12       to form."

13    A    Can you repeat the question, please.

14            MR. MOUKAWSHER:  Maybe you should have

15       the question back.

16            MR. CORCORAN:  Listen to the witness, not

17       to this guy.

18            MR. MOUKAWSHER:  No. You're the one who

19       tried to give his answer.

20            MR. CORCORAN:  No, I didn't.

21            MR. MOUKAWSHER:  She said, I didn't get

22       the answer; and you said, "He said, 'yes.'"

23            MR. CORCORAN:  He said, "yes."

24            MR. MOUKAWSHER:  Well, it's not on the

25       record, so you --
```

```
 1   BY MR. CORCORAN:

 2       Q    Your prior testimony was that after the

 3   first couple of years when he came in to see you and

 4   said "X," it became "rote."

 5            What did you mean when you used the word

 6   "rote"?

 7       A    Kind of rote.

 8            MR. MOUKAWSHER:  Objection to form.

 9   BY MR. CORCORAN:

10       Q    What did you mean when you used the words

11   "kind of rote"?

12       A    Routine.

13       Q    Okay.  When were the contributions made each

14   year, if you know?

15       A    I don't know.

16       Q    You know that you did, in fact, sign

17   waivers?

18       A    Yes.

19       Q    Did you keep copies of those waivers?

20       A    No.

21       Q    Okay.  I'm going to show you -- what Exhibit

22   number is this?

23            MS. AALBERG:  It was 4.

24   BY MR. CORCORAN:

25       Q    I show you Exhibit 4 from the depo.  Do you
```

```
 1              (The last answer was read back.)
 2   BY MR. CORCORAN:
 3       Q    When you were employed at the Levine Agency,
 4   did you have any responsibilities which were
 5   administrative in nature, such as opening the mail?
 6              MR. MOUKAWSHER:  Objection to form.
 7       A    When are you referring to?
 8   BY MR. CORCORAN:
 9       Q    Ever.
10       A    Well, I was only employed by the Levine
11   Agency from 1991 and forward.
12       Q    Levine Life Associates.
13       A    Okay.
14       Q    Same question.
15       A    Was I ever --
16       Q    Did you -- did you have any administrative
17   duties such as opening the mail and answering phones?
18       A    Yes.
19       Q    Maintaining the payroll?
20       A    I didn't maintain the payroll.  I was -- did
21   clerical tasks at times.
22       Q    You mean writing down?
23       A    I -- I -- I made entries into the payroll
24   ledger, wrote the checks out to the employees.
25       Q    Balancing the records?
```

```
 1        A    There was a period of time I may have
 2   reconciled the checkbook.
 3        Q    Did you do this between 1980 and 1986 when
 4   they hired a bookkeeper called Tony Martone?
 5        A    I'm not sure of the exact date Tony Martone
 6   was hired.
 7        Q    But approximately then, that's when he took
 8   over from what you did?
 9        A    I don't know exactly when he started, so I
10   can't tell you when he took over.
11        Q    I'm not asking for the date.  I'm saying:
12   Did he succeed to that job -- withdrawn?
13             Did you perform that job until they hired
14   Tony?
15        A    No.
16        Q    Okay.  Was there somebody after you and
17   before Tony?
18        A    I only did it for a short period of time.
19        Q    I show you these documents and ask if you
20   can recognize them.
21             (An off-the-record discussion was had.)
22   BY MR. CORCORAN:
23        Q    Okay.  So I'm showing you a document
24   previously marked as Defendant's 3.  Can you identify
25   it?
```

1   you employer based on an unsigned employment

2   agreement during a period when you were performing no

3   services for the Levine Agency?

4       A    Earlier you asked if I was performing any

5   sales on behalf of the agency.  Okay.  I can't say

6   that I wasn't performing any services because I

7   continued to field calls coming to me at home from

8   clients that I had written business on, to this day.

9           So had I been doing any sales on behalf of

10  the Levine -- Louis Levine Insurance Agency and all

11  its related companies?  No

12      Q    So people would call you on the phone at

13  home; you would refer to them to the agency?

14      A    No.  I would speak with them.  I wouldn't

15  refer them to the agency.  I would answer their

16  questions.

17      Q    Okay.

18      A    So in terms of service, I wouldn't say that

19  that wasn't the case; but the agreement was unsigned,

20  but I was still receiving a W2 wage in the interim.

21      Q    And you received benefits from July, 1994

22  until January of 1995; is that not correct, for a

23  26-week period?

24      A    A 26-week period, yes.

25      Q    Okay.  Until January of 1995?

```
 1              Can the question be read back.

 2              MR. MOUKAWSHER:  You're wasting time.

 3              (The last question was read back.)

 4       A    I was never asked to pay it back, and I

 5  never did.

 6  BY MR. CORCORAN:

 7       Q    Did you ever advise them you were receiving

 8  paychecks from the Levine Agency?

 9       A    Oh, yes.  Absolutely.  I clearly told them.

10  I kept them full abreast.  They had a copy of my

11  unsigned unemployment agreement -- unsigned

12  employment agreement

13       Q    When did you learn that the Levine Agency

14  started a 401K plan?

15       A    To the best of my recollection, it was late

16  in 1996 that I received a telephone call from father

17  telling me that the Levine Insurance Agency had begun

18  a 401K plan.

19       Q    And at the time you learned that, did you

20  make inquiry of the owners of Levine Agency with

21  respect to the 401K plan?

22       A    Well, I had my father make inquiry because

23  it wasn't talking with Gerald Levine and Danny Carter

24  for that entire time period.

25       Q    Okay.
```