# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BARRY LEVINE

VS CV 3:03CV148(SRU)

WEBSTER INSURANCE

Deposition of MICHAEL LEVINE taken in accordance with the Connecticut Practice Book at the Law Offices of Carmody & Torrance LLP, 195 Church Street, New Haven, Connecticut, before Deborah Gentile, LSR, a Licensed Shorthand Reporter and Notary Public, in and for the State of Connecticut on December 19, 2003, at 10:09 a.m.

DEBORAH GENTILE, LSR
LSR NO. 419

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE
MADISON, CT 06443
203 245-9583

100 PEARL STREET, 14th FLOOR
HARTFORD, CT 06103-4506
800 839-6867

witness's testimony back to him.

MR. MOUKAWSHER: No. You're mischaracterizing the testimony. You asked him if he recognized the handwriting, not if he had any idea who wrote them.

MR. CORCORAN, III: Fine. That's a good distinction.

BY MR. CORCORAN, III:

Q Who wrote them?

A In my opinion?

Q Yeah.

A Joseph Cushner.

Q Not because you recognize his handwriting?

A Because that was his job.

Q Throughout the entire period of the payroll records you reviewed?

A Up until the time he left the company.

Q Which was when?

A I don't remember when he left the company.

Q But you don't recognize the handwriting?

A I wouldn't recognize the handwriting, but if you asked me who I thought wrote it, my answer would be Joseph Cushner, C-U-S-H-N-E-R.

Q Mr. Levine, are you familiar with LLIA, Incorporated?

Q And were you at some point an employee of Levine Life Associates, Inc.?

A I was president of Levine Life Associates Inc., and president of Levine Financial.

Q You're president of both?

A No, when the name was changed it's only one company.

Q I understand. When -- was that the first position you ever had with Levine Life Associates?

A No. Originally I was employed by Luis Levine's, Inc.

Q In what capacity?

A Agent.

Q When did you become president of Levine Life Associates, Inc.?

A When we formed the company.

Q When was that?

A Give or take in the late '60s, early '70s.

Q Okay. And so you were an owner of the company?

A I'm a major owner of the company.

Q When you say "major," can you explain what you mean?

A Yes. There was three major owners. I was one of them.

Q Who were the others?

agreement, correct?

A Correct.

Q And what was the purpose of that agreement as you understand it today?

A Buy me out.

Q You didn't do any work for the -- for LLIA after you entered into that agreement of buying you out, did you?

A No.

Q Did LLIA enter into such agreements with any other departing employees other than yourself, if you know?

A My brother.

Q Is that Herbert?

A Herbert.

Q Also Barry?

A And also Barry, but not the same kind of agreement.

Q When was the Barry agreement?

A I don't know.

Q When was the Herbert agreement?

A It should have been the same time mine was.

Q You said the agreement with Barry wasn't the same as the agreement with you. How did it differ?

A Barry's agreement was an employment contract,

the company, you're a W2 employee and entitled to all corporate fringe benefits. A deferred compensation agreement means you receive a 1099 and you are not entitled to corporate fringe benefits.

Q You're not going to perform any more services in the future?

A That is correct.

Q That's what you had?

A That's what I had.

Q Was this agreement negotiated on Barry's behalf by you?

MR. MOUKAWSHER: Objection to form.

MR. CORCORAN, III: If you recall.

THE WITNESS: I would have to agree, yes.

BY MR. CORCORAN, III:

Q Is there a handwritten change on it that you see?

A Is there a handwritten change?

Q Page 3.

MR. MOUKAWSHER: Page 3 on the top?

MS. AALBERG: Yeah, on the top.

MR. MOUKAWSHER: You mean page 4?

MR. CORCORAN, III: Just because she said 3 -- she meant 4. Page 4 at the top.

BY MR. CORCORAN, III:

Q Somebody's written something in there. Do you see that?

A Yes.

Q Is that your handwriting?

A No.

Q Is it Barry's?

A I don't know.

Q Okay.

A All it does is change the address.

Q Okay.

A Notification address.

Q Is it your testimony you don't recognize your son's handwriting?

A I -- sometimes I can't recognize my wife's handwriting.

Q I'm asking you: Is it your testimony that you do not recognize the handwriting of your son Barry Levine as a general matter?

A Yeah. I -- it looks to me like it could be Barry's handwriting, but I couldn't absolutely say yes.

Q Couldn't swear to it?

A No.

Q Is it more probable than not it's Barry's correcting his own address there?

A Probably, but what's -- all it does is change the address of the employee notification.

MR. MOUKAWSHER: Objection to form.

BY MR. CORCORAN, III:

Q Do you know why this agreement was entered into?

A Do I know why the agreement was entered into?

Q Yeah. You just told us you negotiated it. I'm asking you why?

A I'm thinking.

Q All right. I'm sorry. Take your time.

A Repeat that question.

Q Sure. Do you know why this agreement was entered into; do you remember?

A It was part of Barry's package.

Q What kind of package?

A Part of the buyout package.

Q Was Barry having some troubles personally and at the company at this point?

A Barry had a severe mental problem.

Q That effected his ability to work at the company in addition to conduct his private life?

MR. MOUKAWSHER: Objection to form.

MR. CORCORAN, III: Is that correct?

THE WITNESS: I'm not a doctor. I'm not his doctor, but I could see that Barry had

severe mental problems.

BY MR. CORCORAN, III:

Q How could you -- how did you observe that?

A Some of the things he said and people said he did. I wasn't there so I can't say he did it, but I know he was disturbed and I know he had a mental problem.

Q Did some of the things that people told you he did at this time involve treatment of female employees at the agency? Did people talk to you about that?

A That's what they tell me. I didn't see it and I wasn't there.

Q You heard that a number of times, did you not?

A I heard it from the same people who I don't trust.

Q Which people?

A My brother Gerry and my ex-brother-in-law Dan Carter.

Q But you yourself also at that point concluded that Barry had some severe emotional problems?

A I saw that.

Q How did you see it?

A Well, just the way he acted.

Q Could you give me an example so that --

A No, I can't.

Q You have to let me fin --

A I can't give you an example.

Q The last two questions that I tried to ask you cut me off.

A Repeat it.

Q Can you give me any examples of what you saw in the early 1990s which gave you concern about Barry's emotional well being?

A I cannot give you an example.

Q Why?

A I could just see it.

Q But you can't remember anything specific?

A No.

MR. CORCORAN, III: Okay. Let's take five minutes at this point and we'll make a copy of that.

MR. MOUKAWSHER: This one?

MR. CORCORAN, III: Sure.

(Whereupon a recess took place from 11:12 to 11:22 p.m.)

BY MR. CORCORAN, III:

Q Of these various entities, which entity paid your paycheck during the '90s?

MR. MOUKAWSHER: Objection to form.

THE WITNESS: We had two entities that filed one corporate return. The casualty

operation, Lewis Agency, Inc., and Levine Financial Services, Inc., filed a joint tax return. The assets were co-mingled, the profit was co-mingled, the income was co-mingled and we worked in one part.

BY MR. CORCORAN, III:

Q Did you hold any licenses to sell?

A Of course.

Q And you still hold them?

A Yes, I do.

Q You were the president of the company?

A I was president of the Levine Financial Services. Herbert was president of Lewis Agency, Inc.

Q As president -- as a practical matter, as president what did you basically do?

A The only thing I did as president was at the end of the year we made decisions as to -- I made a decision as to who would receive what.

Q By way of compensation and bonuses and stuff?

A Yes. Bonuses is compensation.

Q Yeah, it is. So you were the chief executive officer of the company?

A Basically, yes.

Q You ran it basically?

A Yes, basically -- no, I didn't run it. I don't

MR. MOUKAWSHER: Objection to form.

THE WITNESS: There was a lot of animosity going on among the family.

BY MR. CORCORAN, III:

Q Can you explain? Around this same time you are saying?

A Probably before, leading up to this time.

Q What kind of animosity?

A My -- I believe at that time, as I recall, that they resented Barry and they were looking to get him out of the business.

Q Why?

A Because they resented the fact that Barry's compensation was pretty much equal to theirs, and they resented the fact that it was my doing that that occurred.

Q And it was?

A Of course.

Q Well, he was your son.

A Of course.

Q And you wanted to provide for him?

A There was a reason for it.

Q What was the reason?

A The reason for it was I was bringing in most of the money. I was being grossly underpaid, and I agreed not to push my compensation up so that he could become

equal to theirs and there was a tremendous amount of resentment in the family.

Q But during --

A He wasn't treated fairly by my partners.

Q But during the same period he was having some personal problems, some emotion -- mental problems?

A Yes, he was.

Q Okay. And they effected his ability to work?

A That's their opinion.

Q Was it not your opinion?

A No.

Q What was your opinion?

A Give him a chance.

Q Did they give him a chance?

A No.

Q Instead of giving him a chance what did they do?

A They threw him out.

Q They bought out his stock?

A They threw this at him.

Q You're pointing at Exhibit 2, correct?

A Uh-huh.

Q You have to say yes.

A Yes.

Q And they told you they didn't want to see his face in the office again, did they not?

MR. MOUKAWSHER: Objection to form.

THE WITNESS: There was a lot of animosity going on among the family.

BY MR. CORCORAN, III:

Q Can you explain? Around this same time you are saying?

A Probably before, leading up to this time.

Q What kind of animosity?

A My -- I believe at that time, as I recall, that they resented Barry and they were looking to get him out of the business.

Q Why?

A Because they resented the fact that Barry's compensation was pretty much equal to theirs, and they resented the fact that it was my doing that that occurred.

Q And it was?

A Of course.

Q Well, he was your son.

A Of course.

Q And you wanted to provide for him?

A There was a reason for it.

Q What was the reason?

A The reason for it was I was bringing in most of the money. I was being grossly underpaid, and I agreed not to push my compensation up so that he could become

equal to theirs and there was a tremendous amount of resentment in the family.

Q But during --

A He wasn't treated fairly by my partners.

Q But during the same period he was having some personal problems, some emotion -- mental problems?

A Yes, he was.

Q Okay. And they effected his ability to work?

A That's their opinion.

Q Was it not your opinion?

A No.

Q What was your opinion?

A Give him a chance.

Q Did they give him a chance?

A No.

Q Instead of giving him a chance what did they do?

A They threw him out.

Q They bought out his stock?

A They threw this at him.

Q You're pointing at Exhibit 2, correct?

A Uh-huh.

Q You have to say yes.

A Yes.

Q And they told you they didn't want to see his face in the office again, did they not?

MR. MOUKAWSHER: Objection to form.

THE WITNESS: Agreement specifies that he's -- he was to be available for work. Whether he worked again or not in the office is dependant upon the whims of my partners.

BY MR. CORCORAN, III:

Q Let's search your recollection. Can you recall any specific instance after that when he -- when your partners ever decided they wanted him to come back and do anything? Can you remember?

A As I'm here today, I can't remember.

Q You can't remember any such instance?

A No.

Q Okay. But calling this an employment agreement gave the corporation the ability to deduct the payments that were made under it, correct?

A The agreement is called employment agreement, but the key to the agreement is verbiage dealing with his availability of service.

Q When you were the president, you didn't have to answer anything you didn't want to, but I would like you to listen to my question and answer it if you would.

A I was answering the question.

Q I don't think so.

MR. CORCORAN, III: Let's have it again.

receive cash instead of contributions to the plan?

A As we're sitting here today, I don't recall.

Q You don't recall any such instances?

A No.

Q Did you ever waive a contribution in lieu of --

A Me personally?

Q Yeah. -- cash?

A No.

Q Did Barry?

A I don't know.

MR. MOUKAWSHER: Objection to form.

BY MR. CORCORAN, III:

Q Were you aware whether or not Barry executed written waivers of his contributions between 1980 and 1992?

A Were -- was I aware?

MR. MOUKAWSHER: Objection to form.

THE WITNESS: Repeat that question, please.

MR. CORCORAN, III: Could the question be read back.

(Whereupon the last question was read by the court reporter.)

MR. MOUKAWSHER: Note my objection to the form.

BY MR. CORCORAN, III:

Q Can you answer?

A No.

Q Not aware?

A No.

Q Okay. I'm going to show you this and ask if you can identify it?

MR. CORCORAN, III: Can you mark this.

(Defendant's Exhibit 4 was marked for identification, described in index.)

BY MR. CORCORAN, III:

Q Can you review the pages before I ask you questions about them, sir.

A Can I review them?

Q Yes. Look at them, if you would, briefly.

A I'm looking at them.

Q Have you looked at anything beyond the first page, Mr. Levine? Is that a no or a yes?

A There's one, two, three, four -- there's 5 pages.

Q Correct. Okay. And what are those five pages? Can you identify them?

A They're titled Waiver Participants.

Q Okay. Is there a signature line?

A Yes.

jeopardy due to creditors?

A I'm not sure of timing on this, but I believe it was during the time he was either going bankrupt or went bankrupt. I'm not sure. Maybe it was way before he went bankrupt. I was concerned with his credit with -- with his future.

Q So you did this to protect him?

A Of course.

Q To insure he would have a place?

A A place to live.

Q And if he had come to you and said, Dad, I want to waive off the plans because I want the cash, you would have said, Barry, don't do that?

A Absolutely no. I would fight him tooth and nail to waive off the plan.

Q You don't remember whether he, in fact, ever did come to you?

A I don't recall him ever coming to me.

Q Could this have been done at the company without your knowledge?

A Of course.

MR. MOUKAWSHER: Objection to form.

BY MR. CORCORAN, III:

Q Has Barry received any disability benefits as a result of this mental illness, if you know?

deteriorated to the point he had to file bankruptcy? Do you have an opinion?

A I have an opinion.

Q What's your opinion, sir?

A Without my knowledge, or I don't know who else's knowledge, he bought many, many condos at the high -- at the high real estate market; and like a lot of other people, the real estate market collapsed and he collapsed with it.

Q So it was bad real estate investments?

A Yes.

Q Okay. Was there a procedure at the agency if a participant elected to waive participation?

A Not that I know of.

Q Would it have been possible -- withdrawn.

Did Barry receive bonuses at the end of each year like the other employees while he worked there?

A Yes.

Q What determined the amount of the bonus?

A I determined the amount.

Q How did you portion bonuses as between, say, Barry and yourself? Did you get more?

A The corporation -- the owners of the corporation were in basically two tiers. Herbert and I were in tier

one and Gerry and Dan Carter and Barry were in tier two.

Q Did you and Herbert get the same amount?

A Herbert and I got exactly the same amount.

Q Who determined that?

A I did.

Q That was because he was on your level?

A Because we basically built the company.

Q You as the CEO did what you thought was right?

A My brother agreed with me. Everything I did he agreed with.

Q Okay. So you and he got the same amount at the year end?

A Yes.

Q And then there was one other tier?

A Yes.

Q For bonus?

A Yes.

Q Who was in that tier?

A I just said it. Gerry, Carter, and my son Barry.

Q Okay. And you earlier said that Mr. Carter and Gerry were not happy with Barry -- Barry's participation because it was equal to theirs?

A They tremendously resented him.

Q Okay. But you were the president?

A I made the major decision.

Q Including what the second level bonus was?

A That's correct.

Q So whether they liked it or not Barry got the same amount they did?

A Give or take.

Q Give or take?

A They weren't all exactly exact.

Q But approximate?

A Approximate.

Q Within a few dollars?

A Well, a few dollars, a few hundreds, a few thousands, you know, give or take.

Q But basically they were on an equal level?

A Basically.

Q Were there periods when you bonused Barry significantly in excess of Dan or Gerry?

A Not to my knowledge.

Q Why not? He was your son.

A As I'm sitting here today, I can't recall.

Q But to your knowledge, you never gave him extra slugs of cash?

A As I said, as I'm sitting here today, I cannot recall.

Q Basically, he was on the same tier as the other

Mr. Levine. That's all I'm doing today is asking you questions.

A My responsibility is to my son and family, not to my partners.

Q So as a result of that, you didn't go to those -- that woman or those women and say, Is it true?

A I did not.

Q You didn't perform any independent investigation?

A I did not.

Q You know at the time that Barry was severely mentally ill?

A I knew he was mentally ill, yes.

Q At the time?

A Yes.

Q Nonetheless, you did not investigate?

A That is correct.

Q During the 1980s was Barry fairly constantly in need of cash?

MR. MOUKAWSHER: Objection to form.

THE WITNESS: Barry is a man. He made his own decisions. I have no idea if he was in need of cash or not in need of cash. I didn't run his life for him. He ran his own life.

BY MR. CORCORAN, III:

Q Did he ever come to you and say, I need some money?

A He did not.

Q All right. Do you know if Dan Carter ever waived his contribution to the plan?

A I do not know.

Q Do you know if Gerald Levine ever waived his contribution to the plan?

A I do not know.

Q Do you know if Herby ever waived his?

A I do not know.

Q Do you if Andrew ever waived his?

A I do not know.

Q How were the contributions calculated?

A Contributions to the profit sharing plan?

Q Yeah.

A By the formula in the plan.

Q I'm going to show you a packet. You actually have copies.

MR. CORCORAN, III: I'll ask you to mark this.

(Defendant's Exhibit 5 was marked for identification, described in index.)

BY MR. CORCORAN, III:

Q If he did, you don't remember?
A I don't recall.
Q Did he have any management role at Levine Financial?
A I don't know what you mean by "management roll."
Q Did he make any personnel decisions?
A No. The decisions usually were made by me.
Q Salary decisions you also made?
A I made them all.
Q Let's see. Was Dan Carter also employed by Levine Financial?
A Yes.
Q He worked for Retirement Planning Associates, correct, but was paid out of Levine Financial?
A Yes.
Q Was he Barry's manager?
A He should not have been.
Q He really didn't have any authority over Barry, did he? He was on an equal level, correct?
A He was on equal level, but I don't know -- there's no such thing as authority in our operation.
Q He couldn't tell Barry what to do?
A He couldn't tell anybody what to do.
Q Who couldn't?
A None of us could tell anybody what to do except

the girls who type this out or do that.

Q You were the president theoretically?

A Name only. You're stuck with that word president.

Q Well, I got it from you.

A Well, but name only.

Q Dan Carter was not Barry's boss?

A He wasn't suppose to be Barry's boss.

Q Did Barry talk direction from anybody?

A If anybody, he took it from me.

Q All right. What was Dan Carter's role in LLIA?

A Dan Carter was the -- was running Retirement Planning Associates. He was planning administrator for all the plans that the -- that we administered for fee basis. He was also the major trustee of our profit sharing plan. He did it almost anything he wanted to do, without me knowing about it.

Q Do you know whether Barry Levine takes medication for his mental condition?

A I don't. I don't know.

Q Do you know whether he ever has?

A I don't recall.

Q Do you know if he's ever been on medication for mental illness?

A I don't know.

Q Are you aware if any -- okay. You don't know anything about his medication?

A No.

Q You don't know if he's ever taken any?

A Well, he has a mental problem. I assume he does take something. I never asked him what.

Q You're not aware of it?

A I don't know.

Q It's purely an assumption?

A It's an assumption that he has a mental disorder.

Q And therefore he may in the past have taken some medication?

A Anybody with a mental disorder would normally take medication.

Q You don't know -- specifically know whether Barry has or has not or does or does not take medication for any --

A I only assumed that he has.

Q Does your son drink alcohol?

A To my knowledge, absolutely not.

Q Does he have any history of abusing alcohol?

A As I recall -- as I sit here, no. I don't know.

Q Do you know whether or not --

A I don't recall. I don't recall.

Q Do you know whether Barry Levine took any recreational drugs such as cocaine between 1980 and 1992?

A As we're sitting here today, I don't recall.

Q Does your son have a history of delusional behavior, if you know?

A I don't know what delusional behavior means.

Q When things are not happening but he thinks they are.

A I have no -- I don't know. I have no -- I don't know.

Q Okay. Does he have any history of paranoia, if you know?

A Not that I know of.

Q Was there any incident concerning the telephones at the office?

A Telephones in the office?

Q Which effected -- and Mr. Levine's threat to sabotage their functioning or to change their functioning; do you recall?

MR. MOUKAWSHER: Objection to form.

THE WITNESS: I don't recall -- as we're here today, I don't recall.

BY MR. CORCORAN, III:

Q Have you ever spoken with anyone regarding this case?

A Regarding what?
Q This case other than Mr. Moukawsher?
A Only Mr. Moukawsher.
Q Ever spoken with Gerry about it?
A No. I -- as I said before, I had one conversation with Gerry. He said to me he hopes Barry wins. How about that one, Gerry?
Q Have you ever spoken with Dan Carter about that?
A Absolutely not. I haven't talked to Dan Carter in three years.
Q Do you get along with Dan Carter?
A For years I haven't talked to him.
Q Why not? Do you not get along with him?
A He doesn't get along with me.
Q Why?
A I think he's jealous.
Q Of what?
A Only my opinion.
Q What's your opinion?
A Enough said.
Q Not enough said. I have a question. What's your opinion?
A In my opinion, he'd do anything to doublecross me.
Q Why?

A I don't know. Ask him.

Q Did you ever tell Gerry with respect to this case to stay out of this because it's not his money, it's Webster's money?

A Never.

MR. CORCORAN, III: That's all I have.

MR. MOUKAWSHER: Can we take five minutes -- I can make my questions faster if we take two minutes.

(Whereupon a short recess was taken.)

CROSS-EXAMINATION

BY MR. MOUKAWSHER:

Q Mr. Levine, with respect to the years 1980 through 1992, during those years do you recollect Barry ever telling you he was waiving off his contribution to the profit sharing plan in exchange for a larger bonus payment?

A Barry never came to me about any waivers. As I said in my deposition a couple minutes ago, if he ever did, I would discourage whole heartly.

Q It's fair to say as best you can recollect you never told him to waive off and, in fact, that would be inconsistent with the advice you would have given?

A It would be against my -- against my grain.

Q Why would it be against your grain?

A I'm in the business of retirement planing and estate planning. The key to my planning is putting money aside for future use. And waiving off a profit sharing plan is the very worst thing you could do against saving money. It's the best savings program in the world.

Q We've been talking about two things here. One, someone waiving off. Signing a waiver and giving it to Dan Carter; and two, the separate act of a person getting a bonus. With respect to the first act of a person waiving off, was it possible during this time period that someone could have signed a waiver or waived off with Dan Carter without you finding out about the waiver itself?

MR. CORCORAN, III: Objection to the form of the question.

THE WITNESS: Absolutely, yes.

BY MR. MOUKAWSHER:

Q Why was it possible that could happen without you finding out about the waiver?

A Dan Carter ran the plan any way he wanted to run the plan. I was too business to do -- I was working ten to twelve hours a day and I had paid no attention whatsoever to the administration of the plan.

Q You did pay a great deal of attention to the year-end bonuses and the compensation of the employees?

A I was in charge of that.

Q And so while a person might have been able to sign a waiver without your finding out about it a person, I take it, could not have received extra compensation in exchange for that waiver without your finding out about it, correct?

MR. CORCORAN, III: Objection to the form of the question.

THE WITNESS: Absolutely had to go through me. I was in charge of compensation.

BY MR. MOUKAWSHER:

Q And given that you were in charge of this -- of that issue, did you ever approve extra compensation for Barry that was given in exchange for him waiving off his contributions to the profit sharing plan?

A No.

Q And did you ever -- do you ever recollect it being discussed that he should get additional compensation for having waived off his profit sharing contribution during this period 1980 to 1992?

A To my knowledge, it was never discussed.

Q And would it be fair to say that to your knowledge it never happened?

MR. CORCORAN, III: Objection to the form.

THE WITNESS: What never happened?

BY MR. MOUKAWSHER:

Q In other words, to the best of your knowledge and belief during 1980 to 1992, would it be fair to say that based on the testimony you have just given that as far as you know Barry never received extra compensation from the company in exchange for waiving off his contribution to the profit sharing plan?

MR. CORCORAN, III: Objection to the form.

THE WITNESS: As far as I know, he never received compensation by waiving off.

BY MR. MOUKAWSHER:

Q He could not have received that extra compensation without you knowing about it?

A That's correct. It had to go through me.

Q In your professional capacity, have you ever advised clients with respect to how they should handle waive-offs of plan contributions?

A Yes. I've have discussed that with many clients.

Q What did you -- what did you advise them on that issue?

A If a client or an employee decides to waive off, we would have a line item on the ledger sheet where the amount the money they would have gotten is listed and added to the -- added to the compensation usually through

a bonus. It had to be on a ledger sheet to make this thing work.

Q Is it your testimony that it would have been on the ledger sheet as a separate and district line item?

A Absolutely, correct.

Q Why would it be important to distinguish between a line item of that nature and the payment of an ordinary bonus?

MR. CORCORAN, III: Objection to the form.

THE WITNESS: Because a bonus is based -- a bonus or income is a decision of the parties and any extra bonus would come because of the line item on the ledger and because of the waiver.

BY MR. MOUKAWSHER:

Q Do you believe that during 1980 to 1992 Dan Carter had a motive to reduce the total compensation and benefits Barry received from the agency?

MR. CORCORAN, III: Objection to the form.

THE WITNESS: There's no question he had a desire because he -- he hated Barry. He was jealous of Barry. Obviously he disliked me intensely, and he would have done it just to get even with me.

BY MR. MOUKAWSHER:

Q And did his dislike of you and resentment of

Barry have anything to do with Barry's compensation benefits?

A The only way he could get at Barry was to get him to waive off the plan because that's the way he would get less benefits or less indirect compensation by getting off the plan.

Q And he couldn't do it through effecting the bonuses, I take it, because that would have required your knowledge?

A Absolutely. He couldn't do it through the corporation because he's got to go through me and that wouldn't work.

Q But he could do it through the profit sharing plan because you didn't directly supervise that?

A I never supervised it. Absolutely.

Q And do you -- you believe that some of Dan Carter's resent against Barry had its origin in the fact Barry was compensated in a manner roughly equal to that of Dan Carter?

A I'll answer that. For many years both he and Gerry fought the idea that I allowed Barry to get almost equal to their compensation because they thought Barry wasn't worth what he was getting, and I fought them because they -- he was getting my compensation that I should have gotten if Barry wasn't there.

Q So it's fair to say that Dan Carter repeatedly voiced his resentment about that compensation structure to you during those years; is that correct?

A More so -- he came to me several times, more so than Gerry. Gerry resented it as well but Dan went wild with resentment.

Q With respect to the way Retirement Planning Associates worked with the profit sharing plan, would it be fair to say that Retirement Associates was acting as an agent for the Levine Agency in administering the profit?

A They were strictly administrators. Dan Carter was trustee of the corporate plan, and he administered as a member of the retirement plan.

Q Retirement Planning Associates' job was then to carry out the wishes of the Levine Agency, correct?

A That's correct. That's correct. His job was strictly a paperwork job.

MR. CORCORAN, III: I'll mark this document as Plaintiff's 1.

(Plaintiff's Exhibit 1 was marked for identification, described in index.)

BY MR. MOUKAWSHER:

Q Mr. Levine, I'm asking you now to look at Plaintiff's Exhibit 1 and tell me whether you recognize that document?