UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BARRY LEVINE | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:03CV148 (SRU) |
| V. | : | |
| | : | |
| WEBSTER INSURANCE, INC. | : | |
| | : | |
| Defendant. | : | DECEMBER 7, 2004 |

**DEFENDANT'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Webster Insurance, Inc. ("Webster"), is entitled to summary judgment on all counts of the plaintiff's Complaint. Despite the plaintiff's futile attempts to generate issues of fact where none exist, there are simply no disputed facts that are essential to any element of the plaintiff's case that must be tried. Therefore, Webster is entitled to summary judgment as a matter of law.

**I.    Webster Is Not Liable for the Actions of its Subsidiaries because the Plaintiff Has Failed to Establish Sufficient Facts to Pierce the Corporate Veil.**

Although the plaintiff accurately describes Connecticut corporate law and the two tests employed by courts to pierce a corporate veil,[1] he does not set forth any evidence to preclude summary judgment in Webster's favor under either test. In support of its September 17, 2004 Summary Judgment Motion, Webster provided the Affidavit of John J. Queirolo, in which Mr. Queirolo attested that LLIA, Inc., Louis Levine Agency, Inc. ("Louis Levine") and Retirement Planning Associates, Inc. ("RPA") are all subsidiaries, either direct or indirect, of Webster and that each is a legally separate and distinct corporation which follows all corporate formalities required by law.[2] In his brief, the plaintiff states his disagreement to such facts but provides no evidence to support his disagreement.

---

[1] Zaist v. Olson, 154 Conn. 563 (1967); Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc., 187 Conn. 544 (1982); SFA Folio Collections, Inc. v. Bannon, 217 Conn. 220 (1991); Davenport v. Quinn, 53 Conn. App. 282 (1999); and In re Silicon Gel Breast Implants Product Liability Litigation, 887 F. Supp. 1447 (N.D. Ala. 1995).
[2] See Exhibit A to Webster's Local Rule 56(a)(1) Statement of Undisputed Facts ("Webster's Motion"). Mr. Queirolo is President and Chief Executive Officer ("CEO") of Webster.

In a desperate attempt to create an issue of fact to halt entry of summary judgment in Webster's favor, the plaintiff baldly asserts that "business property, employees and bank accounts are commingled among the affiliated corporations."[3] Importantly, Webster does not dispute that Mr. Queirolo, President and CEO of Webster, is also the President of LLIA, Inc., Louis Levine and RPA; Gerald Levine and Daniel Carter ("Carter"), two of Webster's thousands of employees, are also officers of LLIA, Inc. and Louis Levine (G. Levine only); Webster and these subsidiaries operate in the same office in Waterford; and a newspaper advertisement demonstrating that Levine is a division of Webster ran in the New London Day.[4] The plaintiff's statement that bank accounts are commingled, however, is simply not true, and is based only upon admissions made by Michael Levine, the plaintiff's father, that many years prior to Webster's acquisition of the companies' stock, when he was president of the Levine Companies[5], he ran the companies in disregard of corporate entity laws.[6] However, the plaintiff provides no evidence, nor can he, that Webster and its subsidiaries have commingled bank accounts or assets, or have in any way disregarded appropriate corporate formalities. The plaintiff has merely made an unsubstantiated and irrelevant statement in his attempt to create a dispute of fact.

In his brief, the plaintiff articulates the two theories under which a court may pierce the corporate veil. However, he fails to mention that "the corporate veil is pierced only under exceptional circumstances . . . [only] where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice."[7] In no way do the facts of this case rise to such level. Under the "instrumentality rule", the plaintiff is required to prove three elements:

> (1) control, not mere majority or complete stock ownership, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the

---

[3] Plaintiff's Objection dated November 5, 2004 ("Objection") at Page 11.
[4] See Exhibit 22 to Objection.
[5] LLIA, Inc., Louis Levine Agency, Inc., Retirement Planning Associates, Inc., and Levine Financial Services, Inc. are herein sometimes collectively referred to as "Levine Companies".
[6] See Exhibit 3 to Objection at Pages 54-55.
[7] Tomasso, 187 Conn. at 557

> violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; <u>and</u> (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."[8]

To prevail under the "identity rule", the plaintiff must show:

> that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape one corporation for the benefit of the whole enterprise.[9]

The undisputed facts of this case satisfy none of the elements of either rule.

Like the plaintiffs in <u>Tomasso</u> and <u>SFA Folio</u> (where the court refused to find sufficient evidence to pierce the corporate veil under either rule), the plaintiff here has not offered any evidence to show this to be such an extreme circumstance. Unlike the plaintiffs in <u>Davenport</u>, where the court pierced the corporate veil under the identity rule, the plaintiff in this case has not provided a scintilla of evidence that corporate formalities were disregarded or that "funds were intermingled among sibling corporations and for personal uses," as was the situation in that case.[10] The facts of the present case are distinguishable from those in <u>Zaist</u>, where an individual who owned a dominating stock interest in the corporate entity, was president, treasurer and a director of two corporations, and completely disregarded corporate formalities.

In <u>Zaist</u>, the court specifically said that piercing the corporate veil was necessary, not because the individual held these positions, but rather it was necessary because of the manner in which he utilized them. "The essential purposes of the corporate structure, including stockholder immunity, must and will be protected when the corporation functions in the normal manner contemplated and permitted by law. When it functions in this manner, there is nothing insidious in stockholder control, interlocking directorates or identity of officers."[11] Here, Webster is a stockholder of the subsidiaries and certain individuals hold various officer positions among the affiliated companies, but these facts do not warrant the court to pierce

---

[8] <u>Id.</u> at 554.
[9] <u>Id.</u>
[10] <u>Davenport</u>, 53 Conn. App. at 301-03.
[11] <u>Zaist</u>, 154 Conn. at 574.

the corporate veil.[12] Additionally, not all of the officers of Webster are identical to the officers of the subsidiaries, and neither Gerald Levine nor Carter is an officer of Webster.[13] Moreover, the record contains not even a scintilla of evidence that Webster has manipulated LLIA, Inc., Louis Levine, or RPA in any way.

The fact that several of the companies operate out of the same building is entirely irrelevant; as the plaintiff shows in his own brief, the companies are, in fact, held out as separate entities from Webster. Although the plaintiff alleges the contrary, it is undisputable that the advertisement which ran in the New London Day newspaper clearly shows Levine as a division of Webster.[14] In fact, the word "Levine" appears four times on the 8 ½" x 5" advertisement, indicating that the Levine Companies are separate from Webster. Thus, contrary to the plaintiff's claims, these entities are not held out to the public as one single entity.

Hence, because there is no evidence of record sufficient to satisfy the elements of either the "instrumentality" or "identity" rule to hold Webster liable for the actions of these subsidiaries, summary judgment should be granted in Webster's favor as to all Counts of the plaintiff's Complaint. Specifically, the undisputed facts do not support the conclusion that Webster controls these subsidiaries in a manipulative manner or that Webster's ownership of the subsidiaries was used, in any way, to commit fraud or the alleged violations at issue here, especially since these allegations pertain to matters which are claimed to have taken place several years before Webster owned these subsidiaries. Moreover, none of the undisputed facts lead one to believe that the independence of any subsidiary was ever terminated. As such, to hold Webster liable for alleged actions of its legally separate and distinct subsidiaries that took place well before Webster became a stockholder of the Levine Companies, would be an injustice. Similarly, to allow plaintiff to amend his Complaint at this late hour would certainly be highly prejudicial to Webster. Webster, therefore, objects to the plaintiff's request to amend its Complaint under Rule 15, and requests that this

---

[12] See SFA Folio, 217 Conn. at 222-23 ("it is a fundamental principal of corporate law that the parent corporation and its subsidiaries are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical officers."(emphasis added)).
[13] See Exhibit A-1 attached hereto.
[14] See Exhibit 22 to Opposition.

court enter summary judgment in its favor on the grounds that it is simply not liable for the actions of its subsidiaries.

## II. The Undisputed Facts Reveal that in the Early 1980's the Plaintiff Had Actual Knowledge of the Alleged Fraud and, Thus, is Time Barred from Prevailing on Count One of His Complaint.

ERISA § 413, which applies to actions arising from a breach of fiduciary duty, states that "in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation."[15] The statutory period begins to run when the person allegedly harmed acquires "actual knowledge" of the occurrence, meaning "when [the plaintiff] has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his . . . duty or otherwise violated the Act."[16] "Actual knowledge" has been defined as knowledge of the "essential facts of the transaction or conduct constituting the violation" and has been articulated to mean "it is not necessary for a potential plaintiff to have knowledge of every last detail of the transaction, or knowledge of its illegality."[17] Here, the plaintiff clearly had knowledge of the essential facts of his claim in 1982 and 1983 when he admits having learned that Gerald Levine and Carter were not waiving their rights to a contribution to the Levine Companies Profit Sharing Plan ("Plan"). Therefore, Count One of the plaintiff's Complaint is barred by ERISA's six year statute of limitations.

The undisputed facts material to this issue are simple. The plaintiff knew in 1982 that only he and his cousin Andrew Levine waived their pension contributions for the 1982 plan year because he handwrote the word "waived" only by his and Andrew's name on a sheet depicting pension plan contribution figures for the that year. The plaintiff also knew in 1983 that he was the only one who received cash in lieu of a contribution for the 1983 plan year when he handwrote the only entry labeled "pension moneys" in the company's payroll records.

---

[15] 29 U.S.C. § 1113 (West 2004).
[16] Broga v. Northeast Util., 315 F. Supp. 2d 212, 221 (D. Conn. 2004).
[17] Caputo v. Pfizer, 267 F.3d 181, 193 (2d Cir. 2001).

Yet, in his opposition the plaintiff attempts to explain these facts by stating, with reference to the sheet containing the 1982 calculations, that "[a]t most, these notes and the word "waived" raise the possibility that Levine did receive cash in 1982 . . . and perhaps was not misled by Carter that year. They do not demonstrate that Levine had, back then, knowledge concerning a whole series of misrepresentations made by Carter over the course of a decade." He also tries to create ambiguities by focusing on Webster's reference to the word "spreadsheet", and delving into an explanation that such term implies a set of calculations that were contrived by the plaintiff.[18] In addition, the plaintiff discusses, at length, whether or not his sole duty was to maintain the payroll records in the early 1980's. *However, whether the plaintiff completed the math necessary to reach the numbers that he wrote on that sheet for 1982, and whether he was the company's "main" payroll person, is completely immaterial to the issue of when he first had knowledge that the statements allegedly made by Carter were false.* The undisputed fact remains that in 1982 he knew that only he and his cousin Andrew waived their pension contributions for the 1982 plan year, and that Carter and Gerald Levine did not. He also knew that he was the only one to receive cash in lieu of a contribution for the 1983 plan year. Therefore, although the plaintiff tries to concoct ambiguities and issues of fact, his attempt focuses on facts that are immaterial to this statute of limitations issue, and creates no ambiguity as to facts that are material to the issue.

Moreover, the law requires that when a plaintiff has actual knowledge that the representations made to him were false, he has actual knowledge of a claim and must bring that claim within six years of acquiring that knowledge. Webster, therefore, disagrees with the plaintiff that the knowledge he had in 1982, at best, hinders a claim for benefits due in 1982 because such knowledge bars him from claiming that he was misled in future years by the same alleged representations. In his Complaint, the plaintiff claims that "on or about December of each year . . . Carter . . . told [him] that all of the agency owners had agreed

---

[18] "Spreadsheet" has been defined as a "display, with multiple columns and rows . . . ." Am. Heritage Dict. (3rd Ed. 1996). Nothing in the term "spreadsheet" infers that the plaintiff was responsible for contriving the numbers written in the columns and rows. In fact, Webster does not dispute whether or not the plaintiff made such calculations, as the plaintiff explained in his deposition that he was merely told what to write. See Exhibit D to Webster's Motion.

to 'waive off' their contributions to the [Plan] and that, for this reason, he should do the same."[19] In his interrogatory responses, the plaintiff further narrows the scope of the alleged statements to "[a]t various dates and times between 1980 and 1992, . . . Carter told [him] that [Carter and Gerald Levine] were also waiving participation."[20] Finally, in his deposition, the plaintiff could not recount for Attorney Corcoran any details of the any specific conversation between Carter and him regarding the alleged representations, but explained only that such conversations eventually ceased because the process became rote.[21] He explained that Carter no longer said anything to him, because he knew the process, and just signed the waivers.[22] Therefore, under the applicable law, since the plaintiff knew in 1982 and 1983 that Carter and Gerald Levine had not waived their participation in the Plan, the plaintiff cannot now claim that he was fraudulently induced by the alleged statements for any subsequent year, especially since, (according to the plaintiff), the actual verbal statements eventually ceased. Thus, Webster is entitled to summary judgment as to Count One of the plaintiff's Complaint because such claim is barred by ERISA's statute of limitations.

### III. Carter's Duties as the Third Party Administrator Were Purely Administrative and Ministerial, Thus, He Was Not An ERISA Fiduciary.

Here, again, the plaintiff tries to concoct ambiguities where none exist. First, he incorrectly states that Webster offered conflicting evidence as to Carter's function in the administration of the Plan. Then he tries to confuse the facts by drawing completely illogical inferences, suggesting that because Celeste Calabria took direction from Carter, it was impossible for Carter to take direction from Michael Levine. However, the undisputed facts in the record do not support the plaintiff's assertions, and the illogical inferences drawn by the plaintiff do not create genuine issues of material fact.

In its interrogatories, Webster stated that Carter worked for RPA, which was the technical and clerical administrator of the Plan.[23] It also stated that Calabria assisted Carter in this task.[24] However, to

---

[19] See Exhibit 14 to Objection.
[20] See Exhibit B-1 attached hereto at Answer 6.
[21] See Exhibit C-1 attached hereto at Pages 145-48.
[22] See Id.
[23] See Exhibit 5 to Objection at Answers 3 & 4.
[24] See Id.

infer that Calabria's assistance to Carter implies that Michael Levine could not have directed Carter's clerical administration of the Plan, is simply illogical. Additionally, the plaintiff confuses Carter and RPA's role with the role of the Plan Administrator, which is defined by the Plan documents as the employer (i.e. Levine Companies). Nowhere do the Plan documents define "Plan Administrator" as the third party administrator, or state that RPA was the Plan Administrator. Carter and RPA's role was the technical and clerical administration of the plan (i.e. handling the paperwork and filings, etc.), while the Levine Companies was responsible for the "decisions concerning the operation of the plan and the eligibility for benefits."[25] Overwhelming evidence in the record, including Michael Levine's own sworn deposition testimony in this case, his testimony in the plaintiff's 1997 lawsuit, the plaintiff's testimony in this case and the 1997 lawsuit, and Carter's testimony in this case, indicates that it was Michael Levine, not Carter, who ran the Levine Companies. Most notably, the plaintiff has failed to supply any definitive evidence, beyond his belief and a self-serving statement made by his father, to the contrary.

Whether or not a person is a fiduciary is determined by the functions performed by that person.[26] The individual must have discretion and control.[27] Parties who perform "ministerial" functions carried out within a "framework of policies, interpretations, rules, practices, and procedures made by other persons" are not considered ERISA fiduciaries.[28] Therefore, even resolving any true ambiguity in the plaintiff's favor, Michael Levine, as the boss of the Levine Companies, was the Plan Administrator and Carter handled the ministerial duties of the administration of the Plan in the technical and clerical sense, as directed by Michael Levine. Carter had no discretion to act as the Plan Administrator. As such, Carter was not the plan fiduciary and could not commit the fraud alleged. Moreover, Webster maintains that the statements allegedly made by Carter are completely immaterial and do not rise to the level of fraud. Therefore, summary judgment in Webster's favor is appropriate as to Count One of the plaintiff's Complaint.

---

[25] See Schedule A to Exhibit G to Webster's Motion.
[26] Blatt v. Marshall & Lassman, 812 F.2d 810, 812 (2d Cir. 1987).
[27] 29 C.F.R. § 2509.75-8.
[28] 29 C.F.R. § 2509.75-8 at D.2.

## IV. Webster is Entitled to Summary Judgment as to Count Two of the Plaintiff's Complaint because the Plaintiff was not Eligible to Participate and, Thus, Lacks Standing.

The facts material to this issue are not in dispute. The plaintiff was fired, and he signed an agreement called "Employment Agreement" that evidenced his separation from the company.[29] It was the Levine Companies' practice at that time to call employment separation agreements "employment" agreements[30] because there were certain tax benefits to both parties under those agreements.[31] The plaintiff's employment separation agreement did not require the plaintiff to perform any services on behalf of the Levine Companies at any time after January 1, 1993, nor did the plaintiff perform any duties on behalf of the Levine Companies after such time.[32]

In his brief the plaintiff tries, once again, to manufacture a dispute of fact where none exists. He merely states that he was a participant because of the title and wording of the "Employment Agreement" but he does not provide even a scintilla of definitive evidence that he met the eligibility requirements set forth in the Levine Companies Salary Savings Plan ("401(k) Plan") documents at any time. For example, he provides no evidence, nor can he, that he satisfied the Years of Service and Hours of Service requirements of the 401(k) Plan. Although the plaintiff would like the court to infer an ambiguity between the facts as stated by Webster and those stated by the plaintiff, the only ambiguity is between what the plaintiff claimed in his 1997 lawsuit and what he now claims here.[33]

Thus, the plaintiff was not eligible to participate in the 401(k) Plan. Moreover, the plaintiff's claim for benefits under the 401(k) Plan is untimely and is barred by the statute of limitations. Therefore, Webster is entitled to summary judgment on Count Two of the plaintiff's Complaint because the plaintiff does not have standing to bring such claim.

---

[29] See Exhibits C, D, E, & J to Webster's Motion.
[30] See Exhibits D & J to Webster's Motion.
[31] See Exhibit C to Webster's Motion at Page 43; see also Exhibit E to Webster's Motion at Pages 57-58.
[32] See Exhibit D to Webster's Motion.
[33] In the plaintiff's 1997 case, he attempted to convince the court that he could not work due to a mental disability. In connection with that claim, both the plaintiff and his father testified that the plaintiff was not employed by the Levine Companies and that the "Employment Agreement" was a severance agreement evidencing his departure from the company. Here, however, the plaintiff attempts to assert exactly the opposite. Therefore, the only ambiguity as to the facts on this issue is between what the plaintiff claimed in 1997 and what he claims now.

### V. Plaintiff's Claims are Barred Because Neither is Equitable in Nature.

Although the plaintiff characterizes his claims for monetary damages as claims for appropriate equitable relief under ERISA § 502(a)(3), the plaintiff essentially seeks compensation for its losses. Webster maintains its position that the plaintiff's claims are inappropriate under ERISA.[34] The Supreme Court has ruled that a plaintiff may seek restitution in equity, only where the money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.[35] Additionally, the Second Circuit has expressly recognized that the Supreme Court has "repeated its belief that ERISA's express remedies, as the product of long and careful study and compromise, should remain exclusive.[36]  Whether the plaintiff's claim in this matter is contract-based or not, the court is not at liberty to label a remedy as equitable in this situation, where the undisputed facts reveal that the plaintiff repeatedly made a voluntary decision to waive his right to receive a Plan contribution and where the plaintiff was not eligible to participate in the 401(k) Plan. As such, his claims for monetary damages are inappropriate under ERISA and Webster should be granted summary judgment on this issue.

### VI. Conclusion

Based on the foregoing, there is no genuine issue of any material fact that must be tried. Therefore, under all relevant law, Webster is entitled to summary judgment on all counts of the plaintiff's Complaint.

---

[34] 29 U.S.C. § 1132 (a)(3) (West 2004).
[35] Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002).
[36] Gerosa v. Savasta & Co., 329 F. 3d 317, 322 (2d Cir. 2003)(citing Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 375-76 (2002)).

CARMODY & TORRANCE LLP
Attorneys at Law
50 Leavenworth Street
Post Office Box 1110
Waterbury, CT 06721-1110
Telephone: 203 573-1200
10

Respectfully Submitted,

**THE DEFENDANT,
WEBSTER INSURANCE, INC.**

BY: *Kristi Aalberg*
Charles F. Corcoran, Esq. (ct02499)
Kristi D. Aalberg, Esq.(ct23970)
Carmody & Torrance LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509
Telephone: (203) 777-5501
Facsimile:  (203) 784-3199

## **CERTIFICATION**

This is to certify that a copy of the foregoing was filed electronically on the above-captioned date. Notice of the filing will be sent to each party of record electronically by operation of the Court's electronic filing system.

Thomas G. Moukawsher, Esq.
Moukawsher & Walsh, L.L.C.
328 Mitchell Street
P.O. Box 966
Groton, CT 06340

Ian O. Smith, Esq.
Moukawsher & Walsh, L.L.C.
21 Oak Street
Suite 209
Hartford, CT 06106

_____
Kristi D. Aalberg, Esq.