UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BARRY B. LEVINE | : | CIVIL ACTION NO. |
| | : | 3:03 CV 148 (SRU) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE LOUIS LEVINE AGENCY, INC. | : | |
| And WEBSTER INSURANCE, INC., | : | |
| | : | |
| Defendants. | : | MARCH 22, 2005 |

**PLAINTIFF'S RESPONSE TO SUPPLEMENTAL MEMORANDUM OF LAW**

**I.   INTRODUCTION**

After trying to sandbag Levine with its last minute claim about proper parties, Webster's latest gambit is to try to smear the case with a red herring concerning the timing of plaintiff's counsel's disclosure of the decision in *Coan v. Kaufman.*[1]  The Court shouldn't be distracted -- once again Webster has its facts wrong.  The Court should, however, stay its summary judgment decision until the Second Circuit decides *Coan v. Kaufman*.  If, on the other hand, it opts to decide the motion it should reject *Coan* and the defendants' other arguments for summary judgment.

**II.  *COAN V. KAUFMAN***

   **A.  Why Levine Brings *Coan* to the Court's Attention Now.**

On December 9, 2004 this Court (Kravitz, J.) in *Coan v. Kaufman* reaffirmed summary judgment for the defendants following reconsideration.  Most of the dispute in

---

[1] 349 F. Supp. 2d 271 (D. Conn. 2004)(December 9, 2004 affirmation following reconsideration of an August 30, 2004 summary judgment decision in favor of defendants, reported at 333 F. Supp. 2d 14 (D. Conn. 2004)).

*Coan* was over whether Coan had standing in her claim and whether the rules regarding stockholder derivative suits applied to ERISA derivative actions. The Court and parties (at least in this Court) gave less attention to the claim about the appropriate scope of equitable relief. Thomas G. Moukawsher was principally responsible for *Coan*, while Ian Smith was principally responsible for this case.[2] In February 2005, Moukawsher remembered that the absence of appropriate equitable relief was the fourth of Webster's four arguments for summary judgment in this case and told Smith to tell Webster and the Court about *Coan* and ask for a stay during the *Coan* appeal.[3] On March 1, 2005, Smith e-mailed Webster's counsel, Kristi Aalberg, told her about *Coan*, and asked her whether she and her co-counsel, Charles Corcoran, would agree to Levine's request for a stay. Corcoran took until March 14, 2005 to reply and, in any case, refused to agree to a stay. On March 15, 2005, Levine disclosed *Coan* to the Court and asked for a stay. The same day, Webster filed its supplemental memo including its attack on Levine's lawyers.

Webster's memo is filled with baseless hyperbole. It says Levine's attorneys should be sanctioned and Webster should be granted summary judgment because Levine's attorneys "blatantly" and "completely unprofessionally" violated Rule 3.3 of the Rules of Professional Conduct.[4] Webster says Levine's lawyers are "unphased [sic] by the applicability of the Rules of Professional Conduct" and that the Court must "put an end to such antics" by sanctioning them.[5]

Rule 3.3 says it's unethical for lawyers to knowingly conceal from the Court adverse authorities from the controlling jurisdiction. Yet Webster doesn't accuse

---

[2] Exhibit A, Declaration of Moukawsher; Exhibit B, Declaration of Smith.
[3] Exhibit A, Declaration of Moukawsher; Exhibit B, Declaration of Smith.
[4] Webster's Supplemental brief at 6, 12.
[5] *Id.* at 11-12.

2

Levine's lawyers of knowingly concealing from the Court a controlling adverse authority -- Webster merely complains that Levine's lawyers waited to reveal it until after the *Coan* Court reconsidered its ruling and entered its final judgment. The Rule doesn't say anything about requiring lawyers to reveal adverse authorities before they become final, and thus become authorities. Moreover, Levine's counsel brought *Coan* to the Court's attention as soon as they realized it might affect one of the issues before the Court. Accordingly, Levine's lawyers haven't violated Rule 3.3.

Webster's lawyers' latest angry outburst is similar to the charges they baselessly flung at Levine's lawyers after a clerical error caused Levine's Amended Complaint to be docketed separately, when it should have been treated as an attachment to his Motion for Leave to Amend his complaint. Seizing on the clerical error, ignoring the docket notation calling it an error, and the fact that it followed Levine's *motion* for leave to amend, Webster's lawyers excoriated Levine's lawyers for filing an amended complaint without leave of the Court in "blatant" and "obvious" disregard for the rules. Webster demanded then too that the Court sanction Levine by ordering him to pay "all of its fees and costs, including attorney's fees…."[6] As it did in that instance, in this instance the Court should ignore Webster's lawyers' latest baseless attempt to win summary judgment by personally attacking opposing counsel.[7]

**B. This Court Isn't Bound by the District Court Decision in *Coan v. Kaufman* and Shouldn't Follow It.**

---

[6] Defendant's Objection to Plaintiff's Amended Complaint at 1, 3.

[7] For eight years (and ultimately unsuccessfully) Webster's lawyer Charles Corcoran defended Northeast Utilities against company retirees represented by Levine's lawyer Thomas G. Moukawsher. *See Broga v. Northeast Utilities*, 315 F. Supp. 2d 212 (2004). Corcoran tried the same smear tactics in that case, including insisting an irrelevant case was relevant and that Moukawsher "blatantly" violated Rule 3.3 by failing to tell the Court about it. This non-violation is undoubtedly the basis for Corcoran's unsupported claim here that violating Rule 3.3 is plaintiff's counsel's "common practice." The Court in *Broga* rightly ignored Corcoran. Exhibit A, Declaration of Moukawsher.

While a District Court is bound by a Court of Appeals decision from its circuit, it isn't bound by a decision of any other District Court in the circuit, even when the decision is from a Court in the same district. As the Second Circuit held in 1987 in *Hawkins v. Steingut*, "Although district courts within a particular circuit will frequently find each other's decisions persuasive, they remain free to disagree."[8] The Court's rationale in *Hawkins* has been followed by District Courts in Connecticut. In 1992, the Court in *Spear v. West Hartford* said that "the doctrine of *stare decisis* does not compel one district judge to follow the decision of another in the same district and, consequently, there is no such thing as 'the law of the district.'"[9] This Court is therefore not bound by the Court's summary judgment ruling in *Coan*.[10]

Not only is this Court not required to follow the *Coan* decision, but it shouldn't follow it because it's not consistent with Supreme Court decisions, the common law of trusts, and Second Circuit holdings. Levine's action is a suit by a plan beneficiary against the plan fiduciary for misrepresentations it made. The question presented here is whether this suit is typical of those brought in the historic courts of equity, thus justifying monetary relief under ERISA §502(a)(3). Because the answer is "yes," the District Court may grant Levine make whole monetary relief.

     **1.**    *Mertens* **and** *Great West***.**

In 1993, in *Mertens v. Hewett, Inc.*, the Supreme Court said that §502(a)(3) only authorizes the courts to give plan participants relief typically available in the historic

---

[8] 829 F.2d 317, 321 (2d Cir. 1987).
[9] 789 F. Supp. 80, 84 (D. Conn., 1992).
[10] In considering staying decision during the appeal or disagreeing with Coan, the Court should note that the U.S. Department of Labor and the AARP are filing briefs in support of Coan's appeal on the equitable relief issue. DOL is charged with interpreting and enforcing ERISA.

courts of equity.[11]  In *Mertens,* the plaintiffs sought money damages against the actuary of an employee benefit plan for allegedly causing plan losses.[12]  The Supreme Court granted certiorari on a narrow question: "whether ERISA authorizes suits for money damages against nonfiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty."[13]  It ruled that Mertens and the other plaintiffs in that case couldn't get relief because they were suing a non-fiduciary for money damages, and such suits were not typical in the historic courts of equity.[14]  The Supreme Court held that when ERISA §502(a)(3) authorizes courts to award "appropriate equitable relief" courts shouldn't interpret this to mean all equitable relief because, historically, the courts of equity on occasion awarded legal relief; if Congress meant Section 502(a)(3) to permit courts to award legal relief it wouldn't have used the limiting word "equitable."  Accordingly, the Court said that ERISA §502(a)(3) should be viewed as permitting the courts to award only those kinds of relief "typically available in equity."[15]  While the Court didn't say it was an exclusive list, it gave as examples of this kind of relief, relief "such as injunction, mandamus, and restitution."[16]

Several years after *Mertens,* in 2002, the Court in *Great West v. Knudson* said that a health care plan's claim for contractual reimbursement against a plan participant was also not the kind of relief typically awarded by the equity courts.[17]  The plaintiff in *Great West v. Knudson* asked the Court to enforce a contractual provision of its benefit plan requiring plan participants to reimburse the plaintiff insurer for medical payments should

---

[11] 508 U.S. 248, 256 (1993).
[12] 508 U.S. at 250.
[13] 508 U.S. at 251.
[14] *Id.* at 256-63.
[15] 508 U.S. at 256.
[16] *Id*.
[17] 534 U.S. 204 (2002).

the participant recover money for these costs in personal injury litigation.[18] The Court held that the relief the plaintiff-insurer asked for was not equitable because it was essentially an action in contract, seeking damages, a classic legal action that could not be dressed up as an action in equity regardless of the label placed upon the amounts awarded.[19] The Court additionally rejected the plaintiff's argument that the money could be deemed restitution because, at least in equity, that remedy typically seeks money that should rightfully be the plaintiffs from an identifiable pool of funds in the possession and control of the defendant.[20] The contract basis of the claim played a prominent part in the Court's analysis in *Great West*:

> Here, petitioners seek, in essence, to impose personal liability on respondents ***for a contractual obligation to pay money*** -- relief that was not typically available in equity." A claim for money due and owing under a contract is 'quintessentially an action at law.'"[21]

### 2.    The Common Law of Trusts.

In contrast to contract remedies, as Section 197 of the *Restatement (Second) of Trusts* says, the remedies of a plan participant against a fiduciary are exclusively equitable.[22] Moreover, trust authorities like the *Restatement*, Bogert & Bogert, and Scott & Fratcher all agree that in a court of equity where a beneficiary sues a fiduciary for breach of trust, monetary relief is equitable relief.[23] And in *Mertens*, the Supreme Court agreed that where the defendant is a fiduciary instead of a service provider, damages are

---

[18] 534 U.S. at 206-09.
[19] *Id*. at 210-11.
[20] *Id*. at 212-14.
[21] 534 U.S. at 210 (citing, *Wal-Mart Stores, Inc.* v. *Wells*, 213 F.3d 398, 401 (7th Cir. 2000) (Posner, J.)(emphasis added).
[22] at 433.
[23] *Restatement supra* at Illustration 1 §205 cmt. c at 459 (examples of money awards); 3 Austin W. Scott & William F. Fratcher, *The Law of Trusts* §199. at 203-204 & 206 (4th ed. 1988)(payment of money is one kind of equitable relief); George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* §701 at 198 (rev. 2d ed. 1982)(money damages against a trustee available in equity).

6

appropriate: "Professional service providers such as actuaries become liable for damages when they cross the line from adviser to fiduciary."[24] A majority of the current Court appears to agree. The Chief Justice, Justice Stevens and Justice O'Connor would have granted relief even under the facts in *Mertens*.[25] In 2004 they were joined by Justices Ginsberg and Breyer concurring in *Aetna Health, Inc. v. Davila*:

> The Government notes a potential amelioration. Recognizing that "this Court has construed Section 502(a)(3) not to authorize an award of money damages against a non-fiduciary," the Government suggests that the Act, as currently written and interpreted, may "allo[w] at least some forms of 'make-whole' relief against a breaching fiduciary in light of the general availability of such relief in equity at the time of the divided bench." Brief for United States as Amicus Curiae 27-28, n 13 (emphases added); cf. ante, at ____, 159 L. Ed. 2d, at 334 ("entity with discretionary authority over benefits determinations" is a "plan fiduciary"); Tr. of Oral Arg. 13 ("Aetna is [a fiduciary]--and CIGNA is for purposes of claims processing."). As the Court points out, respondents here declined the opportunity to amend their complaints to state claims for relief under § 502(a); the District Court, therefore, properly dismissed their suits with prejudice. See ante, at ____, n 7, 159 L. Ed. 2d, at 335. But the Government's suggestion may indicate an effective remedy others similarly circumstanced might fruitfully pursue.[26]

### 3. *Strom v. Goldman Sachs*.

This Second Circuit has already held that courts can award plan participants make-whole monetary relief against plan fiduciaries under ERISA §502(a)(3). In 1999 this Court considered the issue in *Strom v. Goldman Sachs*.[27] In *Strom* a plan beneficiary sued an ERISA plan for negligently handling a life insurance application leaving the plan beneficiary with a fraction of the benefits she would otherwise have had when the insured plan participant unexpectedly died.[28] The Second Circuit held that a court could give the

---

[24] 508 U.S. at 262.
[25] 508 U.S. at 263 (dissenting opinion).
[26] ___U.S. ___, 124 S.Ct. 2488, 2502-2504 (2004).
[27] 202 F.3d 138 (F.3d 1999).
[28] *Id.* at 140-41.

plaintiff make-whole monetary relief under ERISA §502(a)(3), consisting of the insurance benefits the plaintiff would have gotten if the plan administrator had fulfilled its duties. *Strom*'s most important feature is that we can explain the plaintiff's success in that case by the same distinction Levine tries to make here. Distinguishing *Mertens* and its 1996 holding in *Geller v. County Line Auto Sales, Inc.*[29], the Court said that Section 502(a)(3) provides broader remedies for suits against fiduciaries than it does against nonfiduciaries.[30] The Court held that "make whole relief" -- relief limited to the direct economic consequence of the breach and not including consequential damages -- suitably confines the relief to traditional equitable relief, especially in light of Congress' other uses of the words in places like Title VII where it has been interpreted to include monetary awards in the form of back pay:

> In sum, all of the relevant circumstances point to one conclusion. Actions for breach of trust historically were within the exclusive jurisdiction of equity. Congress appears to regard "make whole" relief such as that sought here as "equitable." Only such a construction would serve Congress' purpose of affording meaningful relief to benefit plan beneficiaries in circumstances such as these. We therefore hold that the relief sought here is "equitable relief" within the meaning of Section 502(a)(3)(B) and that such relief would be "appropriate" in the event plaintiff establishes liability on the part of Goldman. Accordingly, the dismissal of the complaint as against Goldman must be reversed.[31]

The Second Circuit's interpretation of Section 502(a)(3) in *Strom* is consistent with *Mertens* and *Great West*. To interpret Section 502(a)(3) any other way would worsen the remedies dilemma Judge Calabresi, in his partial dissent in the Court's 2003 decision in *Cicio v Doees*, called a "gaping wound" in ERISA law.[32] As Judge Calabresi observed: "it is not too late for the Supreme Court to retrace its Trail of Error and start

---

[29] 86 F.3d 18 (2d Cir. 1996).
[30] *Id. at 143*.
[31] *Strom* at 150.
[32] 321 F.3d 83, 106, 107 (2d Cir. 2003).

8

over from the beginning." Accordingly, there is no reason here, especially in light of Justice Ginsberg's recent uncontradicted comments in *Davila*, for the Court to assume the Supreme Court will not just refuse to "start over" but will actually make matters worse by applying the nonfiduciary rules of *Mertens* and *Great West* to cases like this one where the lawsuit is against a fiduciary. This Court should instead follow the rationale of *Strom* and the 2002 Second Circuit decision *Dunnigan v. Metropolitan Life Insurance Co.*, which granted interest as appropriate equitable relief.[33]

Granting Levine make-whole monetary relief is consistent with the common law, the applicable Supreme Court decisions, and Second Circuit law. ERISA should afford Levine the same relief here.[34]

### 4.     Other Appropriate Equitable Relief.

The Court can still give Levine relief under ERISA §502(a)(3) even if it does not follow *Strom*.

The Court shouldn't rely on *Great West* when it can instead look to the Supreme Court's decision in a breach of fiduciary duty case -- *Varity Corp. v. Howe*.[35] Even if Levine can't get make whole monetary relief, he should be allowed to seek an injunction reinstating the defunct Profit Sharing Plan, requiring the Levine Agency to pay into it the

---

[33] 277 F.3d 223, 229 (2d Cir. 2002)(interest would "make the plaintiff whole by eliminating the effect of a defendant's breach of a fiduciary duty).
[34] The Court reiterated its view about ERISA relief in December, 2004:
> In interpreting the ERISA statute, however, we are constrained to recognize that one of the stated purposes of the statute is to "assure the equitable character of [employee benefit] plans." 29 U.S.C. § 1001(a); see Gallione v. Flaherty, 70 F.3d 724, 727 (2d Cir. 1995). We are confident that the District Court, in exercising jurisdiction over the Local 807 Plan, will keep this overarching purpose in mind. Moreover, "it is well-settled that ERISA grants the court wide discretion in fashioning equitable relief to protect the rights of pension fund beneficiaries." Katsaros v. Cody, 744 F.2d 270, 281 (2d Cir. 1984). Thus, we are also confident that the District Court will exercise its discretion appropriately in formulating any equitable relief to which Arnold may be entitled.

*Arnold v. Lucks*, 392 F.3d 512,_, No. 04-0313, *slip op.* at 9 (2d Cir., 2004).
[35] 516 U.S. 489 (1996).

9

benefits he lost through Carter's breach of fiduciary duty, and directing it to pay the benefits to Levine as required by the terms of the plan. The plaintiffs in *Varity* asked for and received exactly that.

The plaintiffs in *Varity* claimed their employer, acting in its fiduciary capacity, misled them concerning the likely future of the company's benefit plans, causing them to make an ill-informed and ultimately damaging decision regarding their employment status. The Supreme Court upheld the Eighth Circuit's ruling that ERISA §502(a)(3) provided individual relief to the plan participants and let stand the unchallenged form of equitable relief crafted by that circuit.[36] That relief consisted of a kind of reinstatement, ordering the plaintiffs' former employer to permit their participation in the company benefit program during retirement in the face of both their departure from the company and their failure to qualify under the terms of the plan at issue.[37]

The injunctive relief permitted by the Supreme Court in *Varity* has been allowed in circuit courts as well. In 2004 the Ninth Circuit considered *Mathews v. Chevron*.[38] The *Mathews* plaintiffs were plan participants suing a plan fiduciary for breaching its ERISA fiduciary duties by misleading them about a pending severance offer the company was considering.[39] The District Court enjoined the breaching fiduciary to instate the six prevailing plaintiffs into the severance plan at issue and to modify the plan records to put them in the position they would have been in had the breach never occurred.[40] The Ninth Circuit rejected Chevron's claim that in substance the order was nothing more than an order to pay money. The Court held that the District Court's order merely placed the

---

[36] 516 U.S at 515.
[37] *Howe v. Varity Corp.*, 36 F.3d 746, 754-55 (8th Cir. 1994).
[38] 362 F.3d 1172 (9th Cir. 2004).
[39] *Id*. at 1176-78.
[40] *Id*. at 1185-86.

10

plaintiffs in the position they would have been in if the breach hadn't occurred.[41] According to the Court, it was the plan terms and the parties' agreement that the plaintiffs qualified under them that provided benefits, not the Court's order.[42]

Levine is no different from the *Mathews* plaintiffs. If the Court reinstates the plan and orders the trustees to restore Levine's missed contributions to it, the plan terms -- not a court order -- say he gets the benefits. If the Court decides that Levine couldn't potentially get make whole monetary relief under Section 502(a)(3), it should hold that he could potentially get injunctive relief reinstating the plans, ordering the trustees to pay his missed contributions to the plan, and directing the trustees to distribute the benefits to him in accordance with the plans' terms.

### III. THE LEVINE AGENCY'S OTHER ARGUMENTS REMAIN FLAWED

As Levine has already argued in his November 5, 2004 objection to Webster's motion for summary judgment, (1) his claims for benefits under both plans are timely; (2) Carter was a fiduciary of the Profit Sharing Plan; (3) Carter's misrepresentations to Levine were material; and (4) Levine, an employee of the Levine Agency, was eligible to participate in its 401(k) Plan when it was established. Levine incorporates his arguments into this Response to the Levine Agency's summary judgment motion. To the extent that *both* the Levine Agency and Webster now "supplement [Webster's] pending Motion for Summary Judgment,"[43] Levine offers the additional arguments below in opposition to both defendants' summary judgment motions.

### A. The Levine Agency is liable for Carter's Misrepresentations.

---

[41] *Id*. at 1186.
[42] *Id*.
[43] Webster's Supplemental brief at 6.

The parties disagree about Carter's role with respect to the Profit Sharing Plan. As briefed by Levine in his opposition to Webster's summary judgment motion, while Michael Levine may have been the "boss" of the Levine Companies' business operations, it was Carter who had unfettered discretion concerning Plan decisions, and was thus a fiduciary. Levine maintains that the Levine Agency is therefore liable for Carter's misrepresentations. According to the Levine Agency, both Michael Levine and the collective Levine Companies were Plan fiduciaries, but Carter was not.[44] Therefore, says the Levine Agency, it cannot be liable for Carter's misrepresentations to Levine.[45] This is where the Levine Agency is wrong. Even assuming that Carter himself was *not* a Plan fiduciary, the Louis Levine Agency is still liable for his misrepresentations.

In the Third Circuit's 1994 decision *Taylor v. The People's Natural Gas Company*,[46] the plaintiff, like those in *Varity*, was misled about the availability of a company benefit plan. In *Taylor*, the Court

> address[ed] [. . .] whether a plan administrator is liable for statements made by individuals who have been selected as non-fiduciary agents by the plan administrator to assist it in discharging its fiduciary obligation to administer a plan, even though such individuals are formally employees of the plan sponsor, who is not a fiduciary.[47]

The Court in *Taylor* "answer[ed] this question in the affirmative."[48] Here, the plan administrator, the Levine Agency, is liable for the statements made by Carter, whom it selected to assist with Plan administration, even if Carter were found to not be a Plan fiduciary. This is true even if Carter's duties were purely administrative, for the agent in

---

[44] Webster's September 17, 2004 Summary Judgment Brief at 20 – 21.
[45] *Id.* at 14.
[46] 49 F.3d 982 (3d Cir. 1995).
[47] *Id.* at 984.
[48] *Id.*

*Taylor* played the same "ministerial" role to which defendants here claim Carter was restricted.[49]  Interestingly, in *Taylor*, the plan administrator was found liable for the agent's statements even when that agent was an employee of the non-fiduciary plan sponsor.  Here, Carter was an employee of Retirement Planning Associates, the third-party administrator of the Plan and one of the Levine Companies -- the group of Webster subsidiaries which Webster claims *was* a Plan fiduciary.  These facts further support that, under *Taylor*, the Levine Agency is liable for Carter's statements to Levine.

The Second Circuit takes a view similar to the *Taylor* Court's when it comes to a fiduciary's liability for its agent's statements.  In the 2000 decision, *Hudson v. General Dynamics Corp.*, the District Curt held that a fiduciary may be liable for statements made by the person regarded as "the best source for benefits-related information."[50]  The Court held that a fiduciary breach can exist "where an employer intends that certain personnel will serve as the repository of benefits-related information," as was the case with Carter.[51]

**B.  Levine was a Levine Agency Employee and was Eligible to Participate in its 401(k) Plan.**

In its summary judgment memorandum Webster says that Levine "was never an eligible participant" in the 401(k) Plan.[52]  By joining Webster's motion, the Levine Agency now makes the same claim in its Supplemental Brief.  However, Levine proved to Webster over two years ago that, under the 401(k) Plan's language, he met its Years

---

[49] *Id.* at 987.
[50] 118 F. Supp. 2d 248 (D. Conn. 2000)
[51] *Id.* at 249.
[52] Webster's September 17, 2004 Summary Judgment Brief at 1.

13

and Hours of Service eligibility requirements. And Webster never responded to Levine then because it was unable to refute his arguments.

During Levine's summer and fall 2002 administrative appeal process Webster claimed that Levine "failed to meet the [Plan's] Eligibility Requirements set forth in Article III Sections 1 and 2 and the 'Service Rules' set forth in Article IV."[53] In response, Levine explained why he was eligible to participate under the Articles:

> The Levine Companies Salary Savings Plan Summary Plan Description ("SPD") provides a definition of "excluded employees," who *may not* participate in the 401(k) plan. These three categories of employees are (a) leased employees; (b) those whose employment is governed by a collective bargaining agreement under which retirement benefits were the subject of good faith bargaining; and (c) certain nonresident aliens. Mr. Levine does not fall into any of these categories.
>
> Article III, Section 1, of the SPD [. . .] states, "You will be eligible to participate in the Plan if you have completed one (1) Year of Service and have attained age 21." When the Agency's 401(k) plan was established in August of 1996, Mr. Levine had been an employee for over twenty years, and had reached the age of 41, thus satisfying both elements of Section 1.
>
> Webster also cites the "Service Rules" of Article VI of the SPD as support for Levine's ineligibility to participate in the 401(k) plan. Section 1 of this Article explains the process by which an employee gets "credited with" 1000 Hours of Service, the point at which one will have completed a "Year of Service," and thus be eligible to participate in the 401(k) plan. An employee "will," according to Section 2, Subsection (a), "be credited with an Hour of Service for each hour for which [he is] directly or indirectly compensated by [his] Employer for the performance of duties during the Plan Year." Under this rule, Levine would have been eligible for participation in the 401(k) plan in 1996, as long as he had been *compensated* for 1000 hours of work during the period of April 1, 1975 through March 31, 1976, his first year of service with the Agency. Because Mr. Levine was compensated for in excess of 1000 hours of work during that period, he did complete his required Year of Service, and was eligible for participation under Article VI, Sections 1 and 2.
>
> Article VI, Section 3 addresses the "Break in Service," a concept which may affect an employee's eligibility to participate if he or she has not completed more than 500 hours of service within the first 12 months of

---

[53] August 21, 2002 letter from C. Corcoran to T. Moukawsher, Exhibit C at 2.

14

employment. This section does not affect Mr. Levine's eligibility, since, as stated above, he completed more than 1000 hours of service during his first year with the Agency. Finally, Article VI, Section 4 concerns the Uniformed Service Employment and Reemployment Act, which addresses military service and its effect on Plan eligibility. This Section does not apply to Levine because he did not serve in the military during his employment with the Agency.[54]

Webster could not refute Levine's argument that he was eligible, under Articles III and IV, to participate in the 401(k) Plan, so it took an altogether more convenient tack: it said that Levine wasn't a Levine Agency employee at all when the Plan was established. In support of this claim it said Levine's "so-called 'employment' agreement was in fact a separation agreement" that made him ineligible to participate in the 401(k) Plan.[55] In its summary judgment memorandum, Webster dredged up this old argument, and now the Levine Agency does the same. In his November 5, 2004 objection memorandum, Levine refuted all of Webster's arguments that his Employment Agreement was, somehow, a different type of agreement..

Because Levine was an Agency employee who satisfied the Plan's specific requirements, he was eligible to participate in the 401(k) Plan at the time of its formation, and thus has standing in his 401(k) claim.

IV. **CONCLUSION**

As Levine illustrates in this Response, §502(a)(3) is a complex and evolving area of ERISA. Through the *Coan v. Kaufman* appeal, the Second Circuit has the opportunity to clarify what types of relief are available to plan beneficiaries like Coan and Levine under 502(a)(3), and when. The Court should therefore stay its summary judgment

---

[54] September 17, 2002 letter from T. Moukawsher to C. Corcoran, Exhibit D, at 3 – 4.
[55] September 26, 2002 letter from C. Corcoran to T. Moukawsher, Exhibit E.

15

decision until the Second Circuit decides *Coan*. Should the Court choose to make its summary judgment decision now, Levine asks that it disregard the District Court's ruling in *Coan* and deny defendants' motion for summary judgment. But regardless of the Court's decision concerning *Coan*'s impact on this case, it should not be influenced by Webster's baseless attack on Levine's counsel, who've not violated any Rule of Professional Conduct.

        THE PLAINTIFF
        BARRY LEVINE


        By\_\_\_\_/s/ Ian O. Smith_____
        Thomas G. Moukawsher (ct08940)
        Ian O. Smith (ct24135)
        Moukawsher & Walsh, LLC
        21 Oak Street
        Hartford, CT  06016
        (860) 278-7000
        tmoukawsher@mwlawgroup.com
        ismith@mwlawgroup.com

**CERTIFICATION**

I hereby certify that on March 22, 2005, a copy of foregoing Plaintiff's Objection to Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Kristi Dawn Aalberg
Carmody & Torrance
50 Leavenworth St., Po Box 1110
Waterbury, CT 06721-1110
kaalberg@carmodylaw.com

Charles F. Corcoran, III
Carmody & Torrance
195 Church St., PO Box 1950, 18th Floor
New Haven, CT 06509-1950
ccorcoran@carmodylaw.com


        THE PLAINTIFF
        BARRY LEVINE


          /s/ Ian O. Smith
        Thomas G. Moukawsher (ct08940)
        Ian O. Smith (ct24135)
        Moukawsher & Walsh, LLC
        21 Oak Street
        Hartford, CT  06016
        (860) 278-7000
        tmoukawsher@mwlawgroup.com
        ismith@mwlawgroup.com